# UNITED STATES FEDERAL DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Cameron V. Gore, Esq. and ) <br> Heather Woods, ) <br> (husband and wife), ) <br> 2910 Schoolhouse Circle, ) <br> Silver Spring, MD 20902 ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> Robert L. Wilkie, in his official capacity, ) <br> Secretary of the United States ) <br> Department of Veterans Affairs, ) <br> 810 Vermont Avenue, N.W. ) <br> Washington, D.C. 20420; ) <br> ) <br> And ) <br> ) <br> The United States Department of ) <br> Veterans Affairs ) <br> 810 Vermont Avenue, N.W. ) <br> Washington, D.C. 20420; and ) <br> ) <br> And ) <br> ) <br> The United States of America ) <br> ) <br> Defendants. ) | Case No. 1:19-cv-1134 <br><br> **CIVIL COMPLAINT UNDER THE FEDERAL TORT CLAIMS ACT** |

**COME NOW**, the Plaintiffs, Cameron V. Gore, Esq. ("Gore") and Heather Woods ("Woods") by and through undersigned counsel, Christopher E. Brown of THE BROWN FIRM, P.L.L.C., and for their Complaint, seek monetary relief in the amount of $25,000,000.00 under the "Federal Tort Claims Act" ("FTCA") (28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2402 & 2671-2680), as well as declaratory relief, permanent injunctive relief, attorney's fees, and such other relief as this Court deems just and proper.

## Part I. Nature of the Case

1.      The Plaintiffs hereby sue the Defendants under the FTCA based on intentional infliction of emotional distress; negligent infliction of emotional distress, constructive termination, and loss of consortium.  The Plaintiffs believe that the monetary relief requested would be payable not from appropriations of the U.S. Dept. of Veterans Affairs ("VA"), but from the U.S. Gov't "Judgment Fund," a permanent, indefinite appropriation administered at the U.S. Dep't of Treasury (under 28 U.S.C. ch. 171; 28 U.S.C. § 2672, and 31 U.S.C. § 1304), which is used to pay lawfully ordered monetary awards against the United States, and comprise settlements that receive U.S. Dep't of Justice approval.

2.      The Plaintiffs also seek this Court's judicial review per 5 U.S.C. Ch. 7 of the Administrative Procedure Act (the "APA") of a pertinent yet flawed and illegal disciplinary process that occurred within VA as final agency action regarding two attorneys located within the agency's Office of General Counsel ("OGC") to the material detriment of the Plaintiffs in violation of the *"[U.S. Dep't] of Veterans Affairs Accountability and Whistleblower Protection Act of 2017,"* dated June 23, 2017 (Pub. L. No. 115-41) (the "Accountability Act").

### Part II. Parties

3.      Defendant Robert L. Wilkie ("Wilkie") is the Sec'y of VA, which is a Federal agency headquartered in Washington, D.C.  He is being sued in his official capacity.[1]  He is also an attorney who obtained a Juris Doctor (J.D.) from Loyola Univ. School of Law in 1988, and a Master of Laws in Int'l and Comparative Law from Georgetown Univ. Law Center in 1992.[2]

4.      VA is a Federal agency under 5 U.S.C. § 101 with its headquarters located at 810 Vermont Avenue, N.W., Washington, D.C. 20420.  OGC is based at that location with multiple

---

[1] *See* Sec'y Wilkie's bio at the following VA weblink:  https://www.va.gov/opa/bios/secva.asp.
[2] *See* "[Sec'y] of Veterans Affairs:  Who is Robert Wilkie," All Gov, June 1, 2018, at: http://www.allgov.com/news/top-stories/secretary-of-veterans-affairs-who-is-robert-wilkie-180601?news=860479.

satellite offices across the country.  VA's Office of Inspector General ("OIG") is the agency's watchdog that *"conducts oversight of the programs & operations of [VA] through independent audits, inspections, reviews [&] investigations [& promotes] accountability of VA employees ..."[3]*

5.     The United States of America is a republic comprised of forty-eight conterminous states, the Dist. of Columbia, Alaska, and Hawaii, for which its liability for tort claims is authorized under applicable law, as described in 28 U.S.C. § 2674.

## Part III. Jurisdiction

6.     This Court is among those with exclusive jurisdiction to hear FTCA claims. Truman v. United States, 26 F.3d 592, 594 (5th Cir. 1994); Wood v. United States, 961 F.2d 195, 197 (Fed. Cir. 1992).  As noted in ¶ 9 of Truman:

> [F]ederal district courts have exclusive jurisdiction to hear claims cognizable under section 1346(b) [of the FTCA]. Id. However, the exceptions to the FTCA's waiver of sovereign immunity that appear in 28 U.S.C. Sec. 2680 limit the federal courts' [sic] jurisdiction to hear FTCA claims and, if applicable, bar a suit brought against the government. Although there is no justification for any court "to read exemptions into the [Federal Tort Claims] Act beyond those provided by Congress," Rayonier, Inc. v. United States, 352 U.S. 315, 320, 77 S. Ct. 374, 377, 1 L. Ed. 2d 354 (1957), the exceptions that do appear in the FTCA must be strictly construed in favor of the government. Atorie Air, Inc. v. Federal Aviation Admin., 942 F.2d 954, 958 (5th Cir.1991).

Id. Per 28 U.S.C. § 2401(b), the Plaintiffs submitted their FTCA claims to VA on June 29, 2018 and July 2, 2018 within the applicable two-year statute of limitations, and exhausted the administrative process, with VA denying the claims on Jan. 4, 2019.  **Ex 1 -** denial letter and related correspondence between the Plaintiffs and VA regarding the Plaintiffs' FTCA claims.  *See also* the timeline of events *infra* ¶ 22.  Accordingly, this Court has subject matter jurisdiction over

---

[3] *See* the OIG Website, "U.S. Dep't of Veterans Affairs Office of Inspector General Mission Statement, Vision & Values," at:    https://www.va.gov/oig/pubs/VA-OIG-Mission-Vision-Values.pdf.

the Plaintiffs' FTCA claims.  Id.  28 U.S.C. §§ 2401(b) & 2675(a)); and Marsh v. Library of Congress, Civil Action No. 18-2593 (RC), p. 2 (D.D.C. 2019).

7.      In denying the Plaintiffs' FTCA claims, VA stated:  ***"there [is] no evidence of any negligent or wrongful act on the part of an employee of the VA acting within the scope of employment that caused [the Plaintiffs] compensable harm."*** (Emphasis added).  *See* Ex 1.  That is a remarkable statement given the acts complained of herein.

## Part IV. Venue

8.      The acts and omissions that are pertinent to this Complaint occurred in D.C., so venue is proper with this Court per 28 U.S.C. § 1402(b).

## Part V. Background

9.      Gore is a forty-eight-year-old African-American male from Washington, D.C., and former OGC attorney that began working at VA on Jan 31, 1999, at twenty-eight years of age as a contract law staff attorney.  **Ex 2 -** Gore's RPLG Position Description, Resume, Performance Appraisals, and Salary Details**.**  While serving as the Chief Counsel for OGC's Real Property Law Group ("RPLG"), a Senior Executive Service ("SES") position, his last day of employment at VA was on May 4, 2018, after nineteen years of exemplary service,.  Id.  Gore's salary at that time was approx. $177,458.00/year.[4]  Before working at VA, Gore graduated from St. John's College H.S. in May 1988 (H.S. diploma); Penn State Univ. in May 1992 (B.S. Finance); and American University's Washington College of Law in May 1995 (J.D.).  He is licensed to practice law in D.C. and Md.  Id.  Gore has consistently been in good standing with the Md. State Bar Assoc. since his membership on June 5, 1996, and the D.C. Bar Assoc. since his membership on July 10,

---

[4]  *See* the following FederalPay.org weblink regarding Gore's salary at VA: https://www.federalpay.org/employees/dept-of-veterans-affairs-general-counsel/gore-cameron-v.

1998.  He has been married to Plaintiff Heather Woods ("Woods") since Dec. 9, 2010.  **Ex 3** - Plaintiffs' marriage license.  Woods is not and never has been an employee of VA.

10.     Robert Fleck, Esq. ("Fleck") is a Caucasian male, married to Kristina Wiercinski, who began working in OGC on May 1, 2016, as the Chief Counsel for OGC's Procurement Law Group ("PLG"), an SES position.  He is responsible for providing legal services and support for VA's service & supply contracting programs.  *See* **Ex 4**, ¶ 8 of the Fleck Complaint & the Amended Fleck Complaint; *see also* **Ex 5**, p. 2 of the OIG Report. Fleck also oversees OGC's litigation team, which OGC leadership initiated to improve OGC's ability to handle VA-related bid protests, alternative dispute resolution, and litigation. Id.  Fleck's salary at VA is approx. $180,700.00/year.[5] Fleck previously worked at the U.S. Dep't of Army ("Army") from 2004 - 2016.  *See* ¶¶ 8-11 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4; and p. 2 of the OIG Report, Ex. 5. *See* p. 1 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4.

11.     Kristina Wiercinski, Esq. ("Wiercinski" or "KW") is a Caucasian female, married to Fleck, who VA hired for an OGC electronic discovery (a/k/a "e-discovery") attorney position on Oct. 5, 2016.  *See* the timeline of events *infra* ¶ 22; and pp. 2, 11 & 15 of the OIG Report, Ex. 5.  In that capacity she was responsible for providing e-discovery legal support to OGC's three contract law groups (i.e., Fleck's Procurement Law Group; Gore's Real Property Law Group; and a Chief Counsel for OGC's Dist. Contracting Nat'l Practice Group), while working within the RPLG.  *See* ¶ 13 of the Amended Fleck Complaint, Ex. 4; and pp. 2-3 of the OIG Report, Ex. 5. Wiercinski is a GS-14 level attorney at VA, and her salary is approx. $145,629.00/year.[6]  She

---

[5]  *See* the following FederalPay.org weblink regarding Fleck's salary at VA: https://www.federalpay.org/employees/dept-of-veterans-affairs-general-counsel/fleck-robert-r.
[6]  *See* the following weblink regarding Wiercinski's salary at VA: https://www.federalpay.org/employees/dept-of-veterans-affairs-general-counsel/wiercinski-kristina-s.

previously worked at the U.S. Army from 2008-2017.  *See* ¶ 21 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4; and p. 2 of the OIG Report, *infra* Ex. 5.  *See* p. 1 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4.  Her job title and/or responsibilities may have changed since Gore's last day of employment at VA on May 4, 2018.

12.     Richard Hipolit, Esq. ("Hipolit") is a Caucasian male who served as a Deputy Gen. Counsel within OGC, i.e., an SES position, during the seminal events of this Complaint.  He was the first line supervisor of Fleck, as well as Gore (until Gore's last day of employment at VA on May 4, 2018), and was the second line supervisor to Wiercinski.  *See* p. 3 of the OIG Report, Ex. 5.  Hipolit joined VA *"in 1982 as a staff attorney and was appointed to be a Deputy Asst. General Counsel in 1989 and then an Asst. General Counsel in 2005."*[7]  He became the Deputy Gen. Counsel for Legal Policy in Apr. 2014.  Id.  It is believed that Hipolit is now serving in a higher level SES position for OGC, namely as the *"Principal Deputy General Counsel."* [8]

13.     Michael Hogan, Esq. ("Hogan") is a Caucasian male who served as the Executive Director for OGC's Mgmt., Planning, and Analysis ("MPA") team, i.e., an SES position, during the seminal events of this Complaint.  MPA is responsible for OGC's internal administrative functions, including *"OGC Human Resource Services."*  Hogan is believed to have begun working at OGC headquarters in D.C. in 2005, from an OGC satellite office in Baltimore, Md.[9]  His job title and/or responsibilities have changed since Gore's last day of employment at VA on May 4,

---

[7]     For more information regarding Hipolit's professional biography, *see*: https://va.gov/OGC/hipolit.asp.

[8]     *See* pp. 7, 9, and 23 of OGC's Organizational Slide Deck at: https://www.va.gov/OGC/docs/AboutOGC.pdf.

[9]     *See* the "Federal Employee Profile -- Michael R. Hogan," at: https://www.federalpay.org/employees/dept-of-veterans-affairs-general-counsel/hogan-michael-r.

2018, specifically to the position of *"Deputy General Counsel [for] General Law,"* another SES position.  *See* pp. 7 & 10 of OGC's Organizational Slide Deck at fn 8, *supra*.

14.    Catherine Mitrano, Esq. ("Mitrano") is a Caucasian female and was the Principal Deputy Asst. Gen. Counsel within OGC, i.e., an SES position, during the course of events discussed in this Complaint.  Mitrano is believed to have been promoted to that position in D.C. around the Jan-Feb. 2018 timeframe after working as an OGC Chief Counsel based in St. Petersburg, Fl.[10]   Her job title and/or responsibilities have changed since Gore's last day of employment at VA on May 4, 2018, specifically to the position of *"Senior Counselor to the General Counsel." See* pp. 7 & 10 of OGC's Organizational Slide Deck at fn 8, *supra*.

15.    Walter "Walt" Hall, Esq. ("Hall") is a Caucasian male and former Asst. Gen. Counsel (n/k/a "Chief Counsel") for OGC's Healthcare Law Group, i.e., an SES position, who retired from VA around 2013, and subsequently returned to VA to serve as a legal advisor/counselor to Byrne.  Gore knew and occasionally worked on OGC-related matters with Hall during Gore's nineteen-year career at VA.[11]

16.    James Byrne, Esq. ("Byrne") is a Caucasian male who served as VA's presidentially appointed and Senate confirmed Gen. Counsel (i.e., an SES position) during the seminal events of this Complaint.  However, Byrne was subsequently appointed to serve as VA's Acting Deputy Sec'y, effective as of Aug. 28, 2018.[12]   Then, on Jan. 14, 2018, the Sec'y of VA (Robert L. Wilkie) appointed Byrne to serve as the *"General Counsel performing the duties of the*

---

[10]    *See* the "Federal Employee Profile – Catherine Mitrano," at: https://www.federalpay.org/employees/dept-of-veterans-affairs-general-counsel/mitrano-catherine-c.
[11]    *See* the "Federal Employee Profile – Walter A. Hall," at: https://www.federalpay.org/employees/dept-of-veterans-affairs-general-counsel/hall-walter-a.
[12]    For more information regarding Byrne's professional biography, *see*: https://www.va.gov/opa/bios/bio_byrne.asp.

*Deputy Sec'y of Veterans Affairs."   See* fn 12, *supra.   See* also Juliet Eilperin, Josh Dawsey & Seung Min Kim, "It's way too many:  As vacancies pile up in Trump Administration, senators grow concerned," Wash. Post, Feb. 4, 2019.[13]   On Apr. 13, 2019, it was reported that President Trump has nominated Byrne to be the next VA Deputy Sec'y.   *See* Senator Johnny Isakson, "Isakson Statement on Nomination of James Byrne to be Deputy [Sec'y] of VA," https://www.isakson.senate.gov/public/index.cfm/news-releases?ID=3BBD3EC4-0F7F-4E61-80AA-AEA2C3E4518B.

17.    For general information and context about OGC's organizational structure and operations, *see* OGC's Draft Apr. 2018 Organizational Chart and 2019 Organizational Slide Deck contained at Ex. 6;[14] and pp. 24-33 of VA's 2017 "Functional Organizational Manual" Ver 4.0, at: https://www.va.gov/ofcadmin/docs/VA_Functional_Organization_Manual_Version_4.pdf.

18.    The OIG Report No. 17-03324-123 dated Mar. 29, 2018, titled *"Administrative Investigation of Conflict of Interest, Nepotism, and False Statements within the VA Office of General Counsel"* (the "OIG Report"), details events between June 10, 2016 and Jan. 8, 2017, regarding how VA established, announced, and filled the underlying e-discovery attorney position within OGC, which resulted in the hiring of Wiercinski.[15]   *See* pp. 7-15 of the OIG Report, Ex. 5.

---

[13]   https://www.washingtonpost.com/national/health-science/its-way-too-many-as-vacancies-pile-up-in-trump-administration-senators-grow-concerned/2019/02/03/c570eb94-24b2-11e9-ad53-824486280311_story.html?utm_term =.38df60874de5.

[14] OGC's Draft Apr. 2018 Organizational Chart and p. 7 of OGC's 2019 Slide Deck illustrate the general hierarchy that existed within OGC in the 2016 – 2019 timeframe, relative to the seminal events described in this Complaint.

[15] OGC sorely needed an additional e-discovery attorney, as VA had previously been sanctioned at the Civilian Bd. of Contract Appeals in Nov. 2014, for failing to timely provide discovery responses – including to an Appellant tied to a VA construction project in Orlando, Florida. Brasfield & Gorrie v. VA, CBCA 3300, 3354, 3528 (Nov. 2014).  That decision is available at: https://cbca.gov/files/decisions/2014/DANIELS_11-13-14_3300__BRASFIELD_AND_GORRIE_LLC.pdf.

19.     As noted in the OIG Report, Fleck improperly emailed certain confidential VA information (the "Confidential VA Information") to Wiercinski, before VA hired her.  Id. at 1 & 10-16.  *See also* 38 U.S.C. §§ 5723(f) & 5727(23).  When Fleck & Wiercinski testified under oath to multiple investigators of the OIG, they lied repeatedly by falsely alleging that Gore telephoned Wiercinski <u>in mid-Sept. 2016</u>, and offered her the e-discovery attorney position -- prior to and outside of the well-established authorities, processes, procedures & protocols of VA's Office of Human Resources ("HR") and MPA.  <u>Id.</u>  *See also* ¶¶ 2 & 47 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4.

20.     The OIG also interviewed Gore twice in connection with Wiercinski being selected for the e-discovery attorney position, on which occasions Gore repeatedly and adamantly denied telephoning Wiercinski in mid-Sept. 2016, and offering her the e-discovery attorney position.  *See* pp. 1 & 10-16 of the OIG Report, Ex. 5.  Gore advised the OIG that he only came to know Fleck & Wiercinski through VA, and never contacted Wiercinski until after receiving clearance from MPA to do so <u>on Oct. 4, 2016</u> (i.e., after Fleck had improperly emailed the Confidential VA Information to Wiercinski) – whereupon Gore then called her that same day – and informed her that she had been selected for the e-discovery attorney position.  *See* the timeline of events *supra* ¶ 22, at Clause (K); p. 10 of Gore's FY 2017 Performance Appraisal, Ex. 2; and pp. 11 & 15 of the OIG Report, *infra* at Ex 5.

21.     Once completed, the OIG investigation revealed that contrary to Fleck & Wiercinski's recurring false testimony, Gore did <u>not</u> telephone Wiercinski during the mid-Sept. 2016 timeframe, and offer her the e-discovery attorney position.  *See* pp. 1 & 10-16 of the OIG Report, Ex. 5.  The OIG Report reflects and substantiates that Fleck & Wiercinski failed to testify truthfully and fully cooperate with the OIG's underlying investigation.  *See* pp. 1 & 10-18 of the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

OIG Report, Ex. 5.  And before it was issued, the OIG Report received VA's official review and

concurrence, via the-then Deputy Sec'y of VA.  *See* id. at pp. 17-18.

## Part VI. Factual Allegations

22.     Below is a relevant chronological timeline regarding this matter, identified in two

categories; specifically, the key events that preceded and succeeded Gore's last day at VA on May

4, 2018:

Key Events That Preceded Gore's Last Day of Employment at VA

(A)     On June 10, 2016, Hipolit emails Fleck OGC's draft policy on salaries for
new OGC attorneys, and asks Fleck to email him (i.e., Hipolit) a copy of Wiercinski's resume.
*See* pp. 6-7 of the OIG Report, Ex. 5.  Fleck then forwards Hipolit's June 10, 2016 email to his
(Fleck's) personal email account.  Id.

(B)     On June 17, 2016, Fleck emails Wiercinski's resume to Hipolit.  Id.

(C)     Between Aug. 2, 2016 and Aug. 11, 2016, an RPLG General Attorney
sends out four emails to coordinate as needed with Fleck, MPA, HR, and Gore, to effectuate
changing an RPLG general staff attorney vacancy to an e-discovery attorney vacancy, and provide
HR with a sample e-discovery attorney vacancy announcement.  Id. at pp. 8-9.

(D)     On Aug. 11, 2016, Gore emails Fleck to provide a status on a few HR issues
regarding the OGC contract law teams, including the RPLG e-discovery attorney vacancy.  Id. at
p. 9.

(E)     On Aug. 12, 2016, MPA posts (announces) the vacancy announcement for
the RPLG e-discovery attorney position on the OGC-wide SharePoint site, with the stated caveat
that applications of non-VA employees could be sent directly to Gore, for evaluation with internal
OGC applicants.  Id. at p. 10.

(F)     On Aug. 16, 2016, two OGC employees applied for the e-discovery
attorney position.  That same day, Fleck emailed Wiercinski the OGC internal announcement.  Id.

(G)     On Aug. 18, 2016, Wiercinski emailed her resume, cover-letter, and last
two performance appraisals to Gore.  Id.

(H)     "Mid-Sept. 2016" is the general timeframe according to repeated false
testimony from Fleck & Wiercinski to the OIG, that Gore allegedly called Wiercinski, and offered
the e-discovery attorney position.  Id. at pp. 11-15.

1

2

(I)    On Sept. 30, 2016, Fleck unduly emailed the Confidential VA Information to Wiercinski, via an unencrypted format to a personal computer.  Id. at p. 11.

3

4

5

(J)    On Oct. 4, 2016, the three RPLG attorneys comprising the "OGC Best Qualified Analysis Review Panel" (the "OGC Review Panel") completed their joint interviews and separate evaluations of the three candidates for e-discovery attorney position, and sent an email to Gore advising that the OGC Review Panel recommends that Wiercinski as the only candidate to be considered for the position.  Id. at pp. 11-13.

6

7

8

9

(K)    On Oct. 4, 2016, Gore accepts the recommendation of the OGC Review Panel; emails and obtains approval from Hipolit to select Wiercinski for the position without an interview; then relays that selection decision to MPA; and receives clearance to contact Wiercinski.  See p. 10, at ¶ 2 of the "Leading People" § of Gore's FY 2017 Performance Appraisal, Ex. 2.  See also pp. 11-13 & 15 of the OIG Report, Ex. 5.

10

11

12

(L)    On Oct. 4, 2016, Gore telephones Wiercinski and informs her that she has been "selected" for the position and that MPA would be contacting her to conduct the onboarding process (i.e., HR issuing a tentative offer to Wiercinski; HR and Wiercinski completing the requisite steps preceding HR's issuance of a final offer to Wiercinski; and then HR issuing a final offer to Wiercinski).  See pp. 11-13 & 15 of the OIG Report, Ex. 5.

13

14

(M)    On Oct. 5, 2016, MPA contacts Wiercinski *"to inform her she was selected for the [e-discovery] position."*  Id. at p. 11.

15

16

17

(N)    On Oct. 27, 2016 and Oct. 31, 2016, respectively, Bradley & Hipolit sign Gore's FY 2016 Performance Appraisal, ranking him at a Level 4 "Exceeds Fully Successful" rating, out of a maximum Level 5 "Outstanding" rating, with a total numerical score of 430 points, out of a maximum possible 500 points.  *See* Gore's FY 2016 Performance Appraisal, Ex. 2.

18

19

20

21

(O)    On Nov. 28, 2016, Hogan sends an email to the Chief Counsel of OGC's Information Law Group, stating:  *"I [i.e., Hogan] am rethinking [Gore's] hiring of Wiercinski because of the frequent overlap between [Gore's Real Property Law] group and . . . Fleck's [Procurement Law] group, especially with the creation of [the OGC Litigation Team,] which Bob will have some responsibility for leading."*  Id. at p. 11.

22

23

24

(P)    Between Nov. 28, 2016 and Jan. 7, 2016, Hogan decides to allow:  (i) Gore's selection of Wiercinski for the e-discovery attorney position (per the preceding Clause L); and (ii) MPA's prior telephone call to Wiercinski on Oct. 5, 2016, informing Wiercinski of her selection for the e-discovery attorney position (per the preceding Clause M) -- to stand -- and let HR onboard Wiercinski into the e-discovery attorney position.  Id. at pp. 11-12.

25

26

(Q)    On Jan. 8, 2017, Wiercinski begins her first official day as an e-discovery attorney within OGC's RPLG.  Id. at p. 12.

27

28

(R)     On July 12, 2017, Gore provides a first interview to the OIG for approx. 4 hours, regarding the issues described in the OIG Report.  *See* ¶¶ 6-7 Gore's Notes About the OIG Report & Related Matters, Ex. 10; and pp. 1 & 10-18 of the OIG Report, Ex. 5.

(S)     On Sept. 28, 2017, Gore provides a second interview to the OIG for approx. 1.5 hours, regarding the issues described in the OIG Report -- after unexpectedly becoming a "subject of the investigation" -- due to Fleck & Wiercinski repeatedly testifying falsely under oath to multiple OIG investigators, claiming that before Fleck emailed the Confidential VA Information to Wiercinski on Sept. 30, 2016 -- Gore telephoned Wiercinski in "mid-Sept. 2016," to offer her the e-discovery attorney position.  Id.

(T)     On Oct. 16, 2017, Byrne & Hipolit sign Gore's FY 2017 Performance Appraisal, ranking him at a Level 4 "Exceeds Fully Successful" rating, out of a maximum Level 5 "Outstanding" rating, with a total numerical score of 450 points, out of a maximum possible 500 points.  *See* Gore's FY 2017 Performance Appraisal, Ex. 2.

(U)     On Feb. 9, 2018, VA's Deputy Sec'y executes a Memo confirming that VA has reviewed and concurred with the findings and recommendations of the OIG Report (prior to the OIG's public release of the OIG Report on Mar. 29, 2018).  Id. at pp. 17-18

(V)     On Mar. 23, 2018, after receiving a recommendation from the OIG that Fleck be fired, Hipolit issues a proposal letter *"that [cites] Fleck on charges of conduct unbecoming [of a lawyer &] disclosing sensitive information & [recommends] his demotion to a non-supervisory position."*  *See* ¶¶ 79 & 82 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4.

(W)     On Mar. 29, 2018, the OIG Report is issued, which per its contents confirms on: (i) pp. 1 & 10-16 that Fleck had a conflict of interest vis-à-vis Wiercinski and engaged in nepotism; Fleck unduly emailed the Confidential VA Information to Wiercinski before VA hired her; Fleck & Wiercinski lied repeatedly about Gore while testifying under oath to multiple OIG investigators; and contrary to Fleck & Wiercinski's false testimony about Gore, Gore did not telephone Wiercinski in mid-Sept. 2016, to offer her the e-discovery attorney position; and (ii) pp. 17-18 that VA's then-current Deputy Sec'y reviewed the OIG Report and expressly concurred with its findings and recommendations.  *See* pp. 1 & 10-18 of the OIG Report, Ex. 5.

(X)     On Apr. 9, 2018, Gore visits Mitrano in her office, to try to discuss OIG Report-related issues, but was rebuffed.  *See* ¶¶ 12-35 of Gore's Notes About the OIG Report & Related Matters, **Ex. 10**.

(Y)     Between Apr. 9, 2018 through Apr. 18, 2018, no VA or OGC officials provide Gore with any information re the pending accountability process regarding the OIG Report.  Id.

(Z)     On Apr. 13, 2018, Byrne **willfully disregards** the OIG's recommendation that Fleck be fired, as well as Hipolit's recommendation that Fleck be demoted to a non-supervisory position, and **instead issues an *interim warning letter* to Fleck**, with a requirement

that Fleck take additional training. *See* ¶¶ 79, 82 & 84 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4.

(AA)   On Apr. 19, 2018, Gore is summoned to the OGC suite to meet with Byrne, Mitrano, and Hall, where they acknowledge Gore's safety concerns about having to continue working with and being in close proximity to Fleck & Wiercinski -- but fail to say that will take action such as relocating Fleck to a new office – and instead Byrne vaguely tells Gore to "trust us" (i.e., Byrne, Mitrano, and Hall). *See* ¶¶ 12-35 of Gore's Notes About the OIG Report & Related Matters, Ex. 10.

(BB)   On Apr. 20, 2018, Gore is summoned to the OGC suite to meet with Byrne, Hogan, and Hall, where they ask Gore about a staff attorney's false allegations of listening through the wall of Gore's office, where Gore supposedly told three former VA General Counsels that he intended to burn down VA headquarters and kill people. Id.

(CC)   On or around Apr. 27, 2018, Byrne again **willfully disregards** the OIG's recommendation that Fleck be fired, as well as Hipolit's recommendation that Fleck be demoted to a non-supervisory position, and **instead issues a *final warning letter* to Fleck**, with a requirement that Fleck take additional training. *See* ¶¶ 79, 82, 84 & 85 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4.

(DD)   From Apr. 23, 2018 through May 4, 2018, Gore takes two weeks of leave from VA, following the Apr. 20, 2018 meeting with Byrne, Hogan, and Hall. *See* ¶¶ 29-38 of Gore's Notes About the OIG Report & Related Matters, Ex. 10.

(EE)   On May 2, 2018, Gore resigns from VA effective May 4, 2018 (i.e., eighty-four days after VA's Deputy Sec'y concurred with the findings and recommendations of the OIG Report per Clause U above – where such concurrence further confirmed that Gore did not telephone Wiercinski in mid-Sept. 2016, and offer her the e-discovery attorney position). **Ex. 17 -** Hogan's email to RPLG staff regarding Gore's resignation.

<u>Key Events That Succeeded Gore's Last Day of Employment at VA</u>

(FF)   On June 20, 2018 (i.e., forty-seven days after Gore had left VA), Fleck willfully disregards the findings and recommendations of the OIG Report; VA's review and concurrence with the OIG Report; and Byrne's interim & final warning letters and requirement to take additional training – and files suit against the OIG in the <u>Fleck v. Dep't of Veterans Affairs</u> case (Case No 1:18-cv-1452 (D.D.C. 2018) (the "Fleck Complaint"), under the Freedom of Information Act, a/k/a "FOIA") (5 U.S.C. § 552, et seq., as amended) -- and continues to falsely allege per ¶ 36 of the Fleck Complaint -- that Gore telephoned Wiercinski in mid-Sept. 2016 -- and offered her the e-discovery attorney position. *See* Ex 4 - the Fleck Complaint & related pleadings.

(GG)   On June 29, 2018 (i.e., fifty-six days after Gore had left VA), the Plaintiffs file their FTCA claims with VA via Standard Form 95. *See* the Correspondence Between Plaintiffs and VA Re Plaintiffs' FTCA Claims, Ex. 1.

(HH)   On July 1, 2018 (i.e., fifty-eight days after Gore had left VA), the Plaintiffs email a "Supplement Paper" supporting their FTCA claims to VA.  Id.

(II)   On Aug. 8, 2018 (i.e., ninety-six days after Gore had left VA), the Plaintiffs and their counsel send an email to VA in support of their FTCA claims, and explicitly reference the Fleck v. Dep't of Veterans Affairs case and Fleck's ongoing, furthered and perpetuated lies about Gore in that case – which are causing the Plaintiffs further severe harm – even though Gore was no longer employed at VA – as of May 4, 2018.[16]  Id.

(JJ)   On Sept. 14, 2018 (i.e., 133 days after Gore had left VA), the U.S. Dep't of Justice ("DOJ") files a Motion to Dismiss the Fleck v. Dep't of Veterans Affairs case, never advising this Court that the false statement about Gore in ¶ 36 of the Fleck Complaint is false -- and that VA already reviewed and concurred with the OIG's findings and recommendations – which confirmed that Gore did not call Wiercinski in mid-Sept. 2016, and offer her the e-discovery job.  See infra ¶¶ 47, 48, and DOJ's Motion To Dismiss the Amended Fleck Complaint, Ex. 11.

(KK)   On Oct. 5, 2018 (i.e., 58 days after the Plaintiffs emailed VA and advised that Fleck's false ongoing allegations about Gore are causing the Plaintiffs further severe harm, and 154 days after Gore had left VA), Fleck again willfully disregards the findings and recommendations of the OIG Report; VA's review and concurrence with the OIG Report; and Byrne's interim & final warning letters – and files an Amended Complaint in the Fleck v. Dep't of Veterans Affairs case, and continues to falsely allege in ¶ 36 that Gore telephoned Wiercinski in mid-Sept. 2016, to offer her the e-discovery attorney position.  See infra ¶ 44 & Ex. 4.

(LL)   On Nov. 15, 2018 (i.e., 195 days after Gore had left VA), DOJ files a Motion to Dismiss the Fleck v. Dep't of Veterans Affairs case, never advising this Court that the allegations about Gore in ¶¶ 36 of the Fleck Complaint & Amended Fleck Complaint are false -- and that VA already reviewed and concurred with the OIG's findings & recommendations that Gore did not call Wiercinski in mid-Sept. 2016 -- to offer her the e-discovery job.  See infra ¶¶ 47, 48, and Ex. 11.

(MM)   On Dec. 4, 2018 (i.e., 214 days after Gore had left VA), Fleck again willfully disregards the findings & recommendations of the OIG Report; VA's review and concurrence with the OIG Report; and Byrne's interim & final warning letters – and files a Memo of Points and Authorities opposing DOJ's latest Motion to Dismiss the Fleck v. Dep't of Veterans Affairs case – and continues to falsely allege on pp. 3, 5, 18 & 22, that Gore telephoned Wiercinski in mid-Sept. 2016, to offer her the e-discovery attorney position.  See infra ¶ 44 & Ex. 4, Fleck Memo Opposing 12b6 dismissal.

---

[16] Consistent with Afolabi-Brown v. Coombs, et al., Civil Action No. 18-1409 (EGS), pp. 12-13 (D.D.C.), citing Tookes v. United States, 811 F. Supp.2d 322, 331 (D.D.C. 2011), which provides that FTCA claimants are required to notify but not substantiate their claims to underlying Federal agencies, this Aug. 8, 2018 communique' from the Plaintiffs duly informed VA of the false & harmful allegations that Fleck was making about Gore, in the Fleck v. Dep't of Veterans Affairs case.

(NN)   On Dec. 20, 2018 (i.e., 230 days after Gore had left VA), DOJ files a Reply in Support of its Motion to Dismiss the <u>Fleck v. Dep't of Veterans Affairs</u> case, never advising this Court that the allegations about Gore in ¶¶ 36 of the Fleck Complaint & Amended Fleck Complaint, as well as pp. 3, 5, 18 & 22 of Fleck's Memo of Points and Authorities opposing DOJ's latest Motion to Dismiss, are false, nor that VA already reviewed and concurred with the OIG's findings, including that Gore did not call Wiercinski in mid-Sept. 2016, to offer her the e-discovery job.  *See infra* ¶¶ 47, 48, and Ex. 11 – DOJ Reply Brief in Support of 12b6 Motion to Dismiss.

(OO)   On Jan. 4, 2018 (i.e., 245 days after Gore had left VA), VA issues a letter to the Plaintiffs' counsel, formally denying the Plaintiffs' FTCA claim, stating that *"there was no evidence of any negligent or wrongful act on the part of an employee of the VA acting within the scope of employment that caused your clients [sic] compensable harm.  Further, the claims are precluded by the exclusivity provision of the Federal Employees Compensation Act, 5 U.S.C. §8116(c)."*

### Fleck and Wiercinski – Civil Conspiracy and Perjury

23.     The Confidential VA Information that Fleck improperly emailed to Wiercinski on Sept. 30, 2018 in an unencrypted format to a personal computer (versus Gov't furnished equipment) – before VA had hired Wiercinski as a VA employee -- was a document conspicuously marked with the following caption:  ***"This message is not to be forwarded to anyone outside of the U.S. Department of Veterans Affairs ("VA") or to anyone within the VA that does not have direct involvement/interest with this matter."*** (**Emphasis added**).  *See Ex 5, OIG Report, p. 11.

24.     The Confidential VA Information had sensitive status as it detailed several high-dollar contract law matters where VA was vulnerable to the imposition of court sanctions and losses at trial because VA's information technology ("IT") software, systems, processes and capacities were old, outdated and hampering VA's ability to retrieve information and timely respond to discovery requests.  <u>Id.</u>[17] As the OIG described it, the Confidential VA Information

---

[17] *See* GAO Rept. No. 17-408T, titled "<u>Veterans Affairs Information Technology – Mgmt. Attention Needed to Improve Critical System Modernizations, Consolidate Data Centers & Retire Legacy Systems</u>," Feb. 7, 2017, at:  <u>https://www.gao.gov/assets/690/682566.pdf</u>.  *See also* Trevor Noah - The Daily Show, "<u>The V.A. Is Screwing Over Veterans</u>," Youtube, Dec. 1, 2018, at: <u>https://www.youtube.com/watch?v=KNciYSuHarI</u>.  *See also* Nikki Wentling, "<u>The Daily Show blasts VA over GI Bill payment fiasco</u>," Stars & Stripes, Nov. 30, 2018, at:

that Fleck emailed to Wiercinski was a document that *"included a written consolidation of current e-Discovery-related matters within VA, to include a synopsis of the matter, the legal venue, named parties and costs of the matter, and specific VA system failures related to e-Discovery."* Id.

25.     Fleck emailed the Confidential VA Information to Wiercinski in an unencrypted format to a personal computer (versus a VA gov't computer, laptop, or phone), to provide Wiercinski with internal information that would put her at an unfair advantage during anticipated job interview(s) for the e-discovery attorney position.  Id.

26.     Fleck (and by proxy Wiercinski's) subsequent undue conduct that occurred after Gore was no longer an employee at VA as of May 4, 2018, transpired within the context of another VA-related lawsuit, which was previously filed in this Court under FOIA on June 20, 2018.  *See* the timeline of events, *supra* ¶ 22, is Fleck v. Dep't of Veterans Affairs, Case No 1:18-cv-1452 (D.D.C. 2018).  Therein, Fleck continued to lie repeatedly by falsely alleging that Gore telephoned Wiercinski in mid-Sept. 2016, and offered her the e-discovery attorney position before Fleck emailed the "Confidential VA Information" to her.  Id.  Compare ¶ 36 of the Fleck Complaint, ¶ 36 of the Amended Fleck Complaint & pp. 3 & 17-18 of the Fleck Opposition Motion, all at Ex. 4, with pp. 1 & 10-18 of the OIG Report, Ex. 5.

27.     Fleck's actions were done with illegal and improper intent or recklessness to perpetuate prior lies about Gore, which Fleck & Wiercinski had previously and repeatedly made while testifying under oath to multiple OIG investigators, in connection with the OIG Report.  Id.

---

https://www.stripes.com/news/veterans/the-daily-show-blasts-va-over-gi-bill-payment-fiasco-1.558698.  *See* also Letter From Congresswoman Grace Meng to Sec'y Wilkie, Expressing Concern Regarding Information Technology Glitches Preventing Timely GI Bill Payments, Twitter,                    Nov.               13,                2018,                at: https://mobile.twitter.com/RepGraceMeng/status/1062409456087130114/photo/1

28.     Fleck sought to further the ongoing civil conspiracy that existed between himself & Wiercinski during the earlier OIG investigation, which has significantly harmed the Plaintiffs. Id. [18]

29.     Fleck & Wiercinski's repeated lies about Gore during the OIG investigation also fostered and precipitated certain other connected improper acts and omissions of VA which transpired after the OIG Report was issued -- namely:  (A) VA's violation of the Accountability Act; and (B) VA and DOJ's opportunity but abject failure to prevent Fleck (and by proxy Wiercinski) from continuing and perpetuating lies about Gore in the Fleck v. Dep't of Veterans Affairs case.[19]  *See* **Ex 7 - The Accountability Act.**  *See* also *infra* ¶¶ 47-48 & 50-54.

## PLAINTIFFS' INJURIES

30.     The Plaintiffs' severe emotional distress consisted of mental and emotional pain and suffering, depression, worry, anxiety, anguish, grief, despair, resentment, isolation, sleeplessness, embarrassment, shame, frustration, disbelief, cynicism, impatience, anger, bruxism, headaches, moodiness, inconvenience, and reduced enjoyment of life.  It also included significant concern for Gore's career, reputation, livelihood, his two bar licenses, and the adverse impact on his future employability, earning capacity, income and savings, Federal insurance, thrift savings plan, and his future retirement and social security allotments.[20]  As a consequence of the above

---

[18] As Gore was no longer employed at VA when Fleck (and by proxy Wiercinski) furthered their civil conspiracy by continuing to make false allegations about Gore in the Fleck v. Dep't of Veterans Affairs case, their actions are not covered under the "Federal Employees' Compensation Act" ("FECA") codified at 5, U.S.C. § 8101, et seq., and its "exclusivity provision" at 5 U.S.C. § 8116(c).

[19] President Trump signed the Accountability Act into law on June 23, 2017 (Pub. L. No. 115-41). The text and details about the bill are available on Congress.Gov, at: https://www.congress.gov/bill/115th-congress/senate-bill/1094.

[20] *"Good name in man and woman, dear my lord, Is the immediate jewel of their souls. Who steals my purse steals trash. 'Tis something, nothing:  'Twas mine, 'tis his, and has been slave to thousands.  But he that filches from me my good name Robs me of that which not enriches him and*

injuries suffered by Gore, co-Plaintiff Woods has sustained injuries for loss of consortium since the events described herein and is ongoing.  Said loss of consortium has affected the relationship as husband and wife between Plaintiffs and is also ongoing.

31.    After the OIG Report was issued, Gore sought counsel from three former VA General Counsels, then consistent with that advice, proactively engaged his OGC leadership to seek to:  (i) discuss the OIG Report; (ii) express disdain for Fleck & Wiercinski's improper and repeated lies towards him; (iii) note that Gore had received no information or literature from OAWP regarding the accountability and disciplinary process tied to the OIG Report; (iv) explain how Fleck & Wiercinski's several lies put Gore at the risk of multiple felony charges for perjury or making false statements, criminal liability, prison time, monetary fines, loss of his job, salary and possibly his retirement, discipline from the D.C. and Md. bar associations, including up to the loss of his two law licenses, and harmed his future employability; (v) rectify the volatile, toxic and untenable environment that would subsist if Gore had to continue working down the hall and on VA contract-law matters with Fleck & Wiercinski; and (vi) highlight that having to continue working with Fleck & Wiercinski would risk the emotional and physical safety of Gore and other OGC staff members.  *See* Gore's Notes About the OIG Report & Related Matters, Ex. 10.

---

*makes me poor indeed."*  (Emphasis added).  Othello. *See* Jeremy Hylton, The Complete Works of William Shakespeare, 1993, at:  http://shakespeare.mit.edu/othello/full.html.

*See also* Jonathan D. Klien, "Reputation is Key to Success for a Young Lawyer," The Legal Interpreter, June 9, 2016, which states the following regarding the legal profession:  *"Your reputation is an extension of your character, and we are in an industry where you live or die by your reputation. So important is reputation in the law that we, as lawyers, are heavily regulated to ensure some modicum of ethical and appropriate behavior. Such regulations, however, should be the baseline of how you act as a lawyer (and a person)."*  (Emphasis added). http://www.clarkhill.com/uploads/medium/resource/1631/Klein_Reputation_is_Key_Legal_Intel ligencer_06.09.16.pdf.

32.     However, such efforts were to no avail, as Mitrano rebuffed his efforts to discuss these matters on Apr. 9, 2018; and then Gore's OGC leadership (i.e., Byrne, Mitrano, and Hall) summoned him to a meeting on Apr. 19, 2018, and vaguely in part told him to "trust them," and then the next day (i.e., on Apr. 20, 2018), OGC leadership (i.e., Byrne, Hogan, and Hall) summoned him to another meeting, and attempted to gaslight, intimidate, emotionally abuse, and castigate Gore – again, so they could deal with the OIG Report without question or reproach. *See* the timeline of events *supra* ¶ 22 at Clauses (X), (AA), and (BB). *See also* ¶¶ 12-35 of Gore's Notes About the OIG Report & Related Matters, Ex. 10.

33.     Following such events, while on two weeks of approved leave from the office, which Gore took at the suggestion of Hogan -- Gore reflected on this matter and VA's significant, underlying transgressions that had occurred. Id.  During that two week period of leave, it unfortunately became clear to Gore that Fleck, Wiercinski, Byrne, Mitrano, Hogan, and Hall could no longer be trusted in this matter; undue intentions and corruption at the upper echelons of OGC were amiss; and Gore's ability to continue to effectively serve as the Chief Counsel of RPLG was untenable. Id.  Accordingly, he was effectively constructively terminated – he made the difficult and painstaking decision to resign from VA and render himself unemployed, effective May 4, 2018. Id.

34.     Gore's resignation from VA after nineteen years of employment, meant the loss of:  (A) his $177,458.00 a year salary (excluding bonuses); and (B) being retirement eligible at sixty years of age -- which is triggered after achieving twenty years of Federal employment – versus being retirement eligible at sixty-two years of age -- which is triggered after achieving five years of Federal employment).[21]

---

[21] *See* "Federal Employees Retirement Service (a/k/a "FERS") Information Regarding Eligibility," at:  https://www.opm.gov/retirement-services/fers-information/eligibility/.  That website confirms

35.     Gore's decision to resign from VA and render himself unemployed occurred under a constructive termination scenario, in order for him to:

(A) Avoid further exposure and susceptibility to VA's violation of multiple laws, regulations, public policies, duties, rules of professional responsibility, ethical standards & core values, and the breaches of trust -- where OGC leadership (notably Byrne, Mitrano, Hogan, and Hall) improperly and inadequately supervised Fleck & Wiercinski after the OIG Report was issued, and failed to:  (i) physically relocate Fleck to a new office away from Gore; (ii) formally and conclusively restrict Fleck & Wiecinski from interacting with Gore,[22] to prevent a perpetuation of their repeated lies about Gore, potential confrontations, and further deterioration of a professional environment within OGC; (iii) maintain a safe and secure environment for Gore; and (iv) properly hold Fleck & Wiercinski accountable in accordance with applicable law, policies, and procedures.

(B) Remove himself from a hostile, volatile, insufferable, abusive, and untenable work environment work environment, where VA leadership (i.e., Robert Wilkie, who was then the Acting Sec'y of VA; Thomas Bowman, who was then the Deputy Sec'y of VA; and Peter O'Rourke, who was the former Executive Director of OAWP, and the-then VA Chief of Staff) improperly and inadequately monitored, guided, and "supervised" Byrne after the OIG Report

---

in the "Immediate Retirement" section, that Federal employees with twenty years of work experience, are eligible for "immediate retirement benefits" at age sixty.

[22] Gore & Fleck's respective offices were located in the same hallway at VA headquarters, just five doors (i.e., about twenty to twenty-five feet apart) from one another.  Given that close proximity; and the fact that they both worked in OGC on contract law matters; were expected to participate in bi-weekly supervisory contract law staff meetings every Tuesday & Thursday, and weekly OGC senior level staff meetings typically every Tuesday; and coordinate daily as needed on contract law issues -- both directly (i.e., one-on-one) as well as indirectly through their respective staff members -- it was not unusual for their paths to cross during a typical workday.  *See* ¶ 28 of Gore's Notes About the OIG Report & Related Matters, Ex. 10.

was issued -- to prevent him from bypassing OAWP and levying discipline upon Fleck in violation of the Accountability Act and applicable policies and procedures -- and punishing Gore, by expecting him to meekly accept the *status quo,* and continue working with Fleck & Wiercinski, as if nothing had happened.

(C) Eschew further retaliation, reprisal, intimidation, ridicule, gas lighting, threats, abuses, and breaches of trust from OGC leadership (i.e., Byrne, Mitrano, Hogan, and Hall) that conspicuously occurred after the OIG Report was issued, which Gore knew would continue and escalate within VA – especially given:  (i) Gore's nineteen year career at the agency, including ten as a supervisor; (ii) the precarious position that VA was now in, given the truthful testimony that Gore provided to the OIG which confirmed that Fleck inappropriately emailed the Confidential VA Information to Wiercinski, and Fleck & Wiercinski repeatedly testified falsely under oath about Gore to multiple OIG investigators; (iii) the OGC leadership team, torts law experts, and DOJ, would readily deduce that that the Plaintiffs would likely pursue justice and seek legal recourse against VA;[23] (iv) the negative optics that VA would face and ire that the

---

[23] On July 10, 2018, the Wash. Post reported on an incident where the former Acting VA Secretary (Peter O'Rourke) tried to intimidate VA's Inspector General, over the OIG's role in handling VA employee accountability investigations.  *See* the following weblink: https://www.washingtonpost.com/news/powerpost/wp/2018/07/10/inspectors-generals-are-celebrated-as-va-tried-to-intimidate-its-ig/?utm_term=.f60606382a0e.
*See* Joe Davidson, "Victims say VA whistleblower retaliation is growing under Trump, despite rhetoric," Wash. Post, Oct. 30, 2017, at: https://www.washingtonpost.com/news/powerpost/wp/2017/10/30/victims-say-va-whistleblower-retaliation-is-growing-under-trump-despite-rhetoric/?utm_term=.5a11ac767f31.
*See also* Ben Kesling, "Peter O'Rourke, Top VA Official Who Clashed With Lawmakers, Poised to Leave [VA]," Wall Street Journal, Oct. 4, 2018, at:  https://www.wsj.com/articles/peter-orourke-top-va-official-who-clashed-with-lawmakers-poised-to-leave-1538684323.
*See also* Benjamin Krause, "Wall Street Journal:  Peter O'Rourke Soon To Eject From Veterans Affairs," DisabledVeterans.org, Oct. 5, 2018 at: https://www.disabledveterans.org/2018/10/05/wall-street-journal-peter-orourke-soon-to-eject-from-veterans-affairs/.  That article indicates that:  ***"Last summer, O'Rourke helped stand up the agency's Office of Accountability and Whistleblower Protection (OAWP). Whistleblowers believing the offices was actually there to protect them soon reported that OAWP instead***

Defendants would draw from the-then Sec'y of VA and/or White House leadership, for violating the widely-publicized and politically touted Accountability Act; (v) the repeated and documented history of VA leaders retaliating against subordinates that present grievances, claims, or concerns regarding agency wrongdoing, fraud, waste, or abuse; and (vi) the conspicuous absence of information, due process and input that Gore received from VA after the OIG Report was issued -- which Gore surmised was a strong indicator that VA was carrying out a flawed disciplinary process.

(D)     Protect his career, reputation, livelihood, two law licenses, and his future employability from further harm -- especially given the numerous and significant matters that OGC leadership would have expected Gore to supervise and handle at VA – while working in a volatile, insufferable, abusive and untenable environment with Fleck & Wiercinski.[24]

(E)     Navigate away from the increased risk that Fleck & Wiercinski would lie about Gore on other matters including potentially billion-dollar VA-related contract matters, since they had already boldly lied repeatedly about Gore when testifying under oath to multiple OIG investigators *with impunity*.

36.     Gore was promoted three times during his VA career.  Id.  In October 2014, Gore was promoted the first time from a GS-14 level contract law attorney, to OGC's non-supervisory GS-15 legal expert for the VA's Enhanced-Use Leasing ("EUL") program.  Id.  The EUL program is where VA out-leases certain of its underutilized and vacant real properties nationwide to

---

*investigated whistleblowers, and then turned the information over to the same management officials engaging in wrongdoing.").*
*See also* Eric Westervelt, "For VA Whistleblowers, A Culture Of Fear and Retaliation," NPR, June 21, 2018, at:   https://www.npr.org/2018/06/21/601127245/for-va-whistleblowers-a-culture-of-fear-and-retaliation (describing feedback from thirty-plus VA employees about the pervasive culture of managers employing fear, intimidation & retaliation against whistleblowers).
[24] *See* the News Articles & Letters Regarding VA's Pervasive Culture of Retaliation and Reprisal, Ex. 8.

selected-developers, for terms of up to seventy-five years.  Id.[25]  Those entities are then required to finance, construct, operate, maintain, and reuse the improvements, for purposes consistent with VA's mission and operations (e.g., mixed-use projects; Veteran housing facilities; energy facilities; and office & parking structures).  Id.

37.     In July 2008, Gore was promoted a second time, to the position of "Deputy Asst. General Counsel" (now known as a "Deputy Chief Counsel") within OGC, at the GS-15 supervisory level.  Id.  He managed a staff of eight attorneys.  Id.  He and his team provided legal services and support in the areas of real and personal property, EULs, medical facility leasing, environmental & historic preservation law, public-private partnerships, and energy law.  Id.

38.     In June 2016, Gore was promoted a third time, to the position of Chief Counsel of RPLG, as a member of the Senior Executive Service.  *See* Gore's Resume, Ex. 2.  He managed eighteen staff members.  Id.  He and his team provided legal services and support in the areas of major construction, real & personal property, EULs, medical facility leasing, environmental & historic preservation law, public-private partnerships, and energy law.  Id.  Gore regularly worked on complex, high-profile matters regarding VA's real property portfolio, which is the second largest in the Federal Gov't, behind only the U.S. Dep't of Defense ("DOD").

39.     Gore routinely during his nineteen years at VA accepted and accomplished some of the most difficult assignments within OGC, and worked successfully across all levels of the agency, as well as with outside organizations and stakeholders.  *See* Gore's Annual Performance Appraisals, Ex. 2; and Gore's Commendation Letters, Ex. 9.  In doing so, he helped achieve solutions on complex and high-profile legal, legislative, budgetary & policy matters; and helped facilitate improved care & services to our nation's Veterans.  Id.  He also consistently received

superior marks during his annual performance appraisals. *See* Gore's Annual Performance Appraisals, Ex. 2. OGC leadership often expressed high praise for his hard work, dedication, and legal abilities, as noted in his FY 2016 Performance Appraisal, where they described Gore as follows:

> Cam Gore is an indefatigable leader whose commitment to improving services and benefits for Veterans is unparalleled. The hallmark of his superb year: being a key member of the small multi-disciplinary team that is transforming West Los Angeles into a Veteran-centric campus that is helping end Veteran homelessness in a dramatic way. He also helped draft the recently passed enhanced-use leasing legislation (one of the very few legislative proposals to pass Congress this year). Although new to the SES this year, I don't know of anyone in OGC with a brighter future.

Page 11 of Gore's FY 2016 Performance Appraisal, Ex. 2. Shortly after Gore resigned from VA on May 4, 2018 and rendered himself unemployed, he received a farewell card from Byrne thanking Gore for his *"dedicated service to Veterans and our great nation." See* the Commendation Letters and Farewell Cards Issued to Gore, Ex. 9.

<u>The Actions of the Defendants are Egregious and Unconscionable</u>

40.     The OIG Report indicates that Fleck & Wiercinski made repeated false statements while testifying under oath to multiple OIG investigators, specifically by alleging that Gore telephoned Wiercinski in mid-Sept. 2016, and offered her the e-discovery attorney position for OGC – <u>before</u>:  (A) Fleck improperly emailed the Confidential VA Information to Wiercinski in an unencrypted format on Sept. 30, 2016; and (B) MPA in fact telephoned and advised Wiercinski on Oct. 5, 2016, that she was selected. *See* the timeline of events, *supra* ¶ 22. Compare ¶ 36 of the Fleck Complaint, ¶ 36 of the Amended Fleck Complaint & pp. 3 & 17-18 of the Fleck Opposition Motion, Ex. 4, with pp. 1 & 10-18 of the OIG Report, Ex. 5.

41.     The OIG determined that Gore neither called Fleck nor Wiercinski, until <u>after</u> the

OGC Review Panel made its recommendation to Gore on Oct. 4, 2016, that Wiercinski be selected

for the position.  <u>Id.</u> pp. 10-15.  As the OIG Report states on pp. 12-13:

> Based on Mr. Fleck's and Ms. KW's statements, Mr. Gore was re-interviewed, and he denied selecting Ms. KW before the hiring panel made its recommendation. OIG investigators then asked Mr. Fleck's and Ms. KW's attorney for any phone numbers that Mr. Gore allegedly called. Their attorney complied, and the OIG then subpoenaed the records associated with those numbers. Investigators also obtained records associated with Mr. Gore's VA desk and cellular telephones, as well as requested Mr. Gore provide his personal cellular number. The analysis of all of the telephone records resulted in a determination that Mr. Gore did not call Ms. KW, or any other number provided by her attorney, until after the hiring panel made its recommendation on October 4, 2016; therefore, Mr. Gore did not select Ms. KW before the hiring panel's recommendation. After determining that Mr. Fleck and Ms. KW made false statements as to when Ms. KW was notified of her selection for the position in an effort to mitigate any consequences related to Mr. Fleck sharing VA sensitive data with a non-VA employee, the OIG referred the false statements matter to the U.S. Attorney's Office for the District of Columbia. They reviewed the case and declined prosecution due to available administrative remedies.

(Emphasis added).  <u>Id.</u>  The OIG Report further states the following on p. 15:

> OIG's investigation determined that Mr. Fleck and Ms. KW made false statements when questioned about sharing VA sensitive data. Mr. Fleck and Ms. KW stated that nothing was shared before she was selected for the position. Investigators subpoenaed phone records associated with the alleged "mid-September" call and found no record of Mr. Gore calling Ms. KW prior to October 4. Additionally, Mr. Gore denied calling her about the position until October 4, 2016. The statements from Mr. Fleck and Ms. KW are not simple lapses in memory or confusion regarding dates, as they both repeatedly testified that nothing was shared with Ms. KW until after she was selected for the position. Mr. Fleck shared VA sensitive data with Ms. KW before she was selected. The investigation determined that Mr. Fleck and Ms. KW made false statements about when Ms. KW was selected for the e-discovery attorney position to lessen the potential consequences of Mr. Fleck having shared VA sensitive data with a non-VA employee.

<u>Id.</u> p. 15.  *See also* <u>In re Cleaver-Bascombe</u>, 892 A.2d 396, 412 (D.C. 2006), citing <u>In re Shillaire</u>,

549 A.2d 336, 337 (D.C. 1988) (Shillaire I) (quoting that . . . ***"[l]ying under oath on the part of***

***an attorney for the purpose of attempting to cover up previous dishonest conduct is absolutely***

*intolerable; [t]he Bar[, after all,] is a noble calling."*).  **(Emphasis added).**  *See also* United States v. Dunnigan, 507 U.S. 87, 113 (1993) (noting that perjury constitutes providing false testimony under oath with willful intent versus confusion, mistake, or false memory).  *Cf.* McCullough v. Whitaker, Civil Action No. 14-296 (RDM), pp. 18-19 (D.D.C. 2019) (supporting the concept that evidence of employee collusion prior to providing factual statements diminishes their credibility).

42.     The OIG Report, which is permanently located on the OIG website,[26] provided five recommendations to VA.  *See* pp. 15-16 of the OIG Report, Ex. 5.  VA reviewed and expressly agreed with the findings and all five recommendations of the OIG Report, and informed the OIG that VA *"is actively working to comply with each of [them]."*  Id. at 17-18.  *See also* English v. Dist. of Columbia, 651 F.3d 1, 7 (D.C. Cir. 2011), *citing* Talavera v. Shah, 638 F.3d 303, 309-310 (D.C. Cir. 2011) **(confirming that reports of an opposing party prepared *"on a matter within the scope of that relationship . . . while it existed"* is admissible as evidence and party admissions under Rule 801(d)(2)(D) of the Federal Rules of Evidence).  (Emphasis added).**  *See also* Mechanics' Nat. Bank v. U.S. Dept. of HUD, 522 F. Supp. 25, 28-30 (D.D.C. 1981) (confirming that this Court does not reverse final investigatory findings of Federal agencies that are based on "substantial evidence").  *Cf.* Ctr. for Pub. Integrity v. U.S. Dept. of Energy, 234 F. Supp. 3d 65, 73 (D.D.C. 2017) (noting that non-FOIA related agency actions are judicially upheld if supported with substantial evidence and are not arbitrary and capricious).

43.     The first two recommendations regarded OGC and HR needing to take administrative actions against Fleck & Wiercinski.  Id.  The third recommendation informed VA to issue a bill of collection, to recoup unspecified monetary funds that VA paid to Wiercinski during her VA employment.  The fourth recommendation advised VA to determine and take appropriate,

---

[26] The OIG Report is available at:  https://www.va.gov/oig/pubs/VAOIG-17-03324-123.pdf.

but unspecified corrective action regarding Wiercinski's employment at VA.  Id.  The fifth

recommendation advised VA to ensure that VA confer with its Designated Agency Ethics Official

to ensure that the OGC Deputy General Counsel for Legal Policy staff members *"receive*

*appropriate ethics training as related to [the OIG's] findings in this report."*  Id.

44.     On June 20, 2018, the Fleck Complaint was filed against the Dep't of Veterans

Affairs in this Court.  ***See* the Complaint filed in Fleck v. Dep't of Veterans Affairs**, **Case No**

**1:18-cv-1452 (D.D.C. 2018) & related Plaintiff briefs at Ex. 4.**  Then on Oct. 5, 2018, Fleck filed

an *"Amended Complaint."*  Id.  Further, on Dec. 4, 2018, Fleck filed a *"Plaintiff's Memorandum*

*of Points [&] Authorities In Opposition To [the] Defendant's [i.e., DOJ's] Motion To Dismiss"*

(the "Fleck Opposition Motion").  Id.  *See also* DOJ's Motion To Dismiss the Amended Fleck

Complaint & Related Defendant Pleadings, Ex. 11.  In his briefs, Fleck repeatedly alleges that the

OIG investigation was flawed, reached unjust conclusions, and harmed his career, reputation,

livelihood, and future employability.  *See* ¶¶ 99-117 of the Fleck Complaint, Ex. 4; and ¶¶ 99-121

of the Amended Fleck Complaint, Ex. 4.  *See also* pp. 1, 7, 9, 21, 27 & 31 of the Opposition Motion,

Ex. 4.

45.     Fleck asserts in his pleadings that ***"Upon information and belief, given her***

***qualifications and the desire to hire her before she accepted another position, the Chief Counsel***

***of the Real Property Law Group [i.e., Gore] informed Ms. Wiercinski by telephone in mid-***

***September 2016 that she was selected for the e-discovery position."***  **(Emphasis added).**  *See* Ex

4 - ¶36 of the Fleck Complaint & the Amended Fleck Complaint; and pp. 3, 17 & 22-23 of the

Fleck Opposition. [27]

---

[27] Additionally, the Plaintiffs respectfully question why, in light of h Fleck's counsel would include
such falsehoods in the briefs filed on behalf of Fleck (and by proxy Wiercinski) in the Fleck v.
Dep't of Veterans Affairs case, when:  (A) Rule 4.1 of the D.C. Rules of Prof'l Conduct, and Rule
4.1 of the ABA Model Rules of Prof'l Conduct, prohibit attorneys from making and failing to

46.     Furthermore, ¶ 88 of the Amended Fleck Complaint improperly suggests that because the U.S. Atty's Office declined to prosecute Fleck & Wiercinski for the conflict of interest, nepotism, undue dissemination of the Confidential VA Information, and repeated false statements to the OIG as discussed in the OIG Report, that they are innocent of the charges.  Pages 1 and 13 of the OIG Report clearly state that the U.S. Atty's Office declined to prosecute Fleck & Wiercinski, due to VA having available administrative remedies at its disposal.  *See* pp. 1 & 13 of the OIG Report, Ex. 5.

47.     It is notable that none of the DOJ briefs expressly informed this Court that the statements about Gore in ¶ 36 of the Fleck Complaint & the Amended Fleck Complaint, as well as pp. 3, 18 & 22-23 of the Fleck Opposition Motion -- alleging that Gore telephoned Wiercinski in mid-Sept. 2016, and offered her the e-discovery attorney position -- are false.  Compare p. 7 of the DOJ Motion To Dismiss and DOJ Reply Brief, Ex. 11, with ¶ 36 of the Fleck Complaint, ¶ 36 of the Amended Fleck Complaint; and pp. 3 & 17-18 of the Fleck Opposition Motion, Ex. 4.

48.     These failures of DOJ to clearly, consistently and unequivocally articulate to this Court that Gore did not call Wiercinski in mid-Sept. 2016, and offer her the e-discovery attorney position -- as Fleck (and by proxy Wiercinski) have repeatedly alleged – violated Rule 3.3(d) of the D.C. Rules of Prof'l Conduct and Rule 3.3(b) of the ABA Model Rules of Prof'l Conduct.  *See*

---

disclose false statements of material fact to third persons, *"when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6,"* respectively; (B) Rule 8.4 of the D.C. Rules of Prof'l Conduct, and Rule 8.4 of the ABA Model Rules of Prof'l Conduct, in part make it improper for a lawyer to violate, attempt to violate, or assist others to violate, the Rules of Prof'l Conduct, or engage in dishonesty and fraud, or adversely affect the administration of justice; and (C) Rule 11(b)(3) of the Fed. R. Civ. P.; Rule 3.3(a) of the D.C. Rules of Prof'l Conduct, and Rule 3.3(a) of the ABA Model Rules of Prof'l Conduct, prohibit attorneys from making false representations or statements to tribunals, where the proffered allegations run counter to the underlying evidence.  *See* Rule 4.1 of the D.C. Rules of Prof'l Conduct regarding "Truthfulness in Statements to Others," at:   https://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule4-01.cfm

Rule 3.3(d) of the D.C. Rules of Prof'l Conduct regarding "<u>Candor Toward the Tribunal</u>," at: <u>https://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule3-03.cfm</u>.   *See also* Rule 3.3(b) of the ABA Model Rules of Prof'l Conduct regarding "<u>Candor Toward the Tribunal</u>," at: <u>https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_pr ofessional_conduct/rule_3_3_candor_toward_the_tribunal/</u>.

49.     Byrne being involved and making the decisions as the General Counsel on whether and how to discipline Fleck, conspicuously violated the black-letter law and pertinent provisions of the Accountability Act; was *ultra vires*; violated unambiguous and mandatory legal requirements; and should thus be deemed void -- so VA's Office of Accountability & Whistleblower Protection" ("OAWP") – i.e., the office established under the Accountability Act created and required to "advise [&] assist the Sec'y of VA on Dept.-wide issues of [employee] accountability -- can properly conduct its corresponding duties and responsibilities under that statute.   *See* VA's OAWP website at:   <u>https://www.va.gov/accountability/</u>.   *See also* the Accountability Act, Ex. 7.

50.     The Accountability Act and the APA authorize this Court to review such final agency actions.[28]

---

[28] *See* 38 U.S.C. §§ 713(b)(6) & 713(d) of the Accountability Act, Ex. 7; and 5 U.S.C. §§ 701-706 of the APA.   *See* <u>Thompson v. U.S. Dep't of Labor</u>, 885 F.2d 551, 555-56 (9th Cir. 1989); and <u>Portland Audubon Soc'y v. Endangered Species Comm.</u>, 984 F.2d 1534, 1548 (9th Cir. 1993) (stating that judicial review of administrative records *"includes everything that was before the agency pertaining to the merits of its decision"*).   *See also* <u>Friends of the Earth v. Hintz</u>, 800 F.2d 822, 829 (9th Cir. 1986); and <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 420 (1971) (noting that APA reviews occur via the underlying agency compiling and submitting the administrative record to the reviewing court).   *See also* <u>Valentini v. Shinski</u>, 860 F. Supp.2d 1079, 1095 (C.D. Cal. 2012) (confirming the authority of courts to review final agency actions under the APA absent a right of action under another statute).   *See also* <u>Norton v. Southern Utah Wilderness Alliance</u>, 542 U.S. 55, 61-62 (2004), *citing* 5 U.S.C. § 702 (confirming that the APA authorizes lawsuits of persons . . . *"suffering [a] legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."*).   *See also* <u>Wilderness Soc'y v. U.S. Fish & Wildlife Serv.</u>, 353 F.3d 1051, 1059 (9th Cir. 2003), *quoting* <u>Chevron U.S.A.,</u>

51.     The pertinent provisions of the Accountability Act specifically state as follows:

**SEC. 101. ESTABLISHMENT OF OFFICE OF ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION.**

(a) IN GENERAL.—Chapter 3 of title 38, United States Code, is amended by adding at the end the following new section:

''§ 323. Office of Accountability and Whistleblower Protection

''(a) ESTABLISHMENT.—There is established in the Department an office to be known as the 'Office of Accountability and Whistleblower Protection' (in this section referred to as the 'Office').

''(b) HEAD OF OFFICE.—(1) The head of the Office shall be responsible for the functions of the Office and shall be appointed by the President pursuant to section 308(a) of this title.

''(2) The head of the Office shall be known as the 'Assistant Secretary for Accountability and Whistleblower Protection'.

''(3) The Assistant Secretary shall report directly to the Secretary on all matters relating to the Office.

''(4) Notwithstanding section 308(b) of this title, the Secretary may only assign to the Assistant Secretary responsibilities relating to the functions of the Office set forth in subsection (c).

''(c) FUNCTIONS.—(1) The functions of the [Office of Accountability and Whistleblower Protection] are as follows: . . . ''''

(c) FUNCTIONS.—(1) The functions of the Office are as follows:

''(A) Advising the Secretary on all matters of the Department relating to accountability, including accountability of employees of the Department, retaliation against whistleblowers, and such matters as the Secretary considers similar and affect public trust in the Department.

''(B) Issuing reports and providing recommendations related to the duties described in subparagraph (A) [. . .]

---

Inc. v. Natural Resources Defense Council, 457 U.S. 837, at 843 n.9 (1984) (describing the two-step process that courts use to review agency actions under the APA).  *See also* Pinnacle Armor, Inc. v. United States, 648 F.3d 708, 718 (9th Cir. 2011); Abbott Labs. v. Gardner, 387 U.S. 136, 140-141 (1967); and Pinnacle Armor, 648 F.3d 708, 718-719 (9th Cir. 2011), citing Webster v. Doe, 486 U.S. 592, 599 (1988) (confirming the strong legal presumption that judicial review of administrative actions is warranted absent contrary legislative intent or a lack of applicable law). *See also* State of Connecticut, et al. v. U.S. Dep't of Interior, et al., Civil Action No. 17-2564 (RC) at pp. 14-15 & 24-25 (D.D.C. 2019) (explaining that courts conducting APA reviews will *"hold unlawful [&] set aside"* agency actions that *"run counter to evidence before the agency;" are "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise[;]" or if "political pressure influenced the decision[s] in a manner not dictated by the relevant statutes [&] regulations."*).  *See also* Aid Ass'n for Lutherans v. U.S. Postal Serv., 321 F.3d 1166, 1173 (D.C. Cir. 2003) (explaining that Courts conducting APA reviews *"can defer to [an agency's] exercise of administrative discretion on internal management matters . . . [but] cannot abdicate their responsibility to insure compliance with congressional directives setting the limits on that discretion."*).

''(F) **Recording, tracking, reviewing, and confirming implementation of recommendations from audits and investigations carried out by the Inspector General of the Department**, the Medical Inspector of the Department, the Special Counsel, and the Comptroller General of the United States, including the imposition of disciplinary actions and other corrective actions contained in such recommendations[. . .]

(H) Receiving, reviewing, and investigating allegations of misconduct, retaliation, or poor performance involving—''(i) an individual in a senior executive position (as defined in section 713(d) of this title) in the Department [. . .]

''(I) Making such recommendations to the Secretary for disciplinary action as the Assistant Secretary considers appropriate after substantiating any allegation of misconduct or poor performance pursuant to an investigation carried out as described in subparagraph (F) or (H) [. . .]

''(e) RELATION TO OFFICE OF GENERAL COUNSEL.— **The Office shall not be established as an element of the Office of the General Counsel and the Assistant Secretary may not report to the General Counsel[. . .]**

''§ 713. Senior executives: removal, demotion, or suspension based on performance or misconduct

''(a) AUTHORITY.—(1) The Secretary may, as provided in this section, reprimand or suspend, involuntarily reassign, demote, or remove a covered individual from a senior executive position at the Department if the Secretary determines that the misconduct or performance of the covered individual warrants such action.

''(2) If the Secretary so removes such an individual, the Secretary may remove the individual from the civil service (as defined in section 2101 of title 5).

''(b) RIGHTS AND PROCEDURES.—(1) A covered individual who is the subject of an action under subsection (a) is entitled to—

''(A) advance notice of the action and a file containing all evidence in support of the proposed action;

''(B) be represented by an attorney or other representative of the covered individual's choice; and

''(C) grieve the action in accordance with an internal grievance process that the Secretary, in consultation with the Assistant Secretary for Accountability and Whistleblower Protection, shall establish for purposes of this subsection.

''(2)(A) The aggregate period for notice, response, and decision on an action under subsection (a) may not exceed 15 business days.

''(B) The period for the response of a covered individual to a notice under paragraph (1)(A) of an action under subsection (a) shall be 7 business days.

''(C) A decision under this paragraph on an action under subsection (a) shall be issued not later than 15 business days after notice of the action is provided to the covered individual under paragraph (1)(A). The decision shall be in writing, and shall include

the specific reasons therefor.

''(3) The Secretary shall ensure that the grievance process established

under paragraph (1)(C) takes fewer than 21 days.

''(4) A decision under paragraph (2) that is not grieved, and a grievance decision under paragraph (3), shall be final and conclusive.

''(5) A covered individual adversely affected by a decision under paragraph (2) that is not grieved, or by a grievance decision under paragraph (3), may obtain judicial review of such decision[. . .]

**''(2) The term 'misconduct' includes neglect of duty, malfeasance,** or failure to accept a directed reassignment or to accompany a position in a transfer of function.

### SEC. 202. IMPROVED AUTHORITIES OF SECRETARY OF VETERANS AFFAIRS TO IMPROVE ACCOUNTABILITY OF EMPLOYEES.

(a) IN GENERAL.—Subchapter I of chapter 7 of title 38, United States Code, is amended by inserting after section 713 the following new section:

''§ 714. Employees: removal, demotion, or suspension based on performance or misconduct

''(a) IN GENERAL.—(1) The Secretary may remove, demote, or suspend a covered individual who is an employee of the Department if the Secretary determines the performance or misconduct of the covered individual warrants such removal, demotion, or suspension.

''(2) If the Secretary so removes, demotes, or suspends such a covered individual, the Secretary may—

''(A) remove the covered individual from the civil service (as defined in section 2101 of title 5);

''(B) demote the covered individual by means of a reduction in grade for which the covered individual is qualified, that the Secretary determines is appropriate, and that reduces the annual rate of pay of the covered individual; or

''(C) suspend the covered individual . . .

''(2) The Secretary shall issue a final decision with respect to a removal, demotion, or suspension under this section not later than 15 business days after the Secretary provides notice, including a file containing all the evidence in support of the proposed action, to the covered individual of the removal, demotion, or suspension. The decision shall be in writing and shall include the specific reasons therefor.

(Emphasis added).   *See* the Accountability Act, Ex. 7; and 38 U.S.C. §§ 323(a), 323(b), 323(c)(1)(A), 323(c)(1)(B), 323(c)(1)(F), 323(c)(1)(H), 323(c)(1)(I) & 323(e), and 38 U.S.C. §§ 713(a), 713(b), 713(d)(2), 714(a) & 714(c)(2).   *See also* "Dep't of Veterans Affairs Accountability & Whistleblower Protection Act of 2017 (S. 1094)," Cong. Rec. 163:100 (June 13, 2017) pp. H4884-H4896,   at:   https://www.congress.gov/congressional-record/2017/06/13/house-

section/article/H4884-1 (containing statements from multiple congressmen that this legislation is a crucial tool for VA to demote, suspend, or fire employees that engage in misconduct).[29]

52.    In Sayers v. Dep't of Veterans Affairs, Case No. 18-2195 (Fed. Cir. 2018), DOJ conspicuously and unequivocally noted on p. 4 of its "Br. For the Resp't" dated Mar. 11, 2019, that:

> **[t]he Point of the [Accountability] Act was to remove 'many of the bureaucratic hurdles in place, making it easier for the VA Secretary to remove employees of all departments in the VA who are found guilty of wrongdoing or misconduct . . . In taking these measures, Congress acted well within its legislative discretion to determine how best to promote the effective management of the federal workforce at [VA] for the benefit of veterans and the public.  Under Section 714 [of the Accountability Act], the Secretary may remove, demote, or suspend an employee of [VA,] if the Secretary determines the performance or misconduct of the individual warrants such removal, demotion, or suspension.  38 U.S.C. § 714(a)(1).'**

**(Emphasis added).**  Br. For the Resp't at p. 4, Sayers v. Dep't of Veterans Affairs, No. 2018-2195 (Fed. Cir. 2019), ECF No. 34.  Thus, there clearly was no legal prohibition preventing the Sec'y of VA from receiving and then acting upon a recommendation from OAWP, to remove, demote, or suspend Fleck and/or Wiercinski, for their improper conduct as documented in the OIG Report. Id.  See also the Accountability Act, Ex. 7.  Furthermore, DOJ also noted on p. 15 of that same

---

[29] See also "Dep't of Veterans Affairs Accountability & Whistleblower Protection Act of 2017 (S. 1094)," Cong. Rec. 163:100 (June 13, 2017) p. S3414, at: https://www.congress.gov/congressional-record/2017/06/13/senate-section/article/S3414-1 (containing statements from Senator Mitch McConnell confirming the Accountability Act is to enable VA to "hold bad actors accountable").  See also Chevron U.S.A., Inc. v. Natural Res. Def. Counsel, Inc., 467 F.2d 837, 842-843 & n. 9 (1984) (providing that Courts and Federal agencies must give "effect to the unambiguously expressed intent of Congress" when the text of the underlying legislation clearly speaks to the underlying issue).  See also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of America v. Brock, 816 F.2d 761, 766 (D.C. Cir. 1987) (explaining "that statutes must be construed so as to avoid illogical or unreasonable results.").  See also Erik Katz, "Potential Landmark Case Could Upend Major Civil Service Reform," Gov't Executive, Dec. 12, 2018, at:  https://www.govexec.com/management/2018/12/potential-landmark-case-could-upend-major-civil-service-reform/153496/.  Compare the Accountability Act, Ex. 7 (notably the provisions regarding 38 U.S.C. 323(b)(3), (b)(4), (c)(1)(A), (c)(1)(F) & (c)(1)(I)), with 38 U.S.C. § 512.

brief that the Accountability Act was designed to address misconduct where VA employees fail to follow orders, cause deficiencies in VA operations; expose VA to lax security concerns; cost VA time and money; harm Veterans; and put others in jeopardy.  Br. For the Resp't at p. 15, <u>Sayers v. Dep't of Veterans Affairs</u>, No. 2018-2195 (Fed. Cir. 2019), ECF No. 34.

53.     When read together, the Accountability Act clearly reflects that Congress:  (A) mandated that OAWP function separately and apart from OGC while handling underlying disciplinary and accountability matters; and (B) prohibited the Asst. Sec'y of OAWP from reporting to OGC (including Byrne), while (i) serving as the VA official required to investigate disciplinary and accountability matters involving senior VA officials; (ii) making corresponding disciplinary recommendations to the Sec'y of VA for his/her subsequent disposition; and (iii) ensuring that recommendations stemming from OIG investigations, including conduct of "malfeasance," are tracked and implemented.  *See* the Accountability Act, Ex. 7.

54.     Given the pertinent facts, laws, and evidence, it is clear that Byrne's decision and conduct after the OIG Report was issued, to:  (A) issue an interim & then final warning letter and additional training requirement to Fleck – despite the OIG's recommendation that Fleck be fired and Hipolit's recommendation that Fleck be demoted to a non-supervisory position; and (B) violate the Accountability Act and underlying purview of OAWP vis-à-vis the Sec'y of VA– constituted actions under the APA that (i) were arbitrary and capricious; (ii) an abuse of discretion; (iii) exceeded statutory jurisdiction, authority, or limitations; (iv) were contrary to law and procedures required under applicable law; (v) lacked *"a rational choice between the facts . . . and the choice[s] made[;]"* and (vi) fostered, contributed to, and advanced subsequent improper acts & omissions of Fleck, Wiercinski by proxy, and the Defendants (i.e., in the <u>Fleck v. Dep't of Veterans Affairs</u> case) -- which caused the Plaintiffs further significant harm, notably severe emotional distress, and

Woods' loss of consortium.  *See* Brief of Petitioner at 9, <u>Sayers v. Dep't of Veterans Affairs</u>, Case No. 18-2195 (Fed. Cir. 2018), which states as follows:

> <u>Nat. Res. Def. Council, Inc. v. U.S. E.P.A.</u>, 966 F.2d 1292, 1297 (9th Cir. 1992). See also <u>Sierra Pacific Indus. v. Lyng</u>, 866 F.2d 1099, 1105 (9th Cir. 1989), citing <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).  A decision is not supported by substantial evidence *"if it is not supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."* <u>Haebe v. Dep't of Justice</u>, 288 F.3d 1288, 1298 (Fed. Cir. 2002) . . . .

55.    During Byrne's July 19, 2017 nomination hearing before the Senate Veterans Affairs Committee, the Chairman (Senator Johnny Isakson) informed Byrne at the twenty-four minute, sixty second timeframe that Byrne's ***most important charge*** -- if nominated to be VA's General Counsel – was to ensure that VA implemented the Accountability Act correctly and legally.  *See* Senate Veterans Affairs Comm's Pending Nominations Hearing, July 19, 2017, at: <u>https://www.veterans.senate.gov/hearings/pending-nominations-07192017</u>.        Senator   Isakson specifically said as follows to Byrne:

> **Mr. Byrne and I talked about his big responsibility, and I want to underscore it.  As the um, General Counsel to the Veterans Administration, you have in my judgment one big job ahead of you.  And that's making sure that the Accountability bill is implemented, and it is implemented fairly, it is executed appropriately, and it works.**  The ranking member [Senator Jon Tester] has a lot of political capital and so, our Veterans deserve the very best service from the Veterans Administration, and from the leadership of that institution -- the Veterans Administration.  **The Accountability Bill was passed to give the VA rank and file the leadership they need and those who govern them the tools they need, to elicit the support and leadership the Veterans expect, so the Veterans Administration is delivering their job.**  You probably have the most challenging and toughest job of all.  But I am confident in talking with you in my office, that you're ready for it, that you'll do a great job, and we appreciate your willingness to consider doing it, **but don't forget – job one is making sure the Accountability Bill that we [Congress] envisioned and passed, works and works effectively for our Veterans, and for the Secretary [of VA]. . . .**

**(Emphasis added).**  <u>Id.</u>

56.     The Title I provisions of the Accountability Act regarding 38 U.S.C. §§ 323(b)(3) and (e) clearly stipulate that OAWP is an organization that is required to report directly to the VA Sec'y; function separately and distinctly from OGC; and OAWP's Asst. Sec'y is prohibited from reporting to VA's General Counsel (i.e., Byrne).  *See* 38 U.S.C. §§ 323(b)(3) & 323(e); and the Accountability Act, Ex. 7.

57.     While Congress clearly charged and expected Byrne to ensure that VA lawfully implements the Accountability Act, Byrne engaging in the disciplinary process of Fleck with or in lieu of OAWP, violated that legislation as well as pertinent disciplinary and accountability policy; breached OAWP's requisite separation and independence from OGC as conditioned in 38 U.S.C. § 323(e) of the statute; and unduly circumvented the roles and responsibilities of OAWP within VA.  *See* the Accountability Act, Ex. 7; and 38 U.S.C. §§ 323(b)(3) & 323(e).  *See also* Nikki Wentling, "VA employee advocates, lawmakers contend new law targets low-level workers [&] whistleblowers," Stars & Stripes, July 17, 2018, at:  https://www.stripes.com/news/va-employee-advocates-lawmakers-contend-new-law-targets-low-level-workers-and-whistleblowers-1.538147.  *Cf.* n. 2, and pp. 3, 37, 45-48 & 55-57 of the GAO Report, Ex. 12.

58.     On July 19, 2018, GAO issued a Report No. 18-137, titled "Dep't of Veterans Affairs:  Actions Needed to Address Employee Misconduct Process and Ensure Accountability" ("GAO Report").  ***See* the GAO Report at Ex. 12.**  The GAO Report and corroborating news articles confirmed that there are material deficiencies and improvements needed for VA employee accountability actions.  Id.  ***See also* the news articles discussing the GAO Report at Ex. 13.** For example, the GAO Report found evidence that VA fails to adequately track, investigate, and punish senior officials for disciplinary infractions; VA officials that review potential infractions have conflicts of interest, by reviewing employee disciplinary issues falling within their own

chains of command; VA needs internal controls to ensure adherence to proper "separation-of-duty" standards involving the "proposing and deciding officials;" VA lacks adequate written policies and procedures to properly hold employees accountable; and VA employees that file claims or report fraud, waste, or abuse, face appreciably higher instances of retaliation, reprisal, intimidation, ridicule, gas lighting, threats, abuses, and breaches of trust and openness.  *See* pp. 44-49 & 54 of the GAO Report, Ex. 12.  *See also* U.S. Gov't Accountability Office, GAO-19-422R, "VA [Mgmt.] Challenges:  Actions Needed to Improve Management [&] Oversight of VA Operations," at p. 10 (Apr. 10, 2019):   https://www.gao.gov/assets/700/698398.pdf.   (Citing GAO's recommendation and VA's concurrence to establish new policy and an information system to properly upload and track its *"misconduct and associated disciplinary-action data . . . ."*).  In fact, pp. 47-48 of the GAO Report stated that:

> The independence of officials conducting or reviewing the results is paramount to the integrity of the process both in deed and appearance. According to VA Directive 0700, the decision whether to conduct an investigation should not be made by an official who may be a subject of the investigation, or who appears to have a personal stake or bias in the matter to be investigated. Moreover, according to OIG policy, investigations referred to VA offices must be reviewed by an official independent of and at least one level above the individual involved in the allegation.

> VA does not have oversight measures to ensure that all referred allegations of misconduct are investigated by an entity outside the control of the facility or program office involved in the misconduct, to ensure independence. VA OIG officials acknowledged that there have been concerns about referring cases back to the chain of command because the OIG is unsure where cases go once they are referred. The investigation of allegations of misconduct by the program office or facility where the complaint originated may present the appearance of a conflict of interest in which managers and staff at facilities may investigate themselves or other allegations where they may have a personal stake or bias in the matter to be investigated. Consequently, there may be an increased risk that the results of the investigation are minimized, not handled adequately, or questioned by the OSC or the individual who made the original allegation.

Pp. 47-48 of the GAO Report, Ex. 12.

59.     Subsequent to issuance of the GAO Report, then-Congresswoman Michelle Lujan

Grisham ("Congresswoman Grisham") made the following public remarks in the Albuquerque

Journal on July 22, 2018:

The findings from a recent [GAO] investigation into the Department of Veterans
Affairs (VA) describe an agency in crisis.  The investigation uncovered that the VA
whitewashed misconduct allegations without interviewing witnesses; flatly ignored
whistleblower concerns; failed to remove or suspend employees who were found
guilty of gross misconduct; and allowed several individuals to investigate their own
accusations.  Most troubling, VA whistleblowers were 10 times more likely to
receive disciplinary action than other employees, and two-thirds of them left the
VA within a year, suggesting pervasive retaliation against employees who reported
wrongdoing or abuse.  These findings unfortunately confirmed the reasons why I
called for this investigation and mirrored the dozens of complaints my office
received from Albuquerque VA staff who described a culture of intimidation and
bullying.  Many even contacted my office anonymously or used aliases to conceal
their identity due to fear of reprisal.  Extremely alarming for me was when a staffer
at the Albuquerque VA Hospital told me that, "When staff complain about
supervisors, management either found a reason to fire them or bullied them until
they quit."  Instead of acknowledging that our most important tool in reforming the
VA is the veterans, loved ones, and staff who bravely report misconduct and abuse,
VA officials were burying complaints and pushing out concerned employees.  VA
Subcommittee Chairman Mike Coffman, R-Colo., had heard the same types of
anecdotes that we had been hearing.  In March 2015, we worked to launch a national
investigation into VA whistleblower and accountability issues because when
problems are hidden, veterans suffer, and people die.  The investigation's findings
were disturbing and portrayed a toxic culture that failed to hold employees
responsible for misconduct and punished those with the courage to speak up.  That
type of turmoil is completely unacceptable for an agency that manages the federal
government's most solemn responsibility: caring for the men and women who were
injured or traumatized defending our nation.  It is clear that whistleblower
retaliation and a pervasive lack of accountability are major roadblocks to reducing
patient wait times, increasing access to PTSD services, improving caregiving and
providing quality health care.  Reforming our VA is not a partisan issue, and
members of Congress must continue to work collaboratively to improve veteran
services and be responsive to the people we represent. We must engage more
members in this effort because much more work remains to be done.  That is why
I urge my Congressional colleagues to establish a blue ribbon commission, similar
to what Congress set up after the terrorist attacks of Sept. 11, 2001, in order to
overhaul how the VA protects whistleblowers and addresses mismanagement,
waste, fraud and abuse.  Further, the VA is blatantly ignoring its procedures on due
process rights, whistleblower rights and employee accountability, and I believe the
Department of Justice (DOJ) has the independence and expertise to immediately
change that culture.  The Trump administration must assign a DOJ federal monitor

to oversee misconduct complaints – for the benefit of whistleblowers and accused. These common-sense steps are needed to ensure the federal government keeps its promise to the brave men and women who risk their lives for our country. I am especially grateful for every person who has come forward and brought to light issues at the VA. Without their courage, we would never know about the problems that need to be fixed; Congress would never have enacted the VA Choice Program; the GAO would never have launched this investigation, and I would not have the honor to advocate for veterans and families experiencing issues at the Albuquerque VA Hospital. I am committed to continuing to do everything possible to reform the VA and work to ensure every veteran receives the timely, quality care they have earned.

**(Emphasis added).** U.S. Rep. Michelle Lujan Grisham, "<u>Urgent Veterans Affairs reform is needed now</u>," Albuquerque Journal, July 22, 2019, at: <u>https://www.abqjournal.com/1199414/urgent-veterans-affairs-reform-is-needed-now.html</u>.

60. On July 30, 2018, then-Congresswoman Grisham and a bipartisan group of congressional members issued a letter to the Sec'y Wilkie, expressing their concern that VA was continuing to retaliate against whistleblowers; failing to hold senior VA officials accountable for misconduct; not following its own rules and procedures for investigating and adjudicating disciplinary matters; and inadequately implementing and documenting recommended adverse actions against guilty employees. *See* U.S. Rep. Michelle Lujan Grisham, et al, "<u>Letter to the Hon. Robert Wilkie, [Sec'y of VA] – National Whistleblower Day</u>," July 30, 2018, Votesmart.org, at: <u>https://drive.google.com/file/d/1tCmF8SeEPLe3BN2buBh0OdDU10mcWpd0/view</u>. The letter also reiterated GAO's recommendation for an independent review of the disciplinary measures implemented thus far for senior VA officials. <u>Id.</u> The letter stated as follows:

Dear Secretary Wilkie,

Congratulations on your confirmation as the new Secretary of Veterans Affairs. We look forward to working with you to ensure that our veterans promptly receive the benefits they have earned through their service to our nation. To ensure the Department of Veterans Affairs (VA) can fulfill its important mission, it is vital that its work force is properly trained, led, and accountable. To that end we call your attention to the recent Government Accountability Office (GAO) report

titled, "Actions Needed to Address Employee Misconduct Process and Ensure Accountability" and urge the VA to immediately implement the recommendations outlined in that report. The GAO reviewed a representative sample of 544 misconduct cases from 2009-2015 and examined a non-generalizable sample of whistleblower disclosures from 2010-2014. The GAO's investigation uncovered serious issues with the VA's record-keeping, its protection of whistleblowers, and its handling of allegations of misconduct, waste, fraud, and abuse.

In the cases reviewed, the GAO found that some VA officials who were found guilty of misconduct received a lesser punishment than recommended or no punishment at all; whistleblowers were 10 times more likely to receive disciplinary action the year they spoke up than their peers; 66 percent of the employees who filed formal whistleblower complaints did not work for the VA the following year; and some employees investigated complaints against themselves.

It is clear that to date the VA has failed to protect whistleblowers and hold senior VA officials accountable for misconduct. These problems are not new, and we have heard similar complaints from VA employees, veterans, and their loved ones for years. This type of turmoil is completely unacceptable for an agency tasked with managing the federal government's most solemn and important responsibilities: caring for the brave men and women who were injured or traumatized defending our nation.

The VA must cultivate a culture of trust and openness, and empower employees to report waste, fraud, abuse, and misconduct. That is why we urge the VA to immediately implement the GAO's recommendations. These recommendations include ensuring that the VA maintains reliable record-keeping and documentation for its misconduct investigations; the VA follows its own rules and procedures for investigating and adjudicating misconduct investigations; and all recommended adverse actions against guilty employees are recorded and implemented. The recommendations also call for independent review and oversight of senior official misconduct to ensure these officials are held accountable for their actions.

Thank you for your prompt attention to this important and serious matter. We look forward to your response.

Sincerely,

Michelle Lujan Grisham, Member of Congress[, et al.]

Id.

61.     On Apr. 16, 2019, a Gov't Exec. news article reported that the OIG has opened up an investigation into systemic corruption within OAWP.   Eric Katz, "New Whistleblower Protection Office Is Under Investigation for Retaliating Against Whistleblowers," Gov't Exec., Apr. 16, 2019, at:   https://www.govexec.com/oversight/2019/04/new-whistleblower-protection-office-under-investigation-retaliating-against-whistleblowers/156314/.   The   article   noted   as follows when describing that OAWP has been improperly "turning on" whistleblowers who come forward, and Byrne has been unduly exercising a "veto power" over OAWP's accountability processes, procedures, and decisions, in violation of the Accountability Act:

> *Government Executive* spoke to several VA employees who expressed frustration or anger toward OAWP, three of whom have already been interviewed by IG investigators. They described feeling betrayed or neglected by an office they believed was going to help them but ended up doing the opposite. They said they have shared information with the investigators, including documentation of alleged reprisal.
>
> The alleged collaboration between the Office of General Counsel and OAWP has troubled observers. Tom Devine, legal director at the Government Accountability Project, a whistleblower advocacy group, said his initial excitement about OAWP has been dampened by "structural developments," including what he called veto power the department's general counsel has over the whistleblower protection office.
>
> This would appear to be in violation of the 2017 law that permanently authorized OAWP, which prohibits the office from existing "as an element of the Office of General Counsel" and its leadership from reporting to OGC. [VA spokesman Curt] Cashour said it was false to suggest that the Office of General Counsel exercises veto power over whistleblower claims, but acknowledged OAWP and OGC do coordinate.
>
> "OAWP has a collaborative working relationship with OGC, but OAWP retains final decision making authority on all OAWP matters," Cashour said.
>
> Rebecca Jones, policy counsel at the Project on Government Oversight, said the office can likely not completely fix its issues while it remains an "internal clearinghouse" for whistleblowers rather than a truly independent office. Jones praised the IG for investigating the alleged retaliation.
>
> "I wish it hadn't come to this," she said . . .

Last year, before his office formally launched an official investigation into the practices of OAWP, VA Inspector General Michael Missal became part of a public spat with then acting Secretary Peter O'Rourke over documents housed within the office. The IG requested access to information on the cases filed with OAWP, but O'Rourke refused to comply. They aired their grievances through a series of public letters, which included O'Rourke harshly reminding Missal that the IG served as the secretary's subordinate. Congress ultimately intervened by emphasizing in a spending bill that the IG had the right to any and all documents it requested.

Id.  The above quote from VA spokesman Curt Cashour ("Cashour") clearly acknowledges that

Byrne has been having improper interactions with OAWP, in violation of the Accountability Act.

Id.  Further, it confirms that OAWP was the proper entity to make disciplinary recommendations

to the Sec'y of VA.

62.     In the instant matter, Byrne was improperly both an interested party situated above

Fleck in the chain of command and the deciding official.  *See supra* ¶ 22 at Clauses (T), (X) &

(AA); ¶¶ 79-80, 82 & 84-86 of the Fleck Complaint, Ex. 4; ¶¶ 79-80, 82; 79-80, 82 & 84-86 of the

Amended Fleck Complaint, Ex. 4; and pp. 6-7 & 19-22 of the Fleck Opposition Motion, Ex. 4.

Byrne's decision to issue two warning letters and an additional training requirement to Fleck

contravened proper analysis of applicable VA policy and the related factors that deciding officials

are instructed to consider in such instances.  Specifically, ¶ 3, titled "Policy" on Page I-1 of VA

Handbook 5021/22, titled "Employee/Mgmt. Relations" and dated Mar. 14, 2016, confirms that

VA employees are expected to maintain *"the highest standards of employee integrity,"* and VA

disciplinary penalties *"will generally be imposed for like offenses."*  The specific text from

Handbook 5021/22 states as follows:

**3. POLICY**
**a. The public interest requires the maintenance of high standards of employee integrity, conduct, effectiveness, and service to the public. When such standards are not met, it is essential that prompt and just corrective action be taken. The policy of VA is to maintain standards of conduct and efficiency that will promote the best interests of the service.** Disciplinary and adverse actions shall be governed by these basic principles:

(1) An employee shall be informed in writing honestly and specifically why the action is being brought against him or her.

(2) An employee shall be given a reasonable opportunity to present his or her side of the case.

(3) The employee and representative shall have assurance of freedom from restraint, interference, coercion, discrimination, or reprisal in discussing, preparing, and presenting a defense.

**b. In taking actions covered by this part, like penalties will generally be imposed for like offenses (see appendix A of this part, for further discussion). However, supervisors should give consideration to several factors when determining what action is appropriate, including the nature and gravity of the offense, the existence of either mitigating or aggravating circumstances, the frequency of the offense, and the employee's position. Adverse actions against employees (excluding employees in the Senior Executive Service (SES)) will be taken only for such cause as will promote the efficiency of the service. [Suspensions of more than 14 calendar days] against SES employees will be based only on misconduct, neglect of duty, malfeasance or failure to accept a directed reassignment, or to accompany a position in a transfer of function.**

**(Emphasis added)**.  *See* VA Handbook 5021/22 at:

https://www.va.gov/vapubs/viewPublication.asp?Pub_ID=836&FType=2.

63.     Additionally, App. "A" beginning on p. II-A-1 of VA Handbook 5021/25 dated Dec. 28, 2017, identifies mitigating and aggravating factors for Title 38, U.S. Code "disciplinary [&] adverse actions" (including the Accountability Act) for VA employees. https://www.va.gov/vapubs/viewPublication.asp?Pub_ID=896&FType=2.  *See* Grant v. Mnuchin, Civil Action No. 15-1008 (RMC) (D.D.C. 2019) (upholding a Federal employee being fired due to a lack of candor when testifying under oath to agency inspector general investigators, disregarding agency procedures, and failing to cooperate in the official investigation); in McCullough, Civil Action No. 14-296 (RDM) at 16-17, this Court noted that an employer's failure to follow established procedures can provide evidence of pretext and cast doubt on the purported reason(s) for the underlying employment decision.

64.     During a Senate Veterans Affairs Comm. hearing held on Sept. 5, 2018 -- which in part involved the-then pending nomination for Dr. Tamara Bonzanto ("Bonzanto") to be the Asst. Sec'y for OAWP -- both Congress & Bonzanto recognized and acknowledged that VA:  (A) needs to develop clearer policies and procedures for VA's employee accountability process; (B) currently has a serious cultural problem of firing lower level employees for improper performance or behavior, versus senior officials; and (C) has improperly allowed senior officials to make accountability decisions regarding VA employees within their respective chains of command.[30] For more information regarding Bonzanto's Senate confirmation to be the Asst. Sec'y of OAWP, *see* the following Congress.gov weblink:   https://www.congress.gov/nomination/115th-congress/2343?r=9.

65.     Notably, despite (A) Congress' clear mandate under the Accountability Act that the Asst. Sec'y for OAWP is charged with handling pertinent disciplinary-related functions for senior VA officials, and making corresponding recommendations to the Sec'y of VA; and (B) the concerns discussed on n. 2, and pp. 3, 37, 45-48 & 55-57 of the GAO Report contained Ex. 12 – which discuss the need for VA officials to avoid undue conflicts of interest when engaging in disciplinary processes and procedures -- ¶¶ 79, 80, 82 & 84-86 of the Fleck Complaint & the Amended Fleck Complaint contained Ex. 4, shockingly confirm that Byrne somehow determined that Fleck only "technically" emailed the Confidential VA Information to Wiercinski, and it was not unbecoming of a licensed Federal attorney – when Fleck & Wiercinski subsequently engaged in illegal and unprotected acts of civil conspiracy, by fraudulently and recklessly lying repeatedly to multiple OIG investigators when testifying under oath – to try to deceive the OIG; thwart the

---

[30] *See* the U.S. Senate Comm. on Veterans' Affairs, "'Pending Nominations (OAWP, CIO)' Before the U.S.  Senate Committee on Veterans Affairs," 115th Congress (Sept. 5, 2018), at: https://www.veterans.senate.gov/hearings/pending-nominations-oawp-cio-09052018.

accuracy and efficiency of the OIG investigation; frame Gore; and cover up their misdeeds.  *See* ¶¶ 79, 80, 82 & 84-86 of the Fleck Complaint & the Amended Fleck Complaint contained Ex. 4; and n. 2, and pp. 3, 37, 45-48 & 55-57 of the GAO Report contained Ex. 12.  Compare ¶¶ 2 & 47 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4, with pp. 11-15 of the OIG Report, Ex. 5.

66.     Byrne's determination per ¶¶ 84-86 of the Fleck Complaint & the Amended Fleck Complaint that Fleck somehow "technically" but did not really email the Confidential VA Information to Wiercinski strains credulity, is at worst *ipse dixit,* and at best an unmitigated oxymoron – particularly given VA's enduring efforts and struggles over the years -- to avoid even unintended releases of Veteran-related information.  Compare ¶¶ 84-86 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4, with pp. 1 & 10-18 of the OIG Report, Ex. 5.  *See* Hope Yen, "VA agrees to pay $20 million to veterans in 2006 data breach," Boston.com, Jan. 28, 2009: http://archive.boston.com/news/nation/washington/articles/2009/01/28/va_agrees_to_pay_20_million_to_veterans_in_2006_data_breach/.  *See also* Dina Gusovsky, "VA data breach 'practically unavoidable,' memo says," CNBC, Feb. 2014, at:  https://www.cnbc.com/2014/02/20/va-data-breach-pratically-unavoidable-memo-says.html.  *See also* Elizabeth Snell, "VA Healthcare Data Breach Exposes Info of 7,000 Veterans," HealthITSecurity, Dec. 29, 2014, at: https://healthitsecurity.com/news/va-healthcare-data-breach-exposes-info-of-7000-veterans.  *See also* Jim Absher, "VA Data Breach Reported by California Hospital," Military.com, Mar. 26, 2018, at:   https://www.military.com/militaryadvantage/2018/03/26/va-data-breach-reported-california-hospital.html.  *See also* Joseph Marks, "VA Stopped Publishing Breach Reports About Vets'  Data  for  Nine  Months,"  Nextgov,  Aug.  24,  2018,  at: https://www.nextgov.com/cybersecurity/2018/08/va-stopped-publishing-breach-reports-about-

vets-data-nine-months/150809/.  *See also* "Lebanon VA Medical Center announces accidental

release of nearly 1000 veterans' information," Fox 43 Newsroom, Jan. 15, 2019, at:

https://fox43.com/2019/01/15/lebanon-va-medical-center-announces-accidental-release-of-

nearly-1000-veterans-information/.

67.    Sec'y Wilkie is on record pledging to avoid actual and apparent conflicts of interest

while at VA, and comply with 18 U.S.C. § 208 -- as evinced in a June 21, 2018 letter that he signed

and submitted to Mitrano -- in Mitrano's concurrent capacity as VA's Designated Agency Ethics

Official.  ***See* the Letter From VA Sec'y Robert L. Wilkie to Catherine Mitrano, Esq. Dated**

**June 21, 2018 at Ex. 14.**  The letter begins by stating that:

> **[t]he purpose of this letter is to describe the steps that I [Secretary Wilkie] will**
> **take to avoid any actual or apparent conflict of interest in the event that I am**
> **confirmed for the position of Secretary of the U.S. Department of Veterans**
> **Affairs.  As required by 18 U.S.C. § 208(a), I will not participate personally**
> **and substantially in any particular matter in which I know that I have a**
> **financial interest directly and predictably affected by the matter, or in which**
> **I know that a person whose interests are imputed to me has a financial interest**
> **directly and predictably affected by the matter, unless I first obtain a written**
> **waiver, pursuant to 18 U.S.C. § 208(b)(1), or qualify for a regulatory**
> **exemption, pursuant to 18 U.S.C. § 208(b)(2) . . . .**

**(Emphasis added).**  Id.  In his role as the head of VA, Sec'y Wilkie is charged with and responsible

to ensure that he and his subordinates, including Byrne, do not involve themselves in disciplinary

matters that constitute actual or apparent conflicts of interests.  *See* 38 U.S.C. § 303 (noting the

Sec'y of VA is responsible for the *"proper execution and administration"* of VA-related laws, and

*"control, direction, and management of the [Dep't.]."*

When Byrne was serving as VA's Gen. Counsel, he was required and expected to avoid conflicts

of interest, and comply with 18 U.S.C. § 208.  *See* 38 U.S.C. § 311 (confirming that VA's Gen.

Counsel is the *"chief legal officer of [VA],"* and *"provides legal assistance to the Sec'y of VA*

*concerning the programs and policies of the [Dep't.]"*).  Notably, Sec'y Wilkie was serving as the

Acting Sec'y of VA from Mar. 28, 2018 through May 29, 2018 -- when Byrne issued the aforementioned interim & final warning letters to Fleck, with a requirement for Fleck to take additional training – and thereby violated the Accountability Act. *See* VA's Official Website, "Office of Public and Intergovernmental Affairs -- [Sec'y] of Veterans Affairs," at: https://www.va.gov/opa/bios/secva.asp. *See also* "United States [Sec'y] of Veterans Affairs," Wikipedia, at: https://en.wikipedia.org/wiki/United_States_Secretary_of_Veterans_Affairs.

68. When Byrne was serving as VA's Gen. Counsel, he was required and expected to avoid conflicts of interest, and comply with 18 U.S.C. § 208. *See* 38 U.S.C. § 311 (confirming that VA's Gen. Counsel is the *"chief legal officer of [VA]," and "provides legal assistance to the Sec'y of VA concerning the programs and policies of the [Dep't.]"*). Notably, Sec'y Wilkie was serving as the Acting Sec'y of VA from Mar. 28, 2018 through May 29, 2018 -- when Byrne issued the aforementioned interim & final warning letters to Fleck, with a requirement for Fleck to take additional training – and thereby violated the Accountability Act. *See* VA's Official Website, "Office of Public and Intergovernmental Affairs -- [Sec'y] of Veterans Affairs," at: https://www.va.gov/opa/bios/secva.asp. *See also* "United States [Sec'y] of Veterans Affairs," Wikipedia, at: https://en.wikipedia.org/wiki/United_States_Secretary_of_Veterans_Affairs.

69. As Chief Counsel for the PLG and an "award winning" attorney before that with DOD -- as Fleck repeatedly touts in the Fleck Complaint, Amended Fleck Complaint & Fleck Opposition Motion -- Fleck knew or should have known that he was expected to safeguard the Confidential VA Information. *See* ¶¶ 8-11 of the Fleck Complaint & the Amended Fleck Complaint, and pp. 1 & 20 of the Fleck Opposition Motion, Ex. 4; and pp. 5-6 of the OIG Report, Ex. 5.

70. Gore certainly had not provided Wiercinski with any form of prior supervisory approval or clearance to receive the Confidential VA Information from Fleck on Sept. 30, 2016. Id.

71. Additionally, during his time in OGC, Fleck had been involved in prior VA hires for new attorneys selected to work on his PLG team, with some located in D.C. and others based in Eatontown, N.J. *See* ¶¶ 15 & 16 of Gore's Notes About the OIG Report & Related Matters, Ex. 10. Thus, he knew or should have known that HR (with support as needed from MPA) issues the tentative offers, final offers and conducts the onboarding process for OGC personnel, not OGC Chief Counsels.[31] Id. *See also* ¶¶ 8-11 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4; pp. 2 & 11-13 of the OIG Report, Ex. 5; OGC's Draft Apr. 2018 Organizational Chart; and pp. 7 & 11 of OGC's Organizational Slide Deck, Ex. 6. *See also* the following U.S. Office of Personnel Management ("OPM") weblink:   https://www.opm.gov/policy-data-oversight/human-capital-management/hiring-reform/hiring-process-analysis-tool/the-tentative-job-offer-and-acceptance-element/.

72. The issue of whether VA adequately held Fleck & Wiercinski accountable for their misdeeds runs afoul of how strongly DOJ has publicly castigated Federal employees whom commit perjury. For example, in June 2018 U.S. Attorney Jessie K. Liu, Esq., ("Liu") who is the same U.S. Atty that was involved in the Fleck v. Dep't of Veterans Affairs case – was referenced in a prior unrelated U.S. Atty's Office press release. It regarded false statements that a former staffer of the Senate Select Committee on Intelligence (James A. Wolfe), made to the Federal Bureau of Investigation. DOJ Press Release, "Former U.S. Senate Employee Indicted on False Statements Charges," June 7, 2018, at: https://www.justice.gov/usao-dc/pr/former-us-senate-

employee-indicted-false-statements-charges.   It discussed DOJ's view on the importance of

holding Federal officials accountable, when they lie to investigators after improperly disclosing

sensitive information:

> **All individuals in positions of trust must be held to the highest of standards, as the American public deserves no less," said Special Agent in Charge Dunham. "As alleged in this indictment, Mr. Wolfe failed to meet those standards in his repeated lies to federal agents concerning the unauthorized disclosure of information. His arrest demonstrates that this conduct will not be tolerated, and those that engage in it will be held accountable.**

**(Emphasis added).** Id.  Atty Liu was also quoted at the end of a Feb. 2019 news article of "Stars

& Stripes," regarding the seriousness of crimes where VA employees *"[betray] the public trust,"*

e.g., through acts of fraud and to obstruct justice.  *See* Spencer S. Hsu, "'Greed corrupted you':

VA official who exploited veterans in fraud scan gets 11 years," Stars & Stripes, Feb. 16, 2019,

at:       https://www.stripes.com/news/veterans/greed-corrupted-you-va-official-who-exploited-

veterans-in-fraud-scam-gets-11-years-1.568932.   *See also* Gregg Re, "Greg Craig, ex-Obama

White House counsel, indicted for alleged false statements," Fox News, Apr. 11, 2019, at:

https://www.foxnews.com/politics/greg-craig-ex-obama-white-house-counsel-indicted-on-

making-false-statements-to-doj. (Confirming at the end of the article that Atty Liu was part of the

team of U.S. Attorneys that announced Greg Craig's Federal indictment for allegedly making false

statements).

     73.     Gore lacked the authority to directly hire Wiercinski for the e-discovery attorney

position (or any other OGC position for that matter), as those responsibilities reside with MPA and

HR.  *See* the timeline of events *supra* ¶ 22 at Clauses (A) through (C), (E), (K) through (M) & (O)

through (Q); ¶¶ 9-11 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4; pp. 2 & 11-

13 of the OIG Report, Ex. 5; OGC's Draft Apr. 2018 Organizational Chart; and pp. 7 & 11 of

OGC's Organizational Slide Deck, Ex. 6.  *See also* **pp. 1-2 of OGC's "General Counsel**

**Handbook,"** specifically the section titled **"Authority of the Executive Director for [MPA],"** **Ex. 20**.  *See also* the following OPM weblink:  https://www.opm.gov/policy-data-oversight/human-capital-management/hiring-reform/hiring-process-analysis-tool/the-tentative-job-offer-and-acceptance-element/.  *See also* the "Overview" section and bullet #1 on p. 30 of VA's 2017 "Functional Organizational Manual" Version 4.0, at: https://www.va.gov/ofcadmin/docs/VA_Functional_Organization_Manual_Version_4.pdf.

74.     And per the following p. 10 excerpt of Gore's FY 2017 Performance Appraisal -- in FY 2017, Gore coordinated with his OGC leadership (e.g., Hipolit and Hogan) during the process of VA recruiting, advertising, hiring, and onboarding seven new attorneys for RPLG (including Wiercinski as the new e-discovery attorney), and in none of those instances did Gore unilaterally contact and hire the underlying individuals:

> As part of leading the office, a key prior for Mr. Gore was to navigate the rigors of the Federal hiring process within and outside of the Office of General Counsel (OGC) and fill several vacancies. Through his efforts, his office was able to advertise, evaluate, interview, and hire 6 new real property staff attorneys, 1 new E-Discovery attorney, and a legal assistant. **Mr. Gore was directly involved and coordinated with his superiors during the process.** These new hires resulted in the acquisition of approximately 16,640 of new man[-]hours for OGC, to support VA's mission and operations.

**(Emphasis added).**  *See* the timeline of events *supra* ¶ 22 at Clauses (H) through (Q); and p. 10 of Gore's FY 2017 Performance Appraisal, Ex. 2.

75.     Gore's diligence in following the instructions of his OGC leadership is substantiated by the following excerpt on p. 10 of the OIG Report, where it is clear that Hipolit wanted Fleck & Gore to coordinate in developing the vacancy announcement for the e-discovery attorney position, because that position would be providing legal support to the OGC Litigation Team – which is comprised of attorneys from PLG, RPLG, and the DCNPG:

> Mr. Hipolit was also questioned [by the OIG investigators] regarding Mr. Fleck's involvement in designing the [e-discovery attorney] position, and evidence was presented indicating Mr. Fleck's involvement in designing the position. **Mr. Hipolit said he wanted Contract Operation leadership involved in designing the Contract Litigation Team, because the team would affect all operations. Mr. Hipolit also said it was natural for Mr. Fleck to be involved in discussions of the position, because he would be one of the people utilizing the services of the Contract Litigation Team.** Mr. Hughes, Chief Counsel of DCNPG, stated during questioning that he had no knowledge of any involvement by Mr. Fleck.

**(Emphasis added).** *See* p. 10 of the OIG Report, Ex. 5.

76.     It is axiomatic that the Plaintiffs have suffered a great deal, when considering that during the timeframe that VA denied the Plaintiffs' FTCA claim, the United States (through DOJ) was concurrently expending time, energy, and taxpayer resources defending itself in the <u>Fleck v. Dep't of Veterans Affairs</u> case. *See* exs. 4 & 11.  But DOJ contested the action, in order to protect the interests of the United States.  <u>Id.</u>  The Plaintiffs have a compelling need and right to do the same, via the instant lawsuit against the Defendants.  <u>Id.</u>  *See also* the timeline of events *supra* ¶ 22.

## Part VII. Applicable Law

### *(This section provides conclusions of law to which the Defendants need not respond)*

77.     Under 28 U.S.C. § 1346(b), Federal Gov't liability for FTCA actions are determined via the law of the state (or in this case, the district) where the acts or omissions occurred, which in the instant matter is D.C.  <u>Richard v. United States</u>, 369 U.S. 1 (1962).  Additionally, in accordance with 28 U.S.C. § 2674, courts have previously noted that:

> "[t]he test established by the [Federal] Tort Claims Act for determining the United States' liability is whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred."

<u>Id.</u>  <u>Wood</u>, 961 F.2d at 198-199 (citing <u>Rayonier v. United States</u>, 352 U.S. 315, 319 (1957)).

The pertinent inquiry is whether the duties set forth in the federal law are analogous to those imposed under local tort law.

Wood, 961 F.2d at 199.

> Establishing a prima facie case of intentional infliction of emotional distress in Washington, D.C. requires a showing of (1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." Futrell v. Dep't of Labor Fed. Credit Union, 816 A.2d 793, 808 (D.C. 2003).  The conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community."  Bernstein v. Fernandez, 649 A.2d 1064, 1075 (D.C. 1991).  "Where reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability."  Homan v. Goyal, 711 A.2d 812, 818 (D.C. 1998).

Amobi v. D.C. Dep't of Corr., 755 F.3d 980, 995 (D.C. Cir. 2014).  *See* Apollo v. CVS Pharmacy, Civil Action No. 17-1775, pp. 8-9 (D.D.C. 2019), *citing* Ben-Kotel v. Howard Univ., 156 F. Supp. 2d 8, 14 (D.D.C. 2001) (reciting the factors to establish a *prima facie* case of intentional infliction of emotional distress); Futrell v. Dep't of Labor Fed. Credit Union, 816 A.2d 793, 808 (D.C. 2003) (reciting the three factors for intentional infliction of emotional distress); Magee v. Am Inst. of Certified Pub. Accountants, 245 F. Supp.3d 106, 111 (D.D.C. 2017) (detailing the elements for intentional infliction of emotional distress); Ortberg v. Goldman Sachs Grp., 64 A.3d 158, 163 (D.C. 2013) (internal quotation marks omitted) (noting the elements for intentional infliction of emotional distress); and Kotsch v. D.C., 924 A.2d 1040, 1045 (D.C. 2007) (quoting Waldon v. Covington, 415 A.2d 1070, 1076 (D.C. 1980).  For a finding of intentional infliction of emotional distress,"*[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly tolerable in a civilized community."* Mann v. Bahi, 242 F. Supp.3d 6, 10 (D.D.C. 2017), quoting Drejza v. Vaccaro, 650 A.2d 1308, 1312 n. 10 (D.C. 1994) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).  *"In the classic (if cartoonish) formulation, "[t]he ultimate question is whether the*

*recitation of the facts to an average member of the community would arouse his [or her] resentment against the actor, and lead him [or her] to exclaim 'Outrageous!'"* Id., citing Purcell v. Thomas, 928 A.2d 699, 711 (D.C. 2007).   The tortfeasor's "[i]ntent or recklessness can be inferred from the outrageousness of the acts." Mann, 242 F. Supp.3d at 10; Taylor v. United States, Civil No. 12-894 (AK) at 6, (D.D.C. 2014), citing Howard Univ. v. Best, 484 A.2d 958, 985 (D.C. 1984); Davis v. Megabus Ne. LLC, 301 F. Supp3d 105, 109 (D.D.C. 2018).   In the Howard Univ. v. Best case, the court noted that *"[a]ctions which violate public policy may constitute outrageous conduct sufficient to state a cause of action for infliction of emotional distress."* Howard Univ. v. Best, 484 at 986, citing Macey v. New York State Electric and Gas Corp., 436 N.Y.S. 2d 389, 391, 80 A.D.2d 669 (1981).   *See also* Liser v. Smith, 254 F. Supp.2d 89, 106 (D.D.C. 2003) (confirming that multiple defendants acting in concert to recklessly and intentionally fabricate facts to support unjustified acts towards a plaintiff is sufficient to *"state a claim"* for intentional infliction of emotional distress).   *See also* Goolsby v. Dist. of Columbia, Case No. 16-cv-2029 (CRC), p. 20 (D.D.C. 2019) (confirming that purposefully or recklessly contriving facts about a plaintiff provides sufficient bases to state a corresponding emotional distress claim).   *Cf.* Garay v. Liriano, 839 F. Supp. 2d 138, 143 (D.D.C. 2012) (stating that circumstances of fabricated facts recklessly and intentionally made about a plaintiff generally warrant juries to consider if reasonable persons would find that the "outrageous" standard has been met for emotional distress).   *See also* Larijani v. Georgetown Univ., 791 A.2d 41, 42 & 44 (D.C. 2002) (noting that supervisory awareness and failure to halt extreme and outrageous events causing emotional distress for a subordinate can constitute an undue *defacto* "ratification" and "approval" of such improper conduct).   *See also* Harris v. Dep't of Veterans Affairs, 776 F.3d 907 (D.C. Cir. 2015) (providing that "current D.C. law allows 'an action for intentional infliction [of

emotional distress to] be made out even in the absence of physical injury or impact.").  *See also* Hargraves v. Dist. of Columbia, 134 F. Supp. 3d 68, 93 (D.D.C. 2015) (noting that *"severe emotional distress does not require proof of physical injury or impact, but typically must be 'so acute that physical consequences are likely to result.'"*).  *See also* Cavaliere v. Lifespring, Inc., 918 F.2d 225 (D.C. Cir. 1990), *citing* Williams v. Baker, 572 A.2d 1062, 1064 (D.C. 1990) (confirming in an unpublished ruling that the D.C. Ct. of Appeals has abandoned the requirement for emotional distress claims to be "traceable" to a physical injury).  Brown v. Green, 781 F. Supp. 36, 38-39 (D.D.C. 1991).  *Cf.* Jane Doe v. Elam II, Civil Action No. 2:14-CV-9788 (C.D. Cal. 2014) (illustrating that Federal courts have awarded intentional infliction of emotional distress damages absent the victim sustaining physical injuries).

78.    A party is liable for such extreme and outrageous acts if the conduct *"is a substantial factor"* in bringing about the harm"[,] and the *"chain of events leading to the injury"* . . . *[is not] "highly extraordinary in retrospect."*  Wilkins v. Dist. of Columbia, 879 F. Supp.2d 35, 42 (D.D.C. 2012), citing Dist. of Columbia v. Carlson, 793 A.2d 1285, 1288 (D.C. 2002).  *See also* Wilkins v. Dist. of Columbia, 879 F. Supp. 2d 35, 42 (D.D.C. 2012) (noting for proximate cause that [an] *"actor's negligent conduct is a legal cause of harm to another if . . . his conduct is a substantial factor in bringing about the harm . . . and "the danger of an intervening negligent or criminal act should have been reasonably anticipated and protected against."*  Additionally, D.C. courts recognize the doctrine of *respondeat superior,* where an employer can be held liable for the acts of its employees that fall within the scope of their employment.  Davis, 301 F. Supp.3d at 109-110 (D.D.C. 2018), citing Boykin v. Dist. of Columbia, 484 A.2d 560, 561 (D.C. 1984); Penn Cent. Transp. Co. v. Reddick, 398 A.2d 27, 29-31 (D.C. 1979), citing Jordan v. Medley, 711 F.2d 211, 214 (D.C. Cir. 1983) (noting that employee actions falling within the scope of

employment occur in virtue of the employment and furthers its ends).  In <u>Penn Cent. Transp. Co.</u>, the Court noted that employers can be liable for employee actions within the scope of employment, which have an antecedent likelihood of occurring.  *See* <u>Penn Cent. Transp. Co.</u>, 398 A.2d at 31. *Cf.* <u>Doe v. U.S.</u>, 838 F.2d 220, 223-224 (7th Cir. 1988); and <u>Bembenista v. U.S.</u>, 866 F.2d 493, 497 (D.C. Cir. 1989) (confirming that an employer can be liable to plaintiffs for breaches of duty and regulations that are independent from torts occurring through improper conduct of other employees).

79.     D.C. courts also recognize a cause of action known as "civil conspiracy," when *"wrongful acts are done in furtherance of the common scheme, and damages [are] suffered as a result."* <u>Studza v. United Arab Emirates</u>, 281 F.3d 1287, 1305-1306 (D.C. Cir. 2002), citing <u>Higgs v. Higgs</u>, 472 A.2d 875, 877 (D.C. 1984); and <u>Blakeney v. O'Donnell</u>, 117 F. Supp.3d 6, 14 (D.D.C. 2015) (quoting <u>Paul v. Howard Univ.</u>, 754 A.2d 297, 310 (D.C. 2000).  *See also* <u>Friends Christian High Sch. v. Geneva Fin. Consultants</u>, 39 F. Supp.3d 58, 64-65 (D.D.C. 2014) (recognizing that civil conspiracy is a valid means to establish vicarious liability for an underlying tort in D.C.).  In <u>Mattiaccio v. Dha Grp., Inc.</u>, 20 F. Supp.3d 220, 230 (D.D.C. 2014), this Court advised that the four elements of civil conspiracy are as follows:

> "'(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.'"

*See also* <u>Weishapl v. Sowers</u>, 771 A.2d 1014, 1023 (D.C. 2001), citing <u>Griva v. Davison</u>, 637 A.2d 830, 848 (D.C. 1994) (confirming the four elements of civil conspiracy in D.C.); <u>Leitner-Wise v. Clark, et al.</u>, Case No. 18-771 (BAH), pp. 5, 9 & 12 (D.D.C. 2018), quoting <u>Halberstam</u>, 705 F.2d at 477.  *See also* <u>Johnson v. Metro. Direct Prop. & Cas. Ins. Co.</u>, Civil Action No. 18-1715, pp. 7-8 (JEB) (D.D.C. 2019) (confirming that pertinent events, conversations, or documents are evidence

that can demonstrate the existence of a civil conspiracy).  A tacit versus an explicit understanding between perpetrators of civil conspiracy, is sufficient to show an agreement between them. Halberstam, 705 F.2d at 477.  In Loagayan v. Odeh, 199 F. Supp.3d 21, 30 (D.D.C. 2016), this Court even noted that "'in most civil conspiracy cases,' courts are required to 'infer an agreement from indirect evidence[,]'" citing Halberstam, 705 F.2d at 486.  In U.S. ex rel. Tran v. Computer Scis. Corp., 53 F. Supp.3d 104, 134, this Court noted that civil conspiracies are not depending on a finding of "an express or formal agreement[,]" and courts can examine the underlying scheme for patterns of coordinated knowledge and corresponding furtherance of the illicit arrangement. Moreover, D.C. law provides that ***"once the conspiracy has been established, all parties to it [are] liable for injuries from acts pursuant to and in furtherance of the common design, even if the parties had not actively participated or benefitted by the parties acts resulting in injury."*** **(Emphasis added).**  Id. at 479-489.  And D.C. courts have even acknowledged the potential for harm occurring to plaintiffs when the defendants' improper acts ***"injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community . . . [and these adverse impacts] can [even] be satisfied without specifically identifying the plaintiff by name.  [It] suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description."***  **(Emphasis added).**  Cf. Ramos v. ADR Vantage, Inc., Case No. 18-cv-01690 (APM), p. 2 (D.D.C. 2018).  And this Court has previously noted that:

> [r]eputational harm typically gives rise to a cognizable injury in one of two situations. The first is when the harm causes a "loss of clients or other business" — *i.e.*, economic injury. See Morgan Drexen, Inc. v. CFPB, 785 F.3d 684, 692–93 (D.C. Cir. 2015). The second situation involves an individual whose reputation is damaged as a result of public stigmatization. See Foretich v. United States, 351 F.3d 1198, 1214 (D.C. Cir. 2003).

Statewide Bonding, Inc. v. U.S. Dep't of Homeland Security, et al., Civil Action No. 18-2115 (JEB) at p. 7 (D.D.C. 2018).

80.     Pertinent D.C. court decisions have consistently held that the "intracorporate conspiracy doctrine," which generally prevents the finding of a conspiracy when the multiplicity of actors needed to form a conspiracy work within the same corporation, does <u>not</u> apply, when the perpetrators of the conspiracy perform acts that are illegal; that cannot be characterized as a routine business decision or conduct; and are acts where the perpetrators have a personal stake in achieving and furthering the corporation's illegal objectives.  *See* <u>Blakeney v. O'Donnell</u>, 117 F. Supp.3d 6, 13-15 (D.D.C. 2015) (providing that the intracorporate conspiracy doctrine *"does not apply and . . . cannot shield [perpetrators] from civil liability."*), citing <u>McAndrew v. Lockheed Martin Corp.</u>, 206 F.3d 1031, 1038-1039 (11th. Cir. 2000) (explaining that the intracorporate conspiracy doctrine does not view corporations as a "single actor" when the persons involved allegedly commit criminal conspiracy).  *See also* <u>Rawlings v. Dist. of Columbia</u>, 820 F. Supp.2d 92, 105-106 (D.D.C. 2011) (noting that individuals are not shielded under the intracorporate conspiracy doctrine for improperly-conspired conduct diverging from their employment responsibilities).

81.     Additionally, for purposes of this matter, negligent infliction of emotional distress can be established in D.C., "when one or more Defendants have 'begun an 'undertaking' that necessarily implicates the Plaintiff's emotional well-being."  <u>Hedgepeth v. Whitman Walker</u>, 22 A.3d 789, 792, 810-811, 815-818 (D.C. 2011).  Specifically, the court stated as follows:

> **We hold that a duty to avoid negligent infliction of serious emotional distress will be recognized only where** the defendant has an obligation to care for the plaintiff's emotional well-being[,] **or the plaintiff's emotional well-being is necessarily implicated by the nature of the defendant's undertaking to or relationship with the plaintiff, and serious emotional distress is especially likely to be caused by the defendant's negligence.**

**(Emphasis added).** <u>Id.</u> at 792.  *See also* <u>Sandberg v. Vincent</u>, Civil Action No. 18-666(CKK) at pp. 6-8 (D.D.C) (discussing the "foreseeability of harm test" that D.C. courts use to discern when

a defendant owes a duty of care to a plaintiff).  *Cf.* John Doe v. George Washington University, Civil Action No. 18-553 (RMC), p. 21 (D.D.C. 2018).  In Williams, the D.C. Court of Appeals held that ***". . . if the plaintiff was in the zone of physical danger and was caused by defendant's negligence to fear for his or her own safety, the plaintiff may recover for negligent infliction of serious emotional distress and any resultant physical injury, regardless of whether plaintiff experienced a physical impact as a direct result of defendant's negligence."*** **(Emphasis added).** Williams v. Baker, 572 A.2d 1062, 1066-1067 (D.C. 1990).   In other words, the Williams court *"abandoned the 'physical impact' requirement in favor of the more liberal 'zone of physical danger' rule, which permits recovery for mental distress if the defendant's actions caused the plaintiff to be 'in danger of physical injury' and if, as a result, the plaintiff feared for his own safety."* Hedgepeth, 22 A.3d at 796.  The Williams holding was judicially clarified a year later, when the D.C. Court of Appeals stated that ***"although the plaintiff's emotional injury must be 'serious and verifiable,' the plaintiff need not experience a physical manifestation of the mental injury."*** **(Emphasis added).** Hedgepeth, 22 A.3d at 797, citing Jones v. Howard Univ., 589 A.2d 424 (D.C. 1991).  Additionally, D.C. has a public policy *"of fully and fairly compensating victims of negligence[, as] reflected by its lack of a cap of such damages."* Raflo v. United States, 157 F. Supp. 2d 1, 7 (D.D.C. 2001); *see also* Kaiser-Georgetown Comm. v. Stutsman, 491 A.2d 502, 509-10 (D.C. 1985) (confirming D.C.'s standing policy of holding corporations fully liable for the negligence with no cap on damages).

82.     We also note that D.C. Courts have recognized the common law doctrine of "negligent supervision," which occurs when an employer *"breaches a duty to the plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to the plaintiff."* Flythe v. Dist. of Columbia, 19 F. Supp.3d 311, 317 (D.D.C. 2014), quoting

James v. Dist. of Columbia, 869 F. Supp.2d 119, 121 (D.D.C. 2012).  *See also* Dist. of Columbia

v. Tulin, 994 A.2d 788, 794 (D.C. 2010); Rawlings v. Dist. of Columbia, 820 F. Supp.2d 92, 114

(D.D.C. 2011) (quoting Dist. of Columbia v. Tulin, 994 A.2d 788, 794 (D.C. 2010); and Blakeney

v. O'Donnell, 117 F. Supp. 3d 6, 20-21 (D.D.C. 2015) (confirming that D.C. law recognizes

negligent supervision when *"[t]he employer knew or should have known its employee behaved in*

*a dangerous or otherwise incompetent manner and that armed with that actual or constructive*

*knowledge, the employer nevertheless failed to adequately supervise the employee."*).  *See also*

Newman v. Borders, Inc., 530 F. Supp.2d 346, 350 (D.D.C. 2008) (noting in part that employers

in D.C. have a duty to use reasonable care supervising their employees).  *See also* Schecter v.

Merch. Home Delivery, Inc., A.2d 415, 428-429 (D.C. 2006) (advising that employers remain

liable for improper acts of employees that further the underlying business activities).  *Cf.* O'Neil

v. Bergan, 452 A.2d 337, 341 (D.C. 1982) (noting professional negligence can exist for attorneys

when their *". . . lack of care [*and*] skill is so obvious" that negligence exists as matter of common*

*knowledge*).  Additionally, the Court of Appeals for the D.C. Circuit has clearly advised that a

defendant that commits a tort of negligence in D.C., is subject to the "eggshell skull" doctrine,

"and is liable for harm resulting from his own negligent conduct[,] even through the harm was

aggravated by the particular plaintiff's condition at the time of the negligent conduct."  Bushong

v. Park, No. 02-CV-633, at 12 (D.D.C. Dec. 2003).

83.     Regarding the Plaintiffs' request that the Federal Gov't be permanently enjoined

from making any further written or verbal statements, allegations, or inferences to suggest that

Gore hired Wiercinski, in lieu of MPA and HR – this Court has opined that to make that decision,

it must consider the following factors:  *"(1) the plaintiff's success on the merits, (2) whether the*

*plaintiff would suffer irreparable harm absent an injunction, (3) the hardship that the defendant*

*or others would suffer, and (4) the public interest."* See <u>McDonald's USA, LLC v. Craft</u>, Case No. 17-cv-00119 (APM) at p. 5 (D.D.C. Nov. 2017), citing <u>Breaking the Chain Found, Inc. v. Capitol Educ. Support, Inc.</u>, 589 F. Supp 2d 25, 30 (D.D.C. 2008). *See also* <u>Heart 6 Ranch, LLC v. Bernhardt, et al.</u>, Civil Action No. 17-2711 (CKK), at p. 17 (D.D.C. 2019), *citing* <u>Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau</u>, 785 F.3d 684, 694 (D.C. Cir. 2015), *quoting* <u>eBay Inc. v. MercExchange, LLC</u>, 547 U.S. 388, 391 (2006) (providing further discussion of the factors that D.C. Courts assess when considering requests for injunctive relief).

84.     In D.C., employees that resign from their employment under constructive termination scenarios due to abusive, severe, or hostile work environments, must show that their resignation was a fitting response. <u>Steele v. Schafer</u>, 535 F.3d 689, 694-695 (D.C. Cir. 2008). A hostile work environment exists when acts of intimidation, ridicule, and insult permeate and detrimentally change the conditions of the victim's employment workplace. <u>Magowan v. Lowery</u>, 166 F. Supp.3d 39, 69 (D.D.C. 2016). A constructive discharge is found to occur "*when the employer deliberately makes working conditions intolerable and drives the employee into an involuntary quit.*" <u>Bean v. Dist. of Columbia</u>, 264 F. Supp. 3d 242, 258-259 (D.D.C. 2017); <u>Lerner v. Dist. of Columbia</u>, 362 F. Supp. 2d 149, 161 (D.D.C. 2005), citing <u>Clark v. Marsh</u>, 665 F.2d 1168, 1173 (D.C. Cir. 1981). In that regard, D.C. Courts will objectively look at "*the totality of the circumstances, including the frequency of the discriminatory conduct, **its severity, its offensiveness, and whether it interferes with an employee's work performance***." **(Emphasis added).** <u>Baloch v. Kempthorne</u>, 550 F.3d 1191, 1201 (D.C. Cir. 2008), citing <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-787 (1998). *See* <u>Gordon v. Duke</u>, 279 F. Supp. 3d 46, 56 (D.D.C. 2017) (distinguishing *"discriminatory intimidation, ridicule, and insult"* from *"the ordinary tribulations of the workplace."*). *See also* <u>Brown v. Dist. of Columbia</u>, Civil Action No. 09-1121,

p. 9 (D.D.C. 2011) (stating that this Court's objective standard for determining constructive discharge is *"did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?")*.

85.     Such Courts will also consider whether a reasonable person would find that the circumstances created a hostile or abusive work environment.  Hill v. Assocs. for Renewal in Educ., 69 F. Supp. 3d 260, 269 (D.D.C. 2014).  In Bean v. Dist. of Columbia, , the Court stated the following regarding constructive termination events:

> Courts usually focus "on the existence of aggravating conditions in the workplace which would lead a reasonable person to resign." [citing Atlantic Richfield Co. v. D.C. Comm'n on Human Rights, 515 A.2d 1094, 1101 (D.C. 1986)] (concluding that the plaintiff was constructively discharged where she "was subject to a continuous barrage of derogatory comments about her appearance, behavior, and morality to the point where her behavior was compared to that of a prostitute"). Typically, "[w]hether working conditions are so intolerable that a reasonable person is forced to resign ... is a question for the trier of fact." [citing Arthur Young v. Sutherland, 631 A.2d 354, 362 (D.C. 1993)].

Bean v. Dist. of Columbia, 264 F. Supp. 3d 242, 258-259 (D.D.C. 2017).

86.     In D.C., "a loss of consortium claim stands 'separate and independent' from a negligence claim."   Casciano v. Rides, LLC, 109 F. Supp. 3d 134, 142 (D.D.C. 2015). Additionally, D.C. courts have often applied a choice of law analysis for loss of consortium claims, where the law of the state in which the married couple is domiciled is applied.  Price v. Stryker Corp., 270 F. Supp. 3d 226, 231 (D.D.C. 2017); Hartley v. Dombrowski, 744 F. Supp. 2d 328, 339 (D.D.C. 2010).  The State of Md., where the Plaintiffs reside, recognizes loss of consortium claims as ones that are derivative to and must be asserted along with the injured spouse's primary claim(s) arising in tort.  Oaks v. Connors, 660 A.2d 423, 33-38 (Md. 1994).

87.     And the state of Md. recognizes loss of consortium cases as occurring when an undue action of another person or entity *"results in a 'loss of society, affection, assistance, and*

*conjugal fellowship' in the marital unit."* <u>Rozinsky v. Assurance Co. of America</u>, No. RDB-15-02408, 5 (D. Md. 2016), *citing* <u>Deems v. Western Maryland Ry. Co.</u>, 231 A.2d 514, 517 (Md. 1967); <u>Nerenhausen v. Washco Mgmt. Corp.</u>, No. JKB-15-1313, 10 (D. Md. 2017).  In the instant case, the Md. Courts & Judicial Proceedings Code annotated at § 11-108(a) includes loss of consortium in the definition of "non-economic damages," and § 11-108(b) stipulates a current monetary recovery cap of $695,000.00, for such causes of action pursued in the year 2018."[32] *See* Md. Courts & Judicial Proceedings Code Ann. § 11-108.[33]

## Part VIII. Causes of Action

### Count I. Intentional Infliction of Emotional Distress[34]

88.    In the instant matter, before Gore was constructively terminated from VA on May 4, 2018, Fleck & Wiercinski (i.e., a married couple who had practiced law with one another for approx. ten years at Fleck's private law firm, and then worked at the U.S. Army's "Communications Electronics Command" (a/k/a "CECOM") for approx. eight years before coming to VA) engaged in illegal and unprotected acts of civil conspiracy, by fraudulently and recklessly lying repeatedly to multiple OIG investigators when testifying under oath – to try to deceive the OIG; thwart the accuracy and efficiency of the OIG investigation; frame Gore; and

---

[32] The Plaintiffs reach the $695,000 cap amount by adding the $350,000 initial cap amount cited in § 11-108(b)(1) of the Maryland Courts & Judicial Proceedings Code, by $345,000, which is derived by calculating the number of years that have passed between the Oct. 1, 1995 date referenced in § 11-108(b)(2) of that Code & the year 2019 (i.e., 23 years), and multiplying that by the $15,000.00 amount also referenced in Section 11-108(b)(2) of the Code (i.e., 23 x $15,000 = $345,000).

[33] Md. Courts & Judicial Proceedings Code Ann. § 11-108 is available at: https://law.justia.com/codes/maryland/2017/courts-and-judicial-proceedings/title-11/subtitle-1/section-11-108/.

[34] The Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint by reference, as though fully set forth herein. (with the exception of those sections where it is indicated Defendants need not respond).

cover up their misdeeds.  *See* the timeline of events *supra* ¶ 22; and pp. 1-2 & 10-18 of the OIG Report, Ex. 5.

89.     Pages 1 & 10-16 of the OIG Report clearly substantiate that Fleck & Wiercinski had the motive, opportunity, and disposition to; and in fact provided, matching testimony under oath to multiple OIG investigators:  (A) falsely alleging that Gore contacted Wiercinski in mid-Sept. 2016, and offered her the e-discovery attorney position, before Fleck emailed Wiercinski the Confidential VA Information; (B) to try to avoid or lessen the consequences of legal, regulatory, and ethical violations associated with Fleck doing so.  Id.

90.     Subsequently, when Gore was no longer employed at VA, Fleck (and by proxy Wiercinski) attempted to further their civil conspiracy, by intentionally continuing, repeating, and perpetrating false allegations about Gore, in the Fleck v. Dep't of Veterans Affairs case.  Compare ¶ 36 of the Fleck Complaint, ¶ 36 of the Amended Fleck Complaint and pp. 3 & 17-18 of the Fleck Opposition Motion, Ex. 4, with pp. 1 & 10-18 of the OIG Report, Ex. 5.  Those aspects of Fleck & Wiercinski's improper conduct occurred after issuance of the OIG Report, which notably contained VA's express concurrence in its findings and recommendations, via the-then Deputy Sec'y of VA.  *See* pp. 17 & 18 of the OIG Report, Ex. 5. Id.

91.     Fleck & Wiercinski's scheme began while they both were acting within the scope of their employment at VA; continued when Fleck (and by proxy Wiercinski) sued VA in the Fleck v. Dep't of Veterans Affairs case; and undoubtedly undermined the public trust, and brought shame, dishonor, and disrepute to VA and the legal profession.  *See* the timeline of events *supra* ¶ 22; the Correspondence Between Plaintiffs and VA Re Plaintiffs' FTCA Claims, Ex. 1; and pp. 1, 10-18 of the OIG Report, Ex. 5.  Additionally, their undue acts and omissions contravened:  (A)

D.C. common law doctrines of civil conspiracy[35] and fraud;[36] (B) D.C. "Electronic-Dist. Personnel

Manual" regulations 1800.2 & 1800.3(a), (m) and (n); 1801.2 that prescribe ethical responsibilities

of employees;[37] (C) Federal regulations of public service (i.e., 5 C.F.R. § 735.203[38] and 5 C.F.R.

---

[35] See Mattiaccio v. Dha Grp., Inc., 20 F. Supp.3d 220, 230 (D.D.C. 2014) (describing the four elements of civil perjury in D.C.). See also Weishapl v. Sowers, 771 A.2d 1014, 1023 (D.C. 2001), citing Griva v. Davison, 637 A.2d 830, 848 (D.C. 1994) (confirming the four elements of civil conspiracy in Washington, D.C.).

[36] In United States ex rel. Folliard v. CDW Tech. Servs. Inc., 722 F. Supp.2d 20, 25 (D.D.C. 2010), this Court recognized the tort of fraud, and noted that it is dependent upon a statement of particularity, e.g., *"the time, place and content of the false misrepresentations, the fact misrepresented and what was [ob]tained or given up as a consequence of the fraud." See also* Molock v. Whole Foods Mkt., Inc., 297 F. Supp.3d 114, 136 (D.D.C. 2018) (recognizing the tort of fraud when a Defendant made statements *"with knowledge of their falsity and with the specific purpose of misleading"* to induce a certain outcome).

[37] The D.C. "Electronic-District Personnel Manual" ("E-DPM") regulations *"are intended to provide District government employees under the authority of the Mayor with relevant information regarding D.C. personnel regulations. This includes guidelines, practices, ethics, expectations and standards of the District government. . . ." See* the D.C. Department of Human Resources discussion of E-DPM regulations at:  https://dchr.dc.gov/page/policies-and-procedures-dchr.

D.C. Personnel Regulation 1800.2 states that:   *"Each employee has a responsibility to the District of Columbia and its citizens to place loyalty to the laws and ethical principles above private gain. To ensure that every citizen can have complete confidence in the integrity of the District government, each employee shall respect and adhere to the principles of ethical conduct set forth in this section, as well as the District of Columbia Employee Ethics Pledge and in supplemental agency regulations and policies."*

D.C. Personnel Regulation 1800.3(a), (m) & (n) state that:   *"The following general principles apply to every employee and form the basis for the standards contained in this chapter. Where a situation is not specifically covered by another provision of law or policy, employees shall apply the following principles set forth in this section in determining whether their conduct is proper: (a) Government service is a public trust, requiring employees to place loyalty to the laws and ethical principles above private gain; (m) Employees shall adhere to all federal, state, and local laws and regulations; and (n) Employees shall not take actions creating the appearance that they are violating the law or the ethical standards set forth in this chapter. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts." See* Part I, Chapter 18 of the D.C. Personnel Regulations at: https://dchr.dc.gov/sites/default/files/dc/sites/dchr/publication/attachments/chap_18_trans_216_e mployee_conduct_0.pdf.

[38] 5 C.F.R. § 735.203 is available at:  https://www.law.cornell.edu/cfr/text/5/735.203.  It states as follows:   ***"An employee shall not engage in criminal, infamous, dishonest, immoral, or***

§§ 2635.101(a), (b)(1), (b)(5) and (b)(14));[39] (D) duties of care and loyalty for OGC lawyers that provide legal advice supporting the Sec'y of VA;[40] (E) VA-related laws, rules of behavior and handbook policies safeguarding against improper disclosure of VA sensitive information and data;[41] (F) the country's "rule of law" founded on truth, honesty, and integrity, particularly from

*notoriously disgraceful, or other conduct prejudicial to the Government."* **(Emphasis added).**

[39] 5 C.F. R. §§ 2535.101(a), (b)(1), (b)(5) & (b)(14) are available at: https://www.law.cornell.edu/cfr/text/5/2635.101. Those provisions state that:

"*(a)* Public service is a public trust. *Each underlined employee has a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain. To ensure that every citizen can have complete confidence in the integrity of the Federal Government, each employee shall respect and adhere to the principles of ethical conduct set forth in this section, as well as the implementing standards contained in this part and in supplemental agency regulations.*
*(b)* General principles. *The following general principles apply to every employee and may form the basis for the standards contained in this part. Where a situation is not covered by the standards set forth in this part, employees shall apply the principles set forth in this section in determining whether their conduct is proper.*
*(1)* Public service is a public trust, requiring employees *to place loyalty to the Constitution, the laws and ethical principles above private gain.*
*(5)* Employees *shall put forth honest effort in the performance of their duties.*
*(14)* Employees *shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts."*

[40] Fleck & Wiercinski's duty of care and loyalty to the Secretary of VA stems from their positions as attorneys for OGC, in conjunction with 38 U.S.C. § 311, which states that: *"[t]here is in the [U.S.] Department [of Veterans Affairs,] the Office of the General Counsel. There is at the head of the office a General Counsel, who is appointed by the President, by and with the advice and consent of the Senate. **The General Counsel is the chief legal officer of the Department and provides legal assistance to the Secretary concerning the programs and policies of the Department.**"* **(Emphasis added).**

[41] Wiercinski was not yet a VA employee & had not yet received a VA computer, laptop, phone or other government furnished equipment -- when Fleck sent her an unencrypted email containing confidential VA information -- to her home email account. Accordingly, Fleck violated applicable laws, rules of behavior & handbook policies regarding proper safeguarding and protection of confidential VA information. *See* 38 U.S.C. Subchapter III titled "Information Security" at: https://www.law.cornell.edu/uscode/text/38/part-IV/chapter-57/subchapter-III. Additionally, VA Handbook 6500 contains multiple "Rules of Behavior" that VA employees are required to follow

1
2
3
4
5
6
7
8

to help ensure proper safeguarding of confidential or sensitive VA information, including at: Clause (4) on p. D-9, which states: *"I am responsible for the security of VA property and information, regardless of my (4) work location. VA security policies are the same and will be enforced at the same rigorous level when I telework as when I am in the office. I will keep government furnished equipment (GFE) and VA information safe, secure, and separated from my personal property and information.* Additionally, Clause (10) on Page D-7 of that same VA Handbook states: *"I will use VA-approved encryption to encrypt any email, including attachments to the email, which contains VA sensitive information before sending the email. I will not send any email that contains VA sensitive information in an unencrypted form."* VA Handbook 6500 is available at: https://www.va.gov/vapubs/viewPublication.asp?Pub_ID=793&FType=2.

VA Handbook 6500.2 also states on p. 33, in Clause (e), the following regarding the requirement that VA emails containing sensitive or personal information must be encrypted: *"(e) Email: Email containing VA SPI must be encrypted with an encryption application certified by the National Institute of Standards and Technology (NIST) as Federal Information Processing Standards (FIPS) 140-2 compliant and approved by OCS, unless a written risk-based decision memorandum from the VA CIO is in place that justifies and memorializes the decision not to encrypt the email. VA has identified specific encryption applications that must be used with VA data. Email sent or received by a VA source that contains SPI that is not encrypted with a FIPS 140-2-compliant encryption application is treated in this Handbook as unencrypted email."* VA Handbook 6500.2 is available at: https://www.va.gov/vapubs/viewPublication.asp?Pub_ID=843&FType=2. *See* also pp. 16-17 of VA's FY 2018 Text-Only Course Transcript Regarding "VA Privacy and Information Security Awareness Rules of Behavior" at: https://va-maint.plateau.com/va_content/31167_VA_Privacy_and_Information_Security_Awareness_and_ROB_09-22-2017_v2.1.pdf (confirming that VA employees should always encrypt emails containing sensitive VA information).

*See also* U.S. Gov't Accountability Office, GAO-19-105, "Information Security – Agencies Need to Improve Implementation of Federal Approach to Securing Systems & Protecting against Intrusions," at pp. 8-9 & 67 (Dec. 2018), at: https://www.gao.gov/assets/700/696105.pdf. Those pages discuss "The Federal Information Security Modernization Act of 2014," & the corresponding responsibility & ongoing need of underlying Federal agencies including VA, to safeguard & improve their measures against improper access & use of internal information.

attorneys;[42] (G) Rule 4.1 of the D.C. Rules of Prof'l Conduct;"[43] (H) Rule 8.3(a) of the D.C. Rules

of Prof'l Conduct;[44] (I) Rule 8.4(a)-(d) of the D.C. Rules of Prof'l Conduct;"[45] (J) ABA Rules of

---

[42] *Cf.* "The Consequences of Perjury and Related Crimes Before the Committee on the Judiciary House of Representatives," 105th Cong. 67 (1998) at: https://www.govinfo.gov/content/pkg/CHRG-105hhrg53247/html/CHRG-105hhrg53247.htm. In the opening statement of that hearing, Chairman of the Judiciary Henry J. Hyde said the following about perjury: ***"So for my friends who think that perjury, lying, and deceit are in some circumstances acceptable and undeserving of punishment, I respectfully disagree. Every citizen is entitled to her day in court, to have her claims considered under the rule of law and free from these abhorrent acts. That applies no matter how small or unpopular or unimportant that person is and no matter how great or popular or powerful her opponent is . . . Even when the weak dare to confront the strong, the truth is not trivial. Playing by the rules is not trivial. The whole history of our civilization tells us that justice is not trivial. Lying poisons justice. If we are to defend justice and the rule of law, lying must have consequences."*** **(Emphasis added).**

[43] Rule 4.1 of the D.C. Rules of Prof'l Conduct titled *"Truthfulness in Statements to Others"* states that: *"[i]n the course of representing a client [i.e., the Secretary of VA], a lawyer shall not knowingly: (a) [m]ake a false statement of material fact or law to a third person; or (b) Fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6."*

*See* D.C. RPC 4.1 at: https://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule4-01.cfm.

[44] Rule 8.3(a) of the D.C. Rules of Prof'l Conduct titled *"Reporting Professional Misconduct"* states that: "(a) A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, shall inform the appropriate professional authority."

*See* D.C. RPC 8.3(a) at: https://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule8-03.cfm.

[45] Rule 8.4(a)–(d) of the D.C. Rules of Prof'l Conduct titled *"Misconduct,"* states that: [i]t is professional misconduct for a lawyer to:
*(a) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;*
*(b) Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;*
*(c) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;*
*(d) Engage in conduct that seriously interferes with the administration of justice . . . ."*

*See* D.C. RPC 8.4(a)-(d) at: https://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule8-04.cfm.

Prof'l Conduct 4.1, 8.3(a), and 8.4(a)–(d);[46] (K) the ethical standards of conduct applicable to Fleck & Wiercinski's respective bar associations;[47] (L) the Federal employment oath of office at

---

[46] Rule 4.1 of the ABA Model Rules of Prof'l Conduct, titled *"Truthfulness in Statements to Others"* states that:  *"In the course of representing a client a lawyer shall not knowingly:*

*(a) make a false statement of material fact or law to a third person; or*

*(b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6."*

*See* ABA Rule 4.1 at: https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_4_1_truthfulness_in_statements_to_others.html.

Rule 8.3(a) of the ABA Model Rules of Prof'l Conduct titled *"Maintaining the Integrity of the Profession"* states that:  *"(a) A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority."*

*See* ABA Rule 8.3(a) at: https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_8_3_reporting_professional_misconduct/.

Rule 8.4(a)-(d) of the ABA Model Rules of Prof'l Conduct, titled "Misconduct" states that:  *"It is professional misconduct for a lawyer to:*
*(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;*
*(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;*
*(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [and]*
*(d) engage in conduct that is prejudicial to the administration of justice[.]"*

*See* ABA Rule 8.4(a)-(d) at: https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_8_4_misconduct/.

[47] Fleck appears to have a bar license in the State of N.J., based on a search of the "NJCourts.gov" website.  Wiercinski's name did not appear during a search of the "NJCourts.gov" website. However, a Google search of "Kristina Wiercinski" reveals links suggesting that she at some point in time practiced law in the State of N.J.

5 U.S.C. § 3331; (M) VA's Core Values and Characteristics contained in 38 C.F.R. § Part 0,

Subpart A, including the agency's well-publicized "I-Care core values," which specifically serve

as the foundation for how VA employees should interact with one another (where the "I" stands

for integrity, the "C" stands for commitment; the "A" stands for advocacy; the "R" stands for

Respect; and the "E" stands for excellence);[48] (N) VA's prior public pledge to keep confidential

---

*See* Benjamin Krause, "Former Awad Winning U.S. Army Attorneys Busted For VA Nepotism Scheme," DisabledVeterans.org, Apr. 5, 2018, ¶ 10, at: https://www.disabledveterans.org/2018/04/05/former-award-winning-us-army-attorneys-busted-va-nepotism-scheme/.

Rule 4.1 of the N.J. Rules of Prof'l Conduct titled "Truthfulness in Statements to Others[,]" states: *"(a) In representing a client a lawyer shall not underline:* *(1) make a false statement of material fact or law to a third person; or (2) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client. (b) The duties stated in this Rule apply even if compliance requires disclosure of information otherwise protected by RPC 1.6."*

*See* N.J. RPC 4.1 at: https://www.njcourts.gov/attorneys/assets/rules/rpc.pdf.

Furthermore, Rule 8.3(a) of the same N.J. ethics rules, titled *"Reporting Professional Misconduct,"* states: *"(a) A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority."* *See* N.J. Rule of Prof'l Conduct 8.3(a) at: https://www.njcourts.gov/attorneys/assets/rules/rpc.pdf.

*See* N.J. RPC 8.3(a) at: https://www.njcourts.gov/attorneys/assets/rules/rpc.pdf.

Additionally, Rule 8.4 (a), (b), (c) & (d) of the N.J. Rules of Prof'l Conduct titled *"Misconduct"* states that: *"It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice[.]"*

*See* N.J. RPC 8.4(a)-(d) at: https://www.njcourts.gov/attorneys/assets/rules/rpc.pdf.

[48] Also note that 38 C.F.R. § 0.602, titled "Core Characteristics, states the following in Clause (a): *"Trustworthy. VA earns the trust of those it serves, every day, through the actions of its employees.*

VA information safety secured; and (O) the Kalkines warnings administered before their testimony to the OIG.[49]   These strictures require attorneys to conduct themselves and engage others in a manner commensurate with the highest standards of ethical behavior.[50]   *See* <u>In re Mason</u>, 736 A.2d 1019, 1024 (D.C. 1999) (noting that *"[l]awyers have a greater duty than ordinary citizens to be scrupulously honest at all times, for honesty is 'basic' to the practice of law . . . Every lawyer has a duty to foster respect for the law, and any act by a lawyer which shows disrespect for the law tarnishes the entire profession."*).   These violations unequivocally illustrate that Fleck (and by proxy Wiercinski's) conduct was extreme and outrageous, intentionally orchestrated, and caused the Plaintiffs to suffer severe emotional distress, amongst other injuries as noted in this Complaint. Compare ¶ 36 of the Fleck Complaint, ¶ 36 of the Amended Fleck Complaint and pp. 3 & 17-18 of the Fleck Opposition Motion, Ex. 4, with the timeline of events, *supra* ¶ 22; and pp. 1 & 10-18 of the OIG Report, Ex. 5.   The Plaintiffs also note that Fleck and DOJ failed in their respective duties to avoid and/or correct the record in the <u>Fleck v. Dep't of Veterans Affairs</u> case, regarding the inaccuracies that Fleck continued to repeatedly make about Gore in underlying briefs.[51]   *See supra* ¶¶ 45 & 47.

---

*They provide care, benefits, and services with compassion, dependability, effectiveness, and transparency."*

[49] *See* ¶¶ 60 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4.  *See also* 5 U.S.C. § 3331 (containing the Federal oath of office).

[50] *See* Terry Frieden, "<u>VA will pay $20M to settle lawsuit over stolen laptop's data,</u>" CNN, Jan. 27, 2009 (containing a quote from VA stating the agency "is committed to being the 'gold standard' in data security, just as we are a leader in the health care industry. We want to assure veterans there is no evidence that the information involved in this incident was used to harm a single veteran."). <u>http://www.cnn.com/2009/POLITICS/01/27/va.data.theft/index.html</u>.

[51] Rule 11(b)(3) of the Fed. R. Civ. P.; Rule 3.3(a)(1) of the D.C. Rules of Prof'l Conduct; and Rule 3.3(a)(1) of the ABA Model Rules of Prof'l Conduct prohibit lawyers from making false statements of fact or law to tribunals, and failing to correct false statements of material fact or law.  *See* Rule 11(b)(3) of the Fed. R. Civ. P. regarding "<u>Signing Pleadings, Motions, and Other Papers; Representations to the Court; Sanctions[,]</u>" at:  <u>https://www.law.cornell.edu/rules/frcp/rule_11</u>. *See also* Rule 3.3(a)(1) of the D.C. Rules of Prof'l Conduct regarding "<u>Candor Toward the</u>

92.     While United States citizens do not have a right to bring private causes of action for criminality -- Fleck & Wiercinski's misconduct as described on pp. 1 & 10-18 of the OIG Report and this Complaint – brings attention to Federal laws against conspiracy, false statements, obstruction of proceedings, perjury, and subordination of perjury (i.e., 18 U.S.C. §§ 371, 1001, 1505, 1621 & 1622)[52] – and D.C. laws against criminal conspiracy (Title 22, c. 18, §

Tribunal," at:  https://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule3-03.cfm.  *See also* Rule 3.3(a)(1) of the ABA Model Rules of Prof'l Conduct regarding "Candor Toward the Tribunal,"                                                                                     at:
https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_3_3_candor_toward_the_tribunal/.

[52] Regarding the issue of how courts assess whether false statements made to the Federal Gov't are "material" & thereby violate 18 U.S.C. § 1001, this Court stated the following in United States v. Moore, 612 F.3d 698, 700-701 (D.C. Cir. 2010):

*"Section 1001 does not define "materially false." The Supreme Court has said a statement is materially false if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decision[-]making body to which it was addressed." United States v. Gaudin, 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). Many of our sister circuits have adopted a somewhat broader approach to determining materiality, asking not only whether a statement might influence a discrete decision, but also whether a statement might affect in any way the functioning of the government agency to which it was addressed. See, e.g., United States v. Alemany Rivera, 781 F.2d 229, 235 (1st Cir.1985) ("test for materiality under 18 U.S.C. § 1001 is ... whether [the statement] had the capacity to influence a government function"); United States v. Lichenstein, 610 F.2d 1272, 1278 (5th Cir.1980) ("false statement must simply have the capacity to impair or pervert the functioning of a government agency"); United States v. White, 270 F.3d 356, 365 (6th Cir.2001) (" 'materiality' is a fairly low bar.... [T]he government must present at least some evidence showing how the false statement in question was capable of influencing federal functioning."); United States v. Moore, 446 F.3d 671, 681 (7th Cir.2006) (statement is material if it "has a natural tendency to influence, or ... is capable of affecting, a government function"); United States v. Calhoon, 97 F.3d 518, 530 (11th Cir.1996) ("it is enough if the statements had a natural tendency to influence [ ] or [were] capable of affecting or influencing a government function") (internal quotation marks deleted); see also Brogan v. United States, 522 U.S. 398, 403, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998) (§ 1001 at least "protect[s] the authorized functions of governmental ... agencies from the perversion which might result" from relying upon a false statement); United States v. Sarihifard, 155 F.3d 301, 307 (4th Cir.1998) (stating distinction between discrete decision and general investigation by grand jury is "irrelevant" to materiality).*

*In determining whether a false statement is material this court has consistently asked whether the statement has a tendency to influence a discrete decision of the body to which it was addressed.*

1805a.(a)(1)),[53] perjury (i.e., Title 22, ch. 24, § 22-2402).[54]  *See* pp. 1 & 10-18 of the OIG Report,

Ex. 5.  In that regard, American civil and criminal laws represent deeply-rooted reflections of what

*See, e.g.,* <u>United States v. Winstead</u>, *74 F.3d 1313, 1320-21 (1996);* <u>United States v. Hansen</u>, *772 F.2d 940, 949 (1985). We have, however, suggested a "lie distorting an investigation already in progress" also would run afoul of § 1001. Hansen, 772 F.2d at 949. We now join the other circuits in holding a statement is material if it has a natural tendency to influence, or is capable of influencing, either a discrete decision or any other function of the agency to which it was addressed."*

18 U.S.C. § 371 provides in pertinent part that *"[i]f two or more persons conspire to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years or both."*

Additionally, 18 U.S.C. §§ 1001, 1621 & 1622 in part respectively provide that persons that either commit perjury regarding matters within the jurisdiction of the Executive Branch (i.e., Federal employees acting within the scope of their employment); commit perjury while under oath; make false declarations to Federal courts, or procures another to commit perjury, shall be subject to an unspecified fine and/or up to 5 years of imprisonment.

18 U.S.C. 1505 in part prohibits persons from seeking to or in fact corruptly influencing, obstructing, or impeding "due and proper administration of the law" regarding proceedings before Federal agencies.

We also note that 18 U.S.C. § 3282 provides a 5 year statute of limitations for prosecution of such non-capital Federal crimes.

*See also* Charles Doyle, Senior Specialist in American Public Law, "<u>False Statements [&] Perjury: An Overview of Federal Criminal Law</u>," Congressional Research Service, May 2018, at: <u>https://fas.org/sgp/crs/misc/98-808.pdf</u> (discussing the Federal criminal statutes of perjury & the potential penalties for violating them).

[53] The crime of "conspiracy to commit crime" under D.C. Code Title 22, c. 18, § 1805a(a)(1) specifically states as follows:  "If 2 or more persons conspire either to commit a criminal offense or to defraud the District of Columbia or any court or agency thereof in any manner or for any purpose, each shall be fined not more than the amount set forth in <u>§ 22-3571.01</u> or imprisoned not more than 5 years, or both, except that if the object of the conspiracy is a criminal offense punishable by less than 5 years, the maximum penalty for the conspiracy shall not exceed the maximum penalty provided for that offense."

[54] The crime of perjury under D.C. Code Title 22, c. 24, § 22-2402, titled "Perjury" is a felony, and that Section specifically states as follows:

(a) A person commits the offense of perjury if:  (1) Having taken an oath or affirmation before a competent tribunal, officer, or person, in a case in which the law authorized such oath or

types of behavior are acceptable and unacceptable in this country.  Id.  Conspiracy to frame another

individual by lying repeatedly under oath to the OIG and then submitting false statements to this

Court, has laws directed against it, because legislators for society at large have declared that such

conduct is undesirable and intolerable in this civilized society, inherently injure and harm the

victims involved and warrant associated penalties and repercussions when verified.  *See* id. &

*supra* ¶ 91.  Accordingly, it is injurious to Gore for the Defendants to render him as a lesser version

of his professional self through the conspiracy of lies and deceit.  Id.

93.    Fleck's repeated lies about Gore to this Court in the Fleck v. Dep't of Veterans

Affairs case, are direct yet unjustified proclamations to the judiciary that Gore is untrustworthy;

underhanded; skirts processes, policies & procedures; and is unfit to practice law.  Id.  *See also*

*supra* ¶ 91; Exs. 4 & 11; and Blakeney v. FBI, et al., Civil Action No. 17-cv-2288 (BAH) at pp.

10-11 (D.D.C. 2019), citing Stern v. FBI, 737 F.2d 84, 91-92 (D.C. Cir. 1984) *(confirming judicial*

*recognition that individuals "have a strong interest in not being associated unwarrantedly with*

*alleged criminal activity.").*

---

affirmation to be administered, that he or she will testify, declare, depose, or certify truly, or that
any written testimony, declaration, deposition, or certificate by that person subscribed is true,
wilfully and contrary to an oath or affirmation states or subscribes any material matter which he
or she does not believe to be true and which in fact is not true; (2) As a notary public or other
officer authorized to take proof of certification, wilfully certifies falsely that an instrument was
acknowledged by any party thereto or wilfully certifies falsely as to another material matter in an
acknowledgement; or (3) In any declaration, certificate, verification, or statement made under
penalty of perjury in the form specified in § 16-5306 or 28 U.S.C. § 1746(2), the person willfully
states or subscribes as true any material matter that the person does not believe to be true and that
in fact is not true.

(b) Any person convicted of perjury shall be fined not more than the amount set forth in § 22-
3571.01 or imprisoned for not more than 10 years, or both.  *See* D.C. Code, Title 22, c. 24, § 22-
2402 at:  https://code.dccouncil.us/dc/council/code/sections/22-2402.html.

*See* In Re Goffe, 641 A.2d 458 at n. 8 (D.C. 1994) (discussing the penalties of lying under oath to
a Federal agency).  *See also* 2910 Ga. Ave. LLC v. Dist. of Columbia, 234 F. Supp.3d 281, 309
(D.C.C. 2017) (confirming that perjury is a felony under D.C. law).

94.     DOJ and VA should have but failed to have Fleck & Wiercinski sign "Non-Prosecution Agreements" -- to make Fleck & Wiercinski expressly agree to refrain from making any future false allegations that contravene or contest the findings and recommendations in the OIG Report, and VA's corresponding review and concurrence thereof -- or face prosecution for the false statements that they repeatedly made about Gore to multiple OIG investigators – as documented in the OIG Report.  *See* §§ 9-27.600; 9-27.620; 9-27.630; 9-27.640; and 9-27.650 of the DOJ Manual, at:  https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution#9-27.650.[55]  DOJ and VA failed to be good stewards of the nation's tax dollars -- because the United States instead had to subsequently expend significant time, funds, and resources – defending against the Fleck v. Dep't of Veterans Affairs case – as well as the instant lawsuit.

95.     The improper acts and omissions regarding defective or deficient pleadings filed with this Court in the Fleck v. Dep't of Veterans Affairs case – occurred as many as 245 days after Gore was no longer with VA.  *See* the timeline of events *supra* ¶ 22 at Clauses (FF) through (NN).  Accordingly, the resulting severe harm to the Plaintiffs, did not occur within a context of Gore being an "employee" of VA under FECA.  *See* the timeline of events *supra* ¶ 22.  The employment relationship was certainly over, as Gore for example, had no VA office; did not have a VA I.D. Badge; was not handling assignments for VA; no longer received a salary from VA; possessed no VA gov't-furnished equipment; and neither supervised nor reported to anyone at VA.  Id. Moreover, FECA cannot provide the various types of relief that the Plaintiffs now seek from this Court.  *See infra* at the "Request For Relief" Section.

---

[55] *Cf.* Nat'l Dist. Atty's Assoc., "Nat'l Dist. Atty's Assoc. Statement on Prosecutorial Best Practices in High Profile Cases," Mar. 27, 2019, at:  https://ndaa.org/wp-content/uploads/NDAA-Press-Release-on-Prosecutorial-Best-Practices-in-High-Profile-Cases.pdf.  (Stating that ". . . when a prosecutor seeks to resolve a case through diversion or some other alternative to prosecution, it should be done so with an acknowledgement of culpability on the part of the defendant."

96.    Fleck & Wiercinski's misconduct contravenes the fidelity that is paramount and essential to the "rule of law;" failed to serve any legitimate public interest; and cannot be tolerated in a Federal agency, national law office, professional setting, or civilized society.  *See* <u>Mann</u>, 242 F. Supp.3d at 10; and <u>Purcell</u>, 928 A.2d at 711.  *See also* <u>Westfield Ins. Co. v. Harris</u>, 134 F.3d 608, 615 (4th. Cir. 1998) (referencing the "doctrine of chances" and the "experience of conduct" that provide *"[w]here prior acts of apparent coincidence are similar, the repeated reoccurrence of such an act takes on increasing relevance to support the proposition that there is an absence of accident."*).

97.    The harm that the Plaintiffs have endured, was exacerbated through VA's illegal & improper acts and omissions, including Byrne's violation of the Accountability Act.  For example, VA and OGC leadership failed to sufficiently engage and check with pertinent MPA and HR subject matter experts, who could have readily confirmed during a basic inquiry that Gore did <u>not</u>, and in fact lacked the requisite authority, to hire Wiercinski.  *See* ¶¶ 9-11 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4; pp. 2 & 11-13 of the OIG Report, Ex. 5; OGC's Draft Apr. 2018 Organizational Chart; and pp. 7 & 11 of OGC's Organizational Slide Deck, Ex. 6.  *See also* the following OPM weblink:   <u>https://www.opm.gov/policy-data-oversight/human-capital-management/hiring-reform/hiring-process-analysis-tool/the-tentative-job-offer-and-acceptance-element/</u>.  *See also* the "Overview" section and bullet #1 on p. 30 of VA's 2017 "Functional Organizational          Manual"          Version          4.0,          at: <u>https://www.va.gov/ofcadmin/docs/VA_Functional_Organization_Manual_Version_4.pdf</u>.   HR handled those actions with support as needed from MPA.  <u>Id.</u>

98.     In <u>United States v. Holland</u>, 22 F.3d 1040, 1047 (11th Cir. 1994), the court clearly articulated the seriousness of perjury violations, regardless of a criminal or civil context.  It stated as follows:

> In so holding, we categorically reject any suggestion, implicit or otherwise, that perjury is somehow less serious when made in a civil proceeding. Perjury, regardless of the setting, is a serious offense that results in incalculable harm to the functioning and integrity of the legal system as well as to private individuals. In the instant case, Holland's perjury inexcusably wasted valuable and scarce public resources. His actions needlessly consumed court time, forced the Federal Bureau of Investigation and the United States Attorney's Office to engage in prolonged investigations, and attempted to prevent private citizens, the Williams plaintiffs, from satisfying their judgment.

<u>Id.</u>

99.     The OIG Report was permanently posted on the internet on or around March 29, 2018.[56] Multiple news articles discussing it subsequently appeared on the internet – including one dated Apr. 5, 2018 from "DisabledVeterans.org" (DVO) -- which is titled "<u>Former Award Winning Army Attorneys [Fleck and Wiercinski] Busted In VA Nepotism Scheme</u>."[57]  ***See* the DisabledVeterans.org News Article at Ex. 15.**  *See also* ¶ 97 of the Amended Fleck Complaint; n. 3 on p. 14 of the Amended Fleck Complaint; and pp. 7, 24 & 31 of the Fleck Opposition Motion, Ex. 4.  That DVO article highlighted the improper acts of Fleck & Wiercinski, and inaccurately posited that all the OGC lawyers involved were culpable in his (and by proxy Wiercinski's) despicable conduct.  Unlike Fleck and Wiercinski, Gore was not involved in their unscrupulous

---

[56] The OIG Report is available at:   <u>https://www.va.gov/oig/pubs/VAOIG-17-03324-123.pdf</u>.

[57] *See* Eric White, "<u>VA chief counsel bent ethics rules to get wife fired</u>," Federal News Network, Apr. 2, 2018, at:   <u>https://federalnewsradio.com/federal-newscast/2018/04/va-chief-counsel-bent-ethics-rules-to-get-wife-fired/</u>.  *See also* Ethan Barton, "<u>Senior VA Lawyer 'Engaged In Nepotism' To Get His Wife An Agency Job</u>," The Daily Caller, Apr. 4, 2018, at: <u>http://dailycaller.com/2018/04/02/senior-va-lawyer-nepotism-wife-job/</u>.  *See also* Emma Cueto, "<u>VA Counsel Pulled Strings To Get Wife Hired, Probe Finds</u>," Law 360, Mar. 30, 2018, at: <u>https://www.law360.com/articles/1027986/va-counsel-pulled-strings-to-get-wife-hired-probe-finds</u>.

behavior including nepotism; the improper exchange of Confidential VA Information; and repeated lies while testifying under oath to multiple OIG investigators.  Id.  See also pp. 1 & 10-16 of the OIG Report, Ex. 5.  Yet, both the OIG Report and DVO article come up during a Google search of *"Cameron Gore Veterans Affairs."*  *See* ¶¶ 8-9 of Gore's Notes About the OIG Report & Related Matters, Ex. 10.

100.  From Mar. 28, 2018 through Apr. 19, 2018, Gore was "on an island," having to sort through the recent events that transpired, while needing to educate himself about VA's accountability process -- and continuing to perform his RPLG Chief Counsel duties.  *See* ¶¶ 10 & 25 of Gore's Notes About the OIG Report & Related Matters, Ex. 10.  That was a harrowing proposition, because OGC leadership frequently told the entire staff including Gore, that we will *"have your back"* when you encounter adversity at VA.  In fact, on Apr. 20, 2018, which was around the same timeframe when Gore sought to discuss and receive support from OGC leadership (i.e., Byrne and Mitrano) regarding the OIG Report -- Mitrano said as much on the front page of an OGC Newsletter -- which she emailed to the entire OGC staff.  ***See* the OGC Newsletter Dated Apr. 20, 2018 at Ex. 16.**  Mitrano's article also specifically indicated that OGC leadership would not tolerate acts of dishonesty or evil intent.  Her quote was as follows:

> **"We have your back."**
>
> **"We have your back." You have heard me, our General Counsel Jim Byrne and other OGC leaders stress this point on many occasions as we ask you to become more comfortable with litigation risk and supporting our clients through culture change.** But what, exactly, does this mean? Surely we won't "have your back" if a case goes south and costs the VA lots of money – or will we? What if a client dis-regards your risk assessment because he or she is unwilling to seek settlement authority and we later lose the case – will we have your back then or will we hold you accountable because you lost a case that had some pretty clear vulnerability?
>
> The answer to the above questions is yes, we will have your back. If you are diligently working your case to the best of your ability given the time and resources

at your disposal, we will support you. First of all, there is no fault in losing a case after advising the client of known risks. How-ever, even if you do make an honest mistake along the way – maybe miss an argument or deadline – we will still support you. **To paraphrase our General Counsel, we will underwrite first time mistakes made in good faith. This means they are not the result of dishonesty, evil intent or pure laziness. We will also underwrite creativity and initiative undertaken in good faith even if it does not ultimately yield the desired results. What we can't support are repetitive errors and intentional acts in defiance of direction.**

**The key here is to try our best, seek help when needed and let your supervisor know as soon as things start looking bad. This is the best way to ensure we can lock arms, mitigate any risk to our clients and be sure we all have each other's back.** No one is perfect and sometimes the lessons we learn from challenging situations actually yield positive results for the VA and our clients if we recognize and apply them correctly.

Thanks for all you do!

Cathy

**(Emphasis added).** Id.

101.    On May 4, 2018, the day that Gore's resignation became effective, Hogan issued an email to Gore's former RPLG staff.  *See* **Hogan's May 4, 2018 email to RPLG Staff, Ex. 17**. The email stated as follows:

Folks,

**As you know, Cam Gore has been on leave for the last two weeks. After a lot of thought, he has decided to resign from VA effective today, May 4th.**

**Cam has demonstrated an extraordinary commitment to VA and all of its real-property programs over his 19-year career, and few can match his record of personal dedication to VA's mission.**

I have spoken with [the RPLG DCC], and he will be Acting Chief Counsel beginning tomorrow. We plan to begin recruitment for a permanent Chief Counsel replacement as soon as possible.

This is sudden news and I appreciate it will take you some time to adjust to it. It would be best if we all continue to focus on our work in support of the Department and Veterans. Please contact [the RPLG DCC], or me, if you need to speak to someone about this matter.

I will hold a meeting with all of you next Thursday when I return from OGC's leadership summit. Take care,

Mike

**(Emphasis added).**  Id.

102.    The damage and injury that Fleck, Wiercinski, VA, and DOJ have caused to Gore's career, is all the more tragic, when considering that he is in a very competitive profession, which has a significantly lower number of African-Americans and other minorities working in senior executive and partner level positions.[58]  That lack of minority representation is even more glaring

---

[58] *See* the "2018 Report On Diversity in U.S. Law Firms," National Association for Law Placement,            Inc.,"            Jan.            2019,            at: https://www.nalp.org/uploads/2018NALPReportonDiversityinUSLawFirms_FINAL.pdf.

Pages 5-6 in part state as follows:  *"In 1993 minorities accounted for 2.55% of partners and women accounted for 12.27% of partners. And at just 3.19% of partners in 2018, minority women continue to be the most dramatically underrepresented group at the partnership level, a pattern that holds across all firm sizes and most jurisdictions. The representation of minority women partners is somewhat higher (3.66%) at the largest firms with more than 700 lawyers. Minority men, meanwhile, accounted for just 5.94% of partners in 2018, compared with 5.52% in 2017. This means that the increase in minorities among partners was not quite three-tenths of one percent for women and somewhat more than four-tenths of one percent for men.*

*But, as is the case with associates, most of the increase in minority representation among partners since 2009 can be attributed to an increase of Asian and Hispanic male partners in particular. Representation of Black/African-Americans among partners has barely changed over the period and was 1.83% in 2018, flat compared with 2017, and not much higher than the 1.71% figure in 2009 . . . ."* (Emphasis added).

*See also* Debra Cassens Weiss, "Law firm diversity is 'good news/bad news story,' says [Nat'l Ass'n of Law Placement Exec. Dir.]." ABAJournal.com, Jan. 9, 2019, at: http://www.abajournal.com/news/article/law-firm-diversity-is-bad-news-good-news-story-nalp-executive-director-says.  That article in part notes that following:  *"At the partnership level, women make up 23.36 percent of law firm partners; blacks make up 1.83 percent of law firm partners; and minorities overall make up 9.13 percent of partners.*

*The percentage of black partners didn't increase between 2017 and 2018. There was less than a percentage point gain for women and minorities, but the increase for minorities was still notable, according to the press release.*

*On the bad-news side, he said, representation of black associates remains below prerecession levels, and representation of black partners "has barely budged since the recession." He also*

in Washington, D.C., which has the highest concentration of lawyers in the country -- many of whom hail from nine prominent law schools in the area – specifically, Georgetown Univ., Catholic Univ., George Washington Univ., American Univ., Howard Univ., Univ. of the Dist. of Columbia, Univ. of Md., George Mason Univ., and Univ. of Va.[59]

### Count II. Negligent Infliction of Emotional Distress[60]

103.    In the instant matter, before Gore was constructively terminated from VA on May 4, 2018, Fleck & Wiercinski engaged in illegal and unprotected acts of civil conspiracy, by fraudulently and recklessly lying repeatedly to multiple OIG investigators when testifying under oath – to try to deceive the OIG; thwart the accuracy and efficiency of the OIG investigation; frame Gore; and cover up their misdeeds.  *See* the timeline of events *supra* ¶ 22; and pp. 1 & 10-18 of the OIG Report, Ex. 5.  Subsequently, when Gore was no longer employed at VA, Fleck (and by proxy Wiercinski) attempted to further their civil conspiracy, by recklessly continuing, repeating,

---

noted that minority women are "the most underrepresented group at the partnership level," with black women being the least well-represented of all."  (Emphasis added).

*See also* Deborah L. Rhode, "Law is the least diverse profession in the nation.  And lawyers aren't doing enough to change that[,]"Washington Post, Mar. 27, 2015 (stating in part that "[a]*lthough blacks, Latinos, Asian Americans and Native Americans now constitute about a third of the population and a fifth of law school graduates, they make up fewer than 7 percent of law firm partners and 9 percent of general counsels of large corporations. In major law firms, only 3 percent of associates and less than 2 percent of partners are African Americans."*).  (Emphasis added).    That    news    article    is    available    at: https://www.washingtonpost.com/posteverything/wp/2015/05/27/law-is-the-least-diverse-profession-in-the-nation-and-lawyers-arent-doing-enough-to-change-that/?utm_term=.5ef381326882.

[59] According to "The Last Gen X American" website:  D.C. ranks #1 in having the largest number of lawyers per capita, with approx. 788 lawyers for every 1 resident.  The state of Md., where Gore resides, ranks #3 on that list, with 64.1 lawyers for every resident.  *See* https://lawschooltuitionbubble.wordpress.com/original-research-updated/lawyers-per-capita-by-state/.

[60] The Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint by reference, as though fully set forth herein. (with the exception of those sections where it is indicated Defendants need not respond).

and perpetrating false allegations about Gore, in the <u>Fleck v. Dep't of Veterans Affairs</u> case.

Compare ¶ 36 of the Fleck Complaint, ¶ 36 of the Amended Fleck Complaint and pp. 3 & 17-18

of the Fleck Opposition Motion, Ex. 4, with pp. 1 & 10-18 of the OIG Report, Ex. 5.  Those aspects

of Fleck & Wiercinski's improper conduct occurred after issuance of the OIG Report, which

notably contained VA's express concurrence in its findings and recommendations, via the-then

Deputy Sec'y of VA.  *See* pp. 17 & 18 of the OIG Report, Ex. 5. <u>Id.</u>  Fleck & Wiercinski's scheme

began while they both were acting within the scope of their employment at VA; continued when

Fleck (and by proxy Wiercinski) sued VA in the <u>Fleck v. Dep't of Veterans Affairs</u> case; and has

undoubtedly brought disrepute to VA and the legal profession.  *See* the timeline of events *supra* ¶

22; the Correspondence Between Plaintiffs and VA Re Plaintiffs' FTCA Claims, Ex. 1; and pp. 1,

10-18 of the OIG Report, Ex. 5.  Additionally, their undue acts and omissions contravened multiple

laws, regulations, duties, rules, policies, ethical standards, oaths, core values, public pledges, and

Kalkines warnings.  *See supra* ¶ 91.  These violations unequivocally illustrate that Fleck (and by

proxy Wiercinski's) conduct was extreme and outrageous, recklessly orchestrated, and caused the

Plaintiffs to suffer severe emotional distress, amongst other injuries as noted in this Complaint.

<u>Id.</u>  Compare ¶ 36 of the Fleck Complaint, ¶ 36 of the Amended Fleck Complaint and pp. 3 & 17-

18 of the Fleck Opposition Motion, Ex. 4, with the timeline of events, *supra* ¶ 22; and pp. 1 & 10-

18 of the OIG Report, Ex. 5.  The Plaintiffs also note that Fleck and DOJ failed in their respective

duties to avoid and/or correct the record in the <u>Fleck v. Dep't of Veterans Affairs</u> case, regarding

the inaccuracies that Fleck continued to repeatedly make about Gore in underlying briefs.  *See*

*supra* ¶¶ 45 & 47.

104.    The Plaintiffs note that the <u>Hedgepeth</u> case (discussed *supra* ¶ 81), contains a

narrow yet clear rule, which appropriately expanded when negligent infliction of emotional

distress can be found. That rule applies in the instant case, because the pertinent false statements that Fleck repeatedly made in the <u>Fleck v. Dep't of Veterans Affairs</u> case unquestionably regard and are inextricably tied to Gore. Compare ¶ 36 of the Fleck Complaint, ¶ 36 of the Amended Fleck Complaint and pp. 3 & 17-18 of the Fleck Opposition Motion, Ex. 4, with pp. 1 & 10-16 of the OIG Report, Ex. 5. At the time of Fleck's submission of false statements about Gore to this Court, Fleck & Gore were former Senior Executive Service colleagues. *See* pp. 2-3 of the OIG Report, Ex. 5. By submitting pleadings to this Court that contained recklessly false and inaccurate statements about Gore, Fleck violated several laws, regulations rules, standards, oaths, and policies, which are premised on attorneys acting professionally, truthfully and with integrity. Compare ¶ 36 of the Fleck Complaint, ¶ 36 of the Amended Fleck Complaint and pp. 3 & 17-18 of the Fleck Opposition Motion, Ex. 4, with pp. 1 & 10-16 of the OIG Report, Ex. 5.

<u>**Count III. Constructive Termination**</u>[61]

105.    As noted *supra* ¶ 35, the improper and illegal acts and omissions of the Defendants as described in this Complaint and its exhibits caused and led to Gore's constructive termination from VA on May 4, 2018. *See supra* ¶¶ 20, 31, 92 & 93; ¶ 36 of the Fleck Complaint, Ex. 4; ¶ 36 of the Amended Fleck Complaint, Ex. 4; pp. 3 & 17-18 of the Fleck Opposition Motion, Ex. 4; pp. 1 & 10-18 of the OIG Report, Ex. 5; Gore's Notes About the OIG Report & Related Matters, Ex. 10; and DOJ's Motion To Dismiss the Amended Fleck Complaint & Related Defendant Pleadings, Ex. 11. Gore's decision to resign was a reasonable and understandable reaction under the horrific circumstances placed upon him in the instant matter. <u>Id.</u> *See also supra* ¶¶ 91 & 92. Fleck & Wiercinski not only engaged in an illegal and improper civil conspiracy, where they lied repeatedly

---

[61] The Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint by reference, as though fully set forth herein. (with the exception of those sections where it is indicated Defendants need not respond).

about Gore when testifying under oath to multiple OIG investigators – but Fleck (and by proxy Wiercinski) then unbelievably furthered and perpetuated those lies about Gore in the Fleck v. Dep't of Veterans Affairs case -- well after Gore had resigned from VA on May 4, 2018.  *See* the timeline of events, *supra* ¶ 22 at Clauses (EE) through (NN).  Fleck's repeated lies about Gore in the Fleck v. Dep't of Veterans Affairs case were done to try to salvage Fleck and Wiercinski's reputations to Gore's detriment; maintain their law licenses and their ability to continue practicing law; and retain their jobs at VA.  *See* pp. 1 & 10-15 of the OIG Report, Ex. 5.

106.    Gore's work environment at VA detrimentally changed after the OIG Report was issued, through errors on the part of the Defendants, specifically where:  (A) Byrne violated the Accountability Act, by issuing an interim warning letter, final warning letter, and additional training requirement to Fleck, thereby bypassing OAWP's independent statutory role and responsibility to recommend disciplinary actions for Fleck & Wiercinski to the Sec'y of VA; (B) OGC negligently supervised Fleck & Wiercinski, by failing to prevent them from being able to prospectively interact with Gore, and thereby foreclose Gore from having to continue to subsist in a hostile, volatile, insufferable, abusive, and untenable work environment; and (C) DOJ negligently failed to obtain signed Non-Prosecution Agreements from Fleck & Wiercinski, which would have made it clear that if Fleck & Wiercinski did not concede to and accept the findings and recommendations of the OIG Report, and the Deputy Secy's express concurrence with them, that DOJ would prosecute them.  *See* pp. 1 & 10-18 of the OIG Report, Ex. 5; and *supra* ¶ 91.

107.    As a result of these VA and DOJ failures, Gore was innately left with the undeserved choice to either:  (A) continue working at VA in those deplorable conditions; or (B) resign from VA under a constructive termination scenario, despite the onset and adverse consequence of resulting unemployment.  Id.  *See also supra* ¶¶ 30-35; and Gore's Notes About

the OIG Report & Related Matters, Ex. 10.  The Plaintiffs aver that Gore made an extremely difficult yet fitting, principled, and reasonable decision when he resigned from VA, particularly after it became clear that:  (i) Fleck & Wiercinski were allowed to remain in their positions virtually unscathed despite lying  repeatedly under oath to multiple OIG investigators to try to frame Gore and cover up for Fleck inappropriately emailing the Confidential VA Information to Wiercinski; (ii) Fleck & Wiercinski retained their jobs at VA despite their actions described in the OIG Report, thus allowing them to further their harmful agenda against Gore without commensurate repercussions, while benefitting from the protective employment "sanctuary" that Byrne improperly provided in lieu of VA adhering to the Accountability Act; (iii) VA failed to prevent Fleck & Wiercinski from engaging with Gore going forward, to protect Gore physically, emotionally, and professionally following their undue behavior; and (iv) Fleck & Wiercinski's improper conduct detrimentally altered the conditions of Gore's work environment at VA.  Id. Those conclusions are substantiated through the fact that Fleck & Wiercinski are still working at VA to this very day, despite their abhorrent conduct.

### Count IV. Loss of Consortium[62]

108.    In the instant case, Fleck's acts of making repeated false allegations about Gore to this Court in the Fleck v. Dep't of Veterans Affairs case -- after Gore was no longer employed at VA as of May 4, 2018 -- coupled with the Defendants' acts and omissions, including a failure to prevent Fleck from doing so, and subsequently setting the court record straight – constituted acts and omissions that have caused the Plaintiffs severe emotional distress; impacted their financial well-being and security; and harmed the level, quality, duration, frequency and intensity of their

---

[62] The Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint by reference, as though fully set forth herein. (with the exception of those sections where it is indicated Defendants need not respond).

love, affection, and interaction.  As a result, Gore & Woods have understandably experienced a range of trials, tribulations, and unpleasant emotions, and expended a significant amount of time seeking justice and recourse for the atrocities involved.  That has adversely and materially affected the higher levels of society, affection, assistance, and conjugal fellowship, which would have otherwise existed between the Plaintiffs.

### Part IX. Corollary Details Regarding the Plaintiffs' Four Causes of Action

### (This section is <u>not</u> to be deemed "allegations" to which the Defendants must respond)

### A. <u>Motives Associated with Byrne's Improper Conduct</u>

109.   Fleck's acts of making repeated false allegations about Gore to this Court in the <u>Fleck v. Dep't of Veterans Affairs</u> case -- after Gore was no longer employed at VA as of May 4, 2018 -- constituted acts that do not fall within the "discretionary function" exception contained in 28 U.S.C. § 2680(a) of the FTCA.  That is because Flecks actions were done intentionally and recklessly to try to cover up for his illegally emailing the Confidential VA Information to Wiercinski; violated multiple laws, regulations, public policies, duties, rules of professional responsibility, ethical standards and core values; and did not entail or require them to make VA-related policy considerations.  *See* <u>Loumiet v. United States</u>, 828 F.3d 935, 941-943 (D.C. Cir. July 2016) (providing that the FTCA's discretionary function exception does not shield actions of Federal employees that fall outside the "range of choice accorded" in Federal law and policy).  *See also* <u>Limone v. United States</u>, 579 F.3d 79, 102 (1st Cir. 2009); <u>U.S. Fid. & Guar. Co. v. United States</u>, 837 F.2d 116, 120 (3rd. Cir. 1988); <u>Sutton v. United States</u>, 819 F.2d 1289, 1293 (5th Cir. 1987); and <u>Myers Inc. v. USPS</u>, 527 F.2d 1252 (1261 (2nd Cir. 1975).

110.   The Plaintiffs proffer two reasons that are not mutually exclusive, why Byrne was influenced or motivated to:  (i) willfully disregard the OIG's recommendation that Fleck be fired,

as well as (ii) Hipolit's recommendation that Fleck be demoted to a non-supervisory position, and instead (iii) issue an interim warning letter and an additional training requirement to Fleck, and then (iv) a final warning letter and an additional training requirement to Fleck – despite the woeful disciplinary precedent for acts of civil conspiracy and perjury that by way of OGC – would now be set within VA for any similar future occurrences. *See supra* ¶ 22 at Clauses (T), (X) & (AA); and *supra* ¶¶ 79, 80, 82 & 84-86 of the Fleck Complaint & the Amended Fleck Complaint, Ex. 4.

### First Reason for Byrne's Improper Conduct

111.    The first reason is that Byrne's actions comport with a wily documented stratagem at the OGC leadership level, which has been employed against VA employees -- including OGC lawyers – when they question or seek retribution from VA.  In many such instances, OGC leadership has been complicit and fails to halt inappropriate supervisory behavior; enact corresponding policy and procedure improvements; and levy discipline against subordinate perpetrators.  Id.  Evidence supporting this allegation previously occurred in connection with a congressional hearing held before the House Veterans Affairs Subcomm. On Oversight and Investigations.  The hearing was held on June 30, 2010, and titled "Evaluating the U.S. Dep't of Veterans Affairs Office of General Counsel."  A recording of the hearing is available at: https://www.gpo.gov/fdsys/pkg/CHRG-111hhrg58055/html/CHRG-111hhrg58055.htm.

112.    It included insightful testimony of a witness named Matthew B. Tully, Esq. ("Tully"), who is a founding partner of the national law firm "Tully Rinckey PLLC."  Id.  *See also* the Tully Rinckey PLLC website at:  https://www.tullylegal.com/.  Tully testified under oath to prior instances where his office represented multiple VA lawyers engaged in employment law disputes and cases against VA, and routinely encountered OGC employing tactics that are grossly unethical; go unchecked; are allowed if not encouraged at the OGC leadership level; and add

significant costs to his law firm's clients.  Id.  Tully's "Prepared Statement" for the hearing in part

stated as follows:

> Through my professional legal dealings with [OGC], as well as the dealings of my
> fellow attorneys, I come before you today with both general [and] specific examples
> of issues plaguing the VA legal department in the hopes that by shining a light on
> the ineffectual and often inhibitive actions taken by this Department's lawyers,
> concrete corrective actions may be taken . . .

> Seventy-five years ago, the Supreme Court in Berger v. United States [295 U.S. 78
> (1935)], issued an opinion implying that government attorneys must practice a
> higher standard of ethics than private attorneys.\1\ Following this decision, the
> judiciary [and] the American Bar Association embraced this implication by
> expressly requiring government attorneys to adhere to higher ethical standards.\2\
> The judiciary in confronting cases dealing with these issues, has been concerned
> with (1) the continuation of needless litigation, (2) harassment, and (3) the pursuit
> of a result contrary to justice and the public interest.\3\ Most notably, in Freeport-
> McMoRan Oil & Gas Co v. FERC, the United States Court of Appeals for the
> District of Columbia Circuit, in citing Berger, found that a government lawyer ``is
> the representative not of an ordinary party to a controversy,'' ``but of a sovereignty
> whose obligation . . . is not that it shall win a case, but that justice shall be done.''
> \4\ The court also found that government agency attorneys may be held to higher
> standards than attorneys for private litigants.'' \5\ As attorneys for the government,
> they have a ``responsibility to seek justice,'' and ``should refrain from instituting or
> continuing litigation that is obviously unfair.'' \6\ . . .

> Based on the Supreme Court's holding in Berger as well as the case law espoused
> in a multitude of other jurisdictions [and] the appropriate ethical rules set forth by
> the American Bar Association and Federal Bar Association, attorneys representing
> government agencies have a heightened ethical duty to seek justice [and] develop
> a full and fair record in handling legal matters. The tendency of agency attorneys
> at [VA] to treat managers as private clients [and] to zealously represent them as
> clients without any concern for the person aggrieved in an employment action is
> completely in contravention of the ethical duties required of government attorneys.
> The practice of agency attorneys in protecting managers at all costs [and]
> contributing to the continuation of needless litigation reflects a complete disregard
> for the principles reflected in the appropriate ethical rules concerning the public
> interest and in seeking justice.

> The current practice of [VA], in using attorneys in management decisions as a form
> of legal strategy, is an additional example of agency attorneys acting in
> contravention of their ethical duties as attorneys for the government. Frequently,
> agency attorneys act as decision makers in adverse actions or discipline actions in
> an attempt to create an attorney-client privilege with managers if the employee
> pursues litigation.

Furthermore, it may isolate the government from liability or protect communications that may be discriminatory or retaliatory. These results do not show any concern for the public interest [and] are clearly not in accordance with Agency attorney's heightened ethical duty to seek justice [and] develop a full and fair record in those cases that they handle for the government.

In my firm's dealings, OGC representatives have utilized numerous stonewalling techniques, often mimicking the corporate litigation counsel at BP', AIG' or Enron'. In fact, instances include OGC engaging in unnecessary legal discovery requests with private counsel, refusing to submit discovery despite private counsel legal requests and failing to adhere to key legal deadlines. This needless [and] borderline unethical action often lengthens the claim process, causing VA employees, many of whom are still employed by the VA during this time, to incur unnecessary legal costs [and] emotional stress. Additionally, the reputation of the VA OGC continues to deteriorate . . .

In one particular case earlier this year, Charlene Ng Tang v. U.S. Department of Veterans Affairs, MSPB Docket No.: AT-0752-10-0514-I-1, a VA hospital employee was demoted based on charges of misconduct and our firm appealed to the Merit Systems Protection Board (MSPB). The VA representative wholly failed to respond to our discovery requests and our motion to compel. Further, VA Attorneys untimely served the VA's request for discovery, which was fraudulently dated about a week before the postmark, a date after the deadline.

Finally, our firm has had numerous issues with the VA OGC not complying with the terms of settlement agreements or not processing settlements altogether. In an EEO complaint in which the victim was sexually harassed by her direct supervisor, the VA settled the claim. However, the Agency failed to follow the terms of the settlement agreement. Further, the OGC refused to take any responsibility for the situation [and] specifically blamed its EEO office for the breach in agreement. Additionally, after admitting there was a breach, the OGC approved the EEO office moving this complainant back to the building where the harassment had occurred less than 1 year earlier, and the alleged harasser was still located, despite being told that the complainant did not feel comfortable being placed in close vicinity to this former supervisor.

In the case of Patrice Robinson v. U.S. Department of Veterans Affairs, EEOC Case No.: 570-2009-00634X, our firm hounded VA attorneys to complete terms of settlement including expunging required personnel files, timely processing the client's resignation, and completing her performance appraisal. Our firm had to file an appeal alleging breach of the settlement agreement before terms were finally complied with appropriately. This not only caused greater stress on the client, but greater legal costs [and] time.

In all of these instances, the unprofessional conduct displayed by the VA lawyers translated into greater financial costs for the client, a prolonged legal process, and greater stress not only on the client, but to all VA staff members involved. Furthermore, due to OGC tactics, VA employees are often denied quality legal representation because plaintiff legal counsel actively avoid accepting VA cases to avoid the legal and financial burdens of working with the VA OGC . . .

The cases cited in this testimony are just the tip of the iceberg of improper conduct by VA lawyers [and] are used to provide some specificity to the abstract allegations made herein. Similar situations can be cited in every other employment law related field of practice . . .

In order to alter the current course of [OGC], my firm believes that [OGC] and their regional offices should be held to the similar standards and scrutiny currently followed by the Department of Justice (DOJ). The DOJ's Office of Professional Responsibility (OPR) reports directly to the Attorney General [and] investigates allegations of misconduct concerning DOJ attorneys (this office is separate from the Inspector General's office further stressing the importance of high ethical standards for DOJ lawyers). OPR's objective is to ensure that DOJ attorneys act in accordance with the high professional standards not only expected of government attorneys, but of the Nation's principal law enforcement agency.

At this time, it would greatly benefit [VA] if both employees [and] private plaintiff counsel were able to file complaints of alleged misconduct to a separate [and] impartial office answerable directly to the Secretary. This would both deter VA OGC from acting unethically and give the Department as a whole a new found legitimacy. By doing so, the VA OGC could become a model of standard ethical practice across all Federal agencies.

(Emphasis added). Id. Cf. Tom Philpott, "Veterans Affairs' move shifts emergency health care costs to vets.  Lawsuit aims to undo that[,] The News Tribune, Nov. 3, 2018, at: https://www.thenewstribune.com/news/business/biz-columns-blogs/article220976750.html.  Cf. Tom Philpott, "New lawsuit challenges VA's nonpayment of some emergency health care," The News Tribune, Jan. 26, 2018 (citing an instance of VA even using its lawyers to help implement regulations that contravene a court ruling requiring payment of outside emergency medical care costs for Veterans) at:    https://www.thenewstribune.com/news/business/biz-columns-blogs/article225020425.html. Cf. Nikki Wentling, "Employee at Indianapolis VA reassigned after mix-up led to veteran's amputation," Stars & Stripes, Apr. 12, 2019, at:

https://www.stripes.com/employee-at-indianapolis-va-reassigned-after-mix-up-led-to-veteran-s-leg-amputation-1.576787#.XLDr7iJQ54I.twitter.   (Citing instance where VA employees were reassigned or allowed to retire after medical treatment errors leading to amputation of a Veteran's leg).

113.    The problems regarding how OGC treats its own attorneys that seek redress against VA were so severe and pervasive, that Tully recommended to the congressional subcommittee that OGC *"should be held to the same or similar standard and scrutiny currently followed by the U.S. [Dep't of Justice . . . [given that] The [DOJ] Office of Professional Responsibility reports directly to the Attorney General and investigates allegations of misconduct concerning DOJ attorneys."* **(Emphasis added).** Id.   Tully also recommended that OGC attorneys needed a mechanism of being able to direct their grievances about VA matters to an independent organization besides OGC, which would be *"directly answerable to the [VA] Secretary[,]"* i.e., such as OAWP that Congress subsequently established via the Accountability Act. **(Emphasis added).** Id. Yet, contrary to Tully's testimony, OGC leadership averred at that same hearing that *"integrity"* and *"the highest ethical standards"* are two core values of OGC. *See* the House Veterans Affairs Subcomm. On Oversight & Investigations hearing titled "Evaluating the U.S. Dep't of Veterans Affairs Office of General Counsel," June 30, 2010, at: https://www.gpo.gov/fdsys/pkg/CHRG-111hhrg58055/html/CHRG-111hhrg58055.htm.

114.    What is notable about that statement that OGC leadership made to Congress while testifying under oath, is that one of the three VA witnesses at that hearing was Hogan. Id. *See also* Westfield, 134 F.3d at 615 (4th. Cir. 1998) (referencing the "doctrine of chances" and the "experience of conduct" that provide *"[w]here prior acts of apparent coincidence are similar, the repeated reoccurrence of such an act takes on increasing relevance to support the proposition that*

*there is an absence of accident."*);  ¶¶ 4-5 of Plaintiff's Complaint titled "Jurisdictional Allegations," <u>Keogh v. United States</u>, Civil Action No. 3:18-1426-JMC (D.S.C 2018), available at:  https://www.scribd.com/document/396153919/Keogh-Complaint.  *See also* John Monk, "<u>Deadly drug mix-up in veteran's case at Dorn VA Medical leads to $800,000 settlement</u>," The State, Dec. 20, 2018, at:  https://www.thestate.com/news/local/crime/article223281650.html.

<u>**Second Reason for Byrne's Improper Conduct**</u>

115.     The second reason regarding why Byrne willfully disregarded the OIG & Hipolit recommendations that proposed stronger discipline for Fleck -- is that Byrne was strategically protecting his own career and financial interests as a political employee of the Trump Administration -- by shielding and "going easy" on Fleck.  As the Chief Counsel for PLG, Fleck was responsible for and required to provide SES level legal support, advice, and assistance on VA's many high-profile, high dollar service, supply, and IT contracts.  *See* OGC's Draft Apr. 2018 Organizational Chart, Ex. 6; p. 14 of OGC's Organizational Slide Deck, Ex. 6; and pp. 24-33 of VA's 2017 "Functional Organizational Manual" Version 4.0, at: https://www.va.gov/ofcadmin/docs/VA_Functional_Organization_Manual_Version_4.pdf.  One such contract is the 10-year $16B no-bid healthcare records Information-Technology ("IT") software contract with a company called "Cerner" (hereafter referred to as the "Cerner Contract"), which is intended to create seamless integration & operability of VA and DOD healthcare records. <u>Id.</u>  *See* Isaac Arnsdorf, "<u>The VA Shadow Rulers' Signature Program Is 'Trending Towards Red,</u>'" Talking Points Memo, Nov. 1, 2018, at:  https://talkingpointsmemo.com/news/veterans-affairs-signature-program.  *See also* Jessica Kim Cohen, "<u>VA's HER project is 'yellow trending towards red,' says report obtained by ProPublica</u>," Beckers Hospital Review, Nov. 8, 2018, at: https://www.beckershospitalreview.com/ehrs/va-s-ehr-project-is-yellow-trending-towards-red-

says-report-obtained-by-propublica.html.  *See also* Senator Jon Tester, "Letter To VA's New Assistant Sec'y for Information & Technology," Senate.gov, Jan. 11, 2019, at: https://www.veterans.senate.gov/imo/media/doc/2019-01-11%20Letter%20to%20Gfrerer%20re%20OIT%20Concerns.pdf.  Recent news reports suggest that while the Cerner Contract is in the early stages of engagement, VA is already experiencing severe implementation problems – for reasons such as crucial, unfilled job vacancies; a lack of resources; mistakes about the software's overall capabilities versus VA's actual needs; internal infighting; confusion about the project's leadership structure as between VA and DOD; a lack of transparency to Congress; and an inability to prioritize multiple competing IT projects.  Id.

116.    On Oct. 10, 2018, Congressman Jim Banks, a member of the House Veterans Affairs Committee ("HVAC") and Chairman of its Subcomm. on Technology Modernization, issued a letter to Byrne.  *See* Congressman Jim Banks, Letter to Acting Deputy Sec'y James Byrne Expressing Concern About VA's Inadequate Focus On Its Electronic Health Records Modernization Platform, Oct. 10, 2018, at: https://banks.house.gov/uploadedfiles/cjb_letter_to_depsec_re_api_gateway.pdf.  Congressman Banks' letter opens by making it clear that the HVAC considers Byrne to be the top VA official accountable to the HVAC, for successful implementation of the Cerner Contract.  Congressman Banks' letter opens with the following remarks to Byrne:

> **As the VA senior leader responsible for . . . [Electronic Health Records] modernization, I write you to express my concern over VA's apparent loss of focus on the open-Application Program Interface (API) gateway interoperability platform concept that VA has explored for over two years and the "open-API pledge" that the department encouraged hundreds of developers to sign in March of this year.**

**(Emphasis added).**  Id.  *See also* Congressman Jim Banks, Letter to Acting Deputy Sec'y James Byrne Regarding VA's Pending Decision On How To Accelerate VA's Medical Scheduling

System, Dec. 14, 2018, at:
https://banks.house.gov/news/documentsingle.aspx?DocumentID=435. *See also* the House
Veterans Affairs Comm. hearing titled "180-Day Review of the Electronic Health Record
Modernization Program," Nov. 14, 2018, at:
https://www.youtube.com/watch?v=TVp5KcDPUqs. At about the 52 minute and 1 hour 18
minute marks of the hearing, Mr. John Windom (VA's Executive Director of the Office of
Electronic Health Record Modernization), testified in response to questions from Congressman
Mike Coffman, that Byrne is the lead VA official accountable for the Cerner Contract. Id.

117. As evidence that the HVAC had been carefully monitoring the Cerner Contract for
several months prior and is concerned about growing problems with the contract, on Nov. 5, 2018,
the-then Chairman of the HVAC (Congressman Phil Roe) and the-then Ranking Member of the
HVAC (Congressman Tim Walz) issued a press release, and posted it on the HVAC website. *See*
Congressmen Phil Roe & Tim Walz, Press Release Announcing an Upcoming Hearing On the
Cerner Contract, Nov. 5, 2018, at:
https://veterans.house.gov/news/documentsingle.aspx?DocumentID=2259. The press release
announced that the HVAC had scheduled and would be holding a congressional oversight hearing
about the Cerner Contract, on Nov. 14, 2018 ("Cerner Contract Hearing"). In the press release,
Congressmen Roe and Walz expressed their concern about the problems that VA is already having
with the $16B contract, by stating as follows:

> **Over the past 180 days, the Department of Veterans' Affairs (VA) Electronic
> Health Record Modernization (EHRM) program has begun to take shape,"
> said full committee Chairman Roe. "Intensive planning is underway, and the
> Committee has identified the risks. As the program enters its critical
> implementation phase at the initial Washington state sites, the Committee will
> be vigilant to ensure execution matches expectations.** I know from my career in
> private practice that any electronic health record transition is challenging and this
> is no exception. It is critical that the implementation of such a system starts from a

sound premise, and is done with care and precision. Now is the time to both look back at the groundwork that has been laid and ahead at the hurdles to come. I am committed to conducting rigorous oversight throughout this process in order to ensure that both veterans and taxpayers are protected and that the transition is as seamless as possible.

Modernizing VA's electronic health record will be one of the most important and challenging undertakings in the Department's history," said full committee Ranking Member Walz. "That's why it's imperative for Congress to conduct frequent oversight **and hold VA leaders accountable every step of the way**. This is an issue that transcends partisan politics, and our shared goal must continue to be ensuring the project's success so that all veterans receive their care as seamlessly as possible. Unfortunately, a recent investigative report has alleged that systemic deficiencies in leadership and expertise at VA, as well as outside influence, unnecessary politicization, and infighting at the highest levels of the Department, could threaten the entire $16 billion project and put veterans' lives at risk. Let me be clear, veterans and taxpayers cannot afford to have this project fail and this Committee must get to the bottom of these allegations. If a single veteran is harmed as a result of mismanagement or negligence on the part of VA or Cerner, that is one too many. This hearing is vital to protecting our veterans throughout the modernization process and beyond.

**(Emphasis added).** Id.

118.    Consistent with these concerns, at the aforementioned Cerner Contract Hearing held on Nov. 14, 2018, members of the House Veterans Affairs Comm. questioned why VA's cost estimate for the Cerner Contract initially estimated to be around $15.8B, has already increased around $300-$350M.  *See* Nicole Ogrysko, "Congress questions VA's 'fuzzy math,' persistent leadership gaps on [Electronic Health Record," Federal News Network, Nov. 14, 2018, at: https://federalnewsnetwork.com/veterans-affairs/2018/11/congress-questions-vas-fuzzy-math-persistent-leadership-questions-on-ehr/.  *See also* House Comm. On Veterans Affairs Hearings, "180-Day Review of the Electronic Health Records Modernization Program," Nov. 14, 2018, at: https://veterans.house.gov/calendar/eventsingle.aspx?EventID=2258.  *See also* Adam Mazmanian, "Lawmakers balk at $350M addition to VA's health record deal," FCW, Nov. 14, 2018, at:  https://fcw.com/articles/2018/11/14/va-cerner-hearing-cost.aspx.  Similar inquiries

occurred on Feb. 5, 2019, when Byrne led a four-person contingent of VA witnesses, who testified before the U.S. Senate Committee on Appropriations "Subcommittee on Military Construction, Veterans Affairs, and Related Agencies" – where Congress continued its ongoing oversight efforts -- to ensure that the Cerner Contract is implemented correctly, on time, and within budget.  *See* U.S. Senate Committee On Appropriations, "Subcommittee Hearing – "Review of the VA's Electronic                Health                Record                Modernization,"                at: https://www.appropriations.senate.gov/hearings/review-of-the-vas-electronic-health-record-modernization.

119.    At approx. the one hour, twenty-two minute mark of the hearing, VA witness John Windom ("Windom") (i.e., VA's Executive Director of the Office of Electronic Health Record Modernization) again informed Congress – this time in response to a question from the Ranking Member (i.e., Senator Brian Schatz) -- that Byrne is the lead VA official in charge of the Cerner Contract.  Id.  *See also* Leo Shane, III, "Senators skeptical over long-term VA health records overhaul," Military Times, Feb. 5, 2019, at:   https://www.militarytimes.com/news/pentagon-congress/2019/02/05/senators-skeptical-over-long-term-va-health-records-overhaul/.   *See also* article titled "Senators Question VA on [Electronic Healthcare Record], Scheduling, IT Modernization," MeriTalk, Feb. 5, 2019, at:  https://www.meritalk.com/articles/senators-question-va-on-ehr-scheduling-it-modernization/.  *See also* Adam Mazmanian, "DOD [&] VA consider an electronic health record czar," FCW, Feb. 5, 2019, at:   https://fcw.com/articles/2019/02/05/dod-va-health-record-czar.aspx.  On Feb. 11, 2019, a news article reported that the cost estimate for the Cerner Contract, originally estimated at $10B, has already begun an upward creep to $16.1B. *See* Jon Stone, "Implementing a New HER at the Veterans Administration Is Taking Longer & Costing     More     than     Earlier     Estimates,"     Dark     Daily,     Feb.     11,     2019,     at:

https://www.darkdaily.com/implementing-a-new-ehr-at-the-veterans-administration-is-taking-longer-and-costing-more-than-earlier-estimates/.  Byrne's lead role for the Cerner Contract was on further display Mar. 7, 2019, when he was VA's primary witness at a hearing before the "House Appropriations Subcomm. On Military Construction, Veterans Affairs, and Related Agencies." *See* the Comm. On Appropriations Hearing Titled "Electronic Health Records Modernization & Information Technology Oversight," Mar. 7, 2019, at: https://appropriations.house.gov/legislation/hearings/electronic-health-record-modernization-and-information-technology-oversight.  At that hearing, Byrne was quoted describing the Cerner Contract as follows:  *"It is in fact a complex, difficult and time-consuming job . . . We need to constantly remind ourselves that when we complete this difficult, complex transformation, there will be tangible, measurable benefits for veterans." See* Dave Boyer, "Congress pressures VA to deliver on $16 billion electronic health-records system," Wash. Times, Mar. 7, 2018, at: https://www.washingtontimes.com/news/2019/mar/7/congress-pressures-veterans-affairs-to-deliver-on-/.  On Apr. 2, 2019, the OIG and GAO testified before the "Subcommittee on Technology Modernization of the House Comm. on Veterans Affairs," about the systemic budgetary, governance structure, and leadership & management challenges that VA continues to encounter for its IT-related systems.  Jessica Kim Cohen, "House lawmakers question unstable IT leadership at VA," Modern Healthcare, Apr. 2, 2019, at: https://www.modernhealthcare.com/government/house-lawmakers-question-unstable-it-leadership-va.  That same day, GAO issued report GAO-19-476T titled *"Veterans Affairs – Addressing IT Management Challenges Is Essential to Effectively Supporting the Dep't's Mission,"* at:  https://www.gao.gov/assets/700/698164.pdf.  It provided further corroborating

details about the significant problems that VA is facing from an IT perspective, including for the Cerner Contract.  Id. at pp. 8-9 & 16-18.

120.   Fleck's demotion or firing at VA would have resulted in the loss of either his:  (A) institutional knowledge and legal expertise for the Cerner Contract (if he was fired); or (B) ability to provide supervisory legal support and assistance for that contract (if he was demoted); and (C) ability to supervise the OGC Litigation Team if litigation arises for the Cerner Contract -- which was a matter for which Congress was holding Byrne accountable.  Id.  In other words, Byrne "losing Fleck" within OGC would have been detrimental to Byrne's own performance at VA, including his ability to be and remain in the good graces of Congress, the White House, Veteran Service Organizations, and the public.  Id.  Byrne being involved in the discipline that Fleck received in contravention of the Accountability Act, represents the specific conflict of interest concerns and "inadequate oversight measures" which were flagged in the GAO Report regarding VA's flawed accountability processes and procedures.  See n. 2, and pp. 3, 37, 45-48 & 55-57, Ex. 12.  It also appears to violate 18 U.S.C. § 208, titled "Acts affecting a personal financial interest;" and 18 U.S.C. § 1505, titled "Obstruction of proceedings before departments, agencies, and committees."  18 U.S.C. § 208 in part prohibits executive branch Federal employees from participating in investigations and decision making activities, which affect their own prospective financial interests.[63]  18 U.S.C. § 1505 in part prohibits persons from seeking to or in fact corruptly influencing, obstructing, or impeding "due and proper administration of the law" regarding proceedings before Federal agencies.[64]

---

[63] See 18 U.S.C. § 208 at:  https://www.law.cornell.edu/uscode/text/18/208.
[64] See 18 U.S.C. § 1505 at:  https://www.law.cornell.edu/uscode/text/18/1505.

**B. <u>Notable Similarities to Ortiz Involving False Allegations and Emotional Distress</u>**

121.     <u>Ortiz v. Chipotle Mexican Grill, Inc.</u>, Case No. <u>15CECG01505</u> (Fresno Cnty. Super. Ct. 2018).  ***See* the Plaintiff's Complaint, the Defendant's Answer & the Jury's Special Verdict Form in the <u>Ortiz</u> case at Ex. 18.**  *See also* Bill Murphy, Jr. "<u>A Fired Employee Won $8 Million in a Stunning Lawsuit Against Chipotle on Friday.  Here's Why She Can't Wait to Go Back to Court on Monday,</u>" Inc.com, May 14, 2018, at:  <u>https://www.inc.com/bill-murphy-jr/chipotle-lost-8-million-in-a-stunning-lawsuit-friday-but-news-theyll-hear monday-could-be-a-lot-worse.html</u>. *See also* Rachel Siegel, "<u>Chipotle wrongfully accused a manager of stealing $636.00.  She just won millions    in    court.    .    .    [,]</u>"    Wash.    Post,    May    14,    2018,    at: <u>https://www.washingtonpost.com/news/business/wp/2018/05/14/chipotle-wrongfully-accused-a-manager-of-stealing-636-she-just-won-millions-in-court/?utm_term=.820c951d8cc2</u>.    *See also* Pablo Lopez, "<u>Fresno Jury says Chipotle owes former manager $7.97 million for wrongful termination,</u>"    Fresno    Bee,    May    10,    2018,    at: <u>https://www.fresnobee.com/news/local/article210797869.html</u>.  *Cf.* "<u>New Haven Rabbi Daniel Greer found liable for $15 million in civil trial alleging he sexually abused a student,</u>" New Haven Register, May 18, 2018, at:  <u>https://www.nhregister.com/connecticut/article/New-Haven-Rabbi-Daniel-Greer-found-liable-for-15-11312455.php</u>.  *Cf.* Complaint, Answer & Jury Form, <u>Mirlis v. Greer</u>, Case No. 3:16-cv-000678-MPS (D. Conn. 2018), ECF 9, 16 & 157.  *Cf.* Michelle Castillo, "<u>Gawker Pays Hulk Hogan [a/k/a "Terry Gene Bollea"] $31 Million to Settle Sex Tape Suit,</u>" NBC News, Nov. 2, 2016, at:  <u>https://www.nbcnews.com/tech/tech-news/gawker-pays-hulk-hogan-31-million-settle-sex-tape-suit-n676871</u>.  *Cf.* Robert W. Wood, "<u>Hulk Hogan Settles $140 Million Gawker   Verdict   For   $31   Million,   IRS   Collects   Big,</u>"   Forbes,   Nov.   3,   2016,   at: <u>https://www.forbes.com/sites/robertwood/2016/11/03/hulk-hogan-settles-140-million-gawker-</u>

verdict-for-31-million-irs-collects-big/#57f39ae56e84.  *Cf.* "First Amended Complaint & Demand

For Jury Trial," at 2, Bollea v. Clem, et al., (Fla. Cir. Ct. 2012) (No. 12012447-CI-011) (confirming

"Hulk Hogan" received a $60 million emotional distress verdict and $31 million settlement after

Defendants posted a sex tape online).  *Cf.* Shegerian & Assoc., "$3.75 Million Awarded to Former

Catholic School Teacher in Verdict Against Archdiocese of Los Angeles," PR Newswire, Nov. 5,

2018, at:   https://www.prnewswire.com/news-releases/3-75-million-awarded-to-former-catholic-

school-teacher-in-verdict-against-archdiocese-of-los-angeles-300743398.html.   That news article

describes a case called Liggins v. Archdiocese of Los Angeles, Case No. BC522726 (Sup. Ct. of

Cal. 2018).

122.   The instant case involves several aggravating factors that make it even more

egregious than the Ortiz case:  (A) Gore worked at VA for 19 years, was promoted three times,

and made approx. $107,458.00.00 a year (i.e., 1.5 times) more than Ortiz (excluding bonuses).[65]

(B) Gore's career, reputation, livelihood, and future employability were besmirched through illegal

& improper acts and omissions of OGC colleagues and superiors, notably Fleck & Wiercinski's

exchange of the Confidential VA Information, acts of civil conspiracy, and repeated lies to

multiple OIG investigators while testifying under oath about Gore violated multiple laws,

regulations, public policies, duties, rules of professional responsibility, ethical standards, and core

---

[65] *Supra* ¶ 9.  *See also* Bill Murphy, Jr. "A Fired Employee Won $8 Million in a Stunning Lawsuit Against Chipotle on Friday.  Here's Why She Can't Wait to Go Back to Court on Monday," Inc.com, May 14, 2018, at:   https://www.inc.com/bill-murphy-jr/chipotle-lost-8-million-in-a-stunning-lawsuit-friday-but-news-theyll-hear monday-could-be-a-lot-worse.html.   *See also* Rachel Siegel, "Chipotle wrongfully accused a manager of stealing $636.00.  She just won millions in    court.    .    .    [,]"    Wash.    Post,    May    14,    2018,    at: https://www.washingtonpost.com/news/business/wp/2018/05/14/chipotle-wrongfully-accused-a-manager-of-stealing-636-she-just-won-millions-in-court/?utm_term=.820c951d8cc2.   *See also* Pablo Lopez, "Fresno Jury says Chipotle owes former manager $7.97 million for wrongful termination,"    Fresno    Bee,    May    10,    2018,    at: https://www.fresnobee.com/news/local/article210797869.html.

values.  (C) Fleck & Wiercinski's false statements to the OIG about Gore consisted of at least four lies (i.e., two from Fleck and two from Wiercinski) to three OIG investigators (an functional increase from four lies to twelve lies), which were conducted to try to deceive the OIG; thwart the accuracy and efficiency of the OIG investigation; frame Gore; and cover up their misdeeds.  (D) Fleck & Wiercinski's behavior caused Gore to have to undergo a second interview with the OIG; put Gore at risk for multiple felony charges for perjury or making false statements, criminal liability, prison time, and monetary fines; jeopardized Gore's two bar licenses, and caused him to undergo counseling.  (E) Gore attempted to discuss the OIG Report with his leadership but was gas-lighted, insulted, intimidated, called a *"diamond in the rough . . , "* and victimized through  a grossly false, inaccurate, and defamatory allegation of an OGC Staff Attorney ("Staff Attorney X"), who surreptitiously listened to certain of Gore's private phone conversations with three former VA General Counsels through an office wall, and ridiculously alleged to Byrne, Hogan, and Hall that Gore intended after a very successful nineteen year at VA, to burn down VA headquarters and kill people.  *See* ¶¶ 12-35 of Gore's Notes Regarding the OIG Report & Related Matters, Ex. 10.  (F) All the while, OGC leadership (i.e., Byrne, Mitrano, Hogan, and Hall) failed to sufficiently engage and check with MPA and HR subject matter experts, who could have readily confirmed that Gore had no authority or wherewithal to hire Wiercinski; expected Gore to obediently continue working with Fleck & Wiercinski despite their repeated lies and effort to frame Gore; refused to give Gore a copy of Staff Attorney X's written affidavit, so Gore could respond to and retort the false allegations in writing; and declined despite Gore's request to contact the three former VA General Counsels, to confirm that Gore did not express any plan to burn down VA headquarters or kill people.  (G) Gore's name is permanently damaged in the public domain through negative news articles about the OIG Report.  (H) From a span of between 47 days and

230 days after Gore's last day at VA on May 4, 2018 to the date of the latest Plaintiff pleading filed in the <u>Fleck v. Dep't of Veterans Affairs</u> case -- (per Clauses (FF) through (NN) of the timeline of events *supra* ¶ 22) -- Fleck continued to falsely, repeatedly, and further allege – i.e., once in the Fleck Complaint, once in the Amended Fleck Complaint, and thrice in the Fleck Opposition Motion (without DOJ ever refuting or correcting those lies about Gore in its three corresponding pleadings to this Court) -- that Gore telephoned Wiercinski, to offer her the e-discovery job -- despite VA agreeing on Feb. 9, 2018 with the prior findings and recommendations of the OIG Report, which confirmed that Gore did not do so.   (I) Despite the Defendants' misconduct against Gore, the Federal Gov't would nonetheless recoup approx. thirty-seven percent of the Plaintiffs' monetary award through Federal taxes.  *See* Brittany De Lea, "<u>Here are the new tax brackets for 2019</u>," Fox Business, Nov. 29, 2018, at:  <u>https://www.foxbusiness.com/personal-finance/here-are-the-new-tax-brackets-for-2019</u>.   (J) Gore is now subject to extensive post-Gov't employment restrictions.   (K) Lastly, Woods suffered a loss of consortium in this matter.

123.    The Plaintiffs proffer that a Federal employee's career, reputation, livelihood, and future employability should never be sullied, via colleagues that civilly conspire and deliberately or recklessly lie repeatedly while testifying under oath, given the profound adverse effects that their acts will have on the victims, the underlying organization, and the rule of law.  This case stands to place OGC within a realm of boundless hypocrisy, whenever its leadership touts the organization as being one that represents "the gold standard" for lawful conduct and accountability.[66]  The conduct of Fleck, Wiercinski, and Byrne fell well short of that aspiration,

---

[66] *See* the following weblink containing a set of OGC slides currently available on the internet: <u>https://www.va.gov/OGC/docs/OGCLawSchoolRecruitment2015.ppt</u>.  Slide #2 notably indicates that VA's Core Values *"define 'who we are' and also how we are different from other organizations,"* then conspicuously publicizes VA's "I-CARE" core values, including "integrity," "respect," & "excellence."  Also note that Slide #6 contains an OGC organizational chart, which

and in hindsight, contravenes apropos wisdom that a prior VA General Counsel previously imparted throughout OGC. **Specifically, Ex. 19 contains a Jan. 5, 2015 email from former VA General Counsel Leigh Bradley, Esq.[67]  In ¶ 5, she implores all OGC staff to *"[recommit] to VA's core values in [their] business practices and dealings . . . and address the many challenges ahead with unquestioned integrity, purposeful commitment, forceful and effective advocacy on behalf of our clients, true respect for one another, and excellence in all that we do."* (Emphasis added).** Ex. 19.

124.    Byrne cannot hold OGC out as having complied with its own internal policies, when comparing:  (A) his decision to issue a couple of warning letters and additional training requirement to Fleck, with (B) App. B in Ch. 1 of OGC's "General Counsel Handbook" – which conspicuously relays that OGC should report an OGC attorney's act(s) of professional misconduct to the transgressor's pertinent state bar associations, when such conduct *"raises a substantial question as to that attorney's honesty, trustworthiness, or fitness to practice law."* (Emphasis added).  *See* App. B in Ch. 1 of OGC's "General Counsel Handbook" at Ex. 20.   In fact, ¶ 8 of Sec. III. A. in App. B of Ch. 1 of OGC's "General Counsel Handbook" -- which indicates that *"the General Counsel or designee will make the final decision whether to report an OGC attorney, on behalf of the Office of General Counsel, to the attorney's licensing State Bar or other relevant tribunal[,]"* represents an inherent, undue conflict of interest -- and violates the Accountability

---

in the top-left corner depicts the position of a "Director, Office of Accountability Review," supposedly reporting to VA's General Counsel – in contravention of the Accountability Act.

[67] Leigh Bradley, Esq. is a former VA Gen. Counsel, who was appointed and served in that position on two occasions, i.e., from 1998 to 2001 & from 2014 to 2016, respectively.  *See* the following website containing her professional biography, before she resigned from VA in Dec. 2016, at the end of her second stint as VA's Gen. Counsel: https://docs.house.gov/meetings/VR/VR00/20160914/105271/HHRG-114-VR00-Bio-BradleyL-20160914.pdf.  *See also* the following website for more information regarding Leigh Bradley, Esq.: http://www.genwnow.com/events/generationw2016/team/leigh-bradley/.

Act requirement that the Ass't Sec'y of OAWP (not VA's Gen. Counsel) make disciplinary recommendations to the Sec'y of VA -- particularly for senior VA officials. Compare 38 U.S.C. §§ 323(b)(3), (4), and (c)(F), (H), and (I) of the Accountability Act, Ex. 7, with ¶ 8 of Sec. III. A. in App. B,n Ch. 1 of OGC's "General Counsel Handbook," Ex. 20; and n. 2, and pp. 3, 37, 45-48 & 55-57 of the GAO Report, Ex. 12.

## C. VA Leadership's Prior Documented Failure To Comply with the Accountability Act

125. While Sec'y Wilkie has publicly praised Congress for passing the Accountability Act, so senior officials can be held accountable, VA is systemically failing to use the authority correctly. That conclusion is substantiated when comparing Wilkie's pertinent remarks and actions, to those of concerned members of Congress and VA stakeholders. On July 23, 2018, Congressman Mike Coffman ("Coffman") made the following remark regarding the importance of Sec'y Wilkie utilizing the Accountability Act properly, to hold senor VA officials accountable:

> **I look forward to sitting down with Secretary Wilkie and letting him know, in no uncertain terms, that unless he cleans house by firing senior VA leaders who have consistently failed our veterans, that no matter what he says or does, he will never change the culture of bureaucratic incompetence that has plagued the VA. Our nation must do a better job in taking care of our veterans.**

**(Emphasis added).** *See* Congressman Coffman, "Coffman Statement on VA [Sec'y] Wilkie's Confirmation," House.gov, July 23, 2018, at: https://coffman.house.gov/news/documentsingle.aspx?DocumentID=2627.

126. Then on Sept. 26, 2018, Sec'y Wilkie testified to the Senate Veterans Affairs Committee ("SVAC") at a hearing titled "The State of the VA: 60 Day Report." A video transcript of the hearing is available at: https://www.veterans.senate.gov/hearings/watch?hearingid=7EBF6810-5056-A066-60E2-F57ADA53C1F4. At the hour mark into the hearing, Senator Sherrod Brown expressed his

concern to Sec'y Wilkie that VA was using the Accountability Act disproportionally, to discipline and fire lower level VA employees (e.g., housekeepers) for marginal offenses, versus VA's senior level officials for egregious offenses.  Id.  In response, Sec'y Wilkie clearly indicated his insistence that VA will hold all employees accountable "to the highest professional standards."  Id.  He specifically stated as follows:

> **We are going to hold our employees to the highest professional standards.**  I am looking at new ways to evaluate performance.  But I do want to say that we [at VA] are unique . . . and I apologize for taking more time . . . **we are a unique Federal department . . . we have three offices that are symbiotic in that they are all focused on the same thing.  We have a General Counsel, we have an Inspector General, and we have the Office of Accountability & Whistleblower Protection.  That was set up by this administration.**

> **They are all designed to address employee misconduct . . . they are also designed to protect employees from retaliation, who legitimately blow the whistle on bad acts.  Let me talk quickly about the Office of Accountability & Whistleblower protection.  That is designed to deal with employees at the GS-15 level and above.**  Right now I believe there are about 200 . . . [no] . . . 280 investigations of GS-15 level employees and above.  I am proud of that because I think that also meets the intent of the Congress.  Last year, about 2,500 as Senator [Sherrod Brown] said . . . 2,500 employees were dismissed . . . **I will also note overall that we do have different conditions here . . . and I don't mean to cast dispersions on my friends who work at the [U.S.] Department of Labor or the [U.S.] Department of Commerce . . . but when a junior employee who is responsible for sweeping the floors, doesn't sweep the floors . . . or doesn't sterilize an instrument . . . that's alright at the [U.S.] Department of Labor because nobody will notice.**

> If they don't do that in our hospitals, the consequences could be catastrophic.  So we have to hold employees at that [junior] level to the highest professional standards.  **That said, I'm going to ensure that our Office of Accountability & Whistleblower protection continues to evaluate and reevaluate those employees at GS-15 and above . . . that has the double advantage of keeping their feet to the fire, but also sending a message down the ranks that there are no . . . as we say in the military . . . there are no different spanks for different ranks.**

**(Emphasis added).**  Id.[68]  The Plaintiffs would be remiss to not flag the obvious, which is that firing several lower level VA employees (many of whom are Veterans) for failing to properly sweep floors -- is a materially distinct and more severe "spank" than the issuance of a couple of warning letters and an additional training requirement – that Byrne levied upon Fleck for his transgressions in the instant matter.  Compare pp. 1 & 10-18 of the OIG Report, Ex. 5, with the timeline of events *supra* ¶ 22 at Clauses (Z) & (CC).  Id.  VA conspicuously firing personnel that fail to sweep floors properly is all the more confounding, when considering that the agency reportedly is on the record for hiring violent felons, abusers, murderers, child molesters, sex offenders, and armed robbers.  *See* Luke Rosiak, "VA Hired A Newly Released Felon Who Attacked Judge's Daughter In the Shower, Cut Her Brakes," Daily Caller, Feb. 19, 2019, at: https://dailycaller.com/2019/02/19/veterans-affairs-violent-felon/.

127.  Sec'y Wilkie's aforementioned testimony to the SVAC confirmed that VA is using the Accountability Act contrary to Congress' intent -- by more readily firing lower level employees (e.g., custodial, laundry, and food service personnel), versus senior VA officials.  *See* the Letter From Senate Veterans Affairs Committee Members to Former VA [Sec'y] David [J.] Shulkin, Federal News Network, Feb. 26, 2018, at: http://federalnewsnetwork.com/wp-content/uploads/2018/03/2018-02-26-Letter-to-Shulkin-Whistleblower-Protection-Act_fnr.pdf. *See also* Nicole Ogrysko, "VA Insists it's not using the accountability act to target low-ranking

---

[68] Also note that on Nov. 9, 2018, Secretary Wilkie spoke at the Nat'l Press Club in D.C.  That speech is available at:  https://www.youtube.com/watch?v=647H3pr9Z2k.  At the 18:20 minute mark, Secretary Wilkie mentions that Congress passed the Accountability Act, so VA can levy employee discipline when appropriate.  Id.  Secretary Wilkie specifically stated as follows: *"Congress has done what no Congress has ever done.  They have given us the roadmap for success.* ***They have passed the . . . Accountability Act, which allows the leadership of our Department to shake up the complacency that has been written about so much. And they have strengthened our ability to make the right decisions on behalf of America's Veterans."*** **(Emphasis added).**  Id.

employees," Federal News Radio, July 17, 2018, which reports that senior VA officials represent 0.1 percent of all disciplinary actions at VA. That news article is available at: https://federalnewsradio.com/veterans-affairs/2018/07/va-insists-its-not-using-the-accountability-act-to-target-low-ranking-employees/. *See also* Richard Sisk, "VA Firings Climb Under Trump; Dems Charge Low-Wage Workers Targeted," Miliary.com, July 19, 2018, at: https://www.military.com/daily-news/2018/07/19/va-firings-climb-under-trump-dems-charge-low-wage-workers-targeted.html. Notably, a prior June 2018 news article confirmed that problem with the following remarks:

> A group of lawmakers is calling on the Veterans Affairs Department's watchdog to investigate the implementation of a new law that makes it easier for the agency to discipline and fire its employees, saying it has been carried out "inappropriately and inconsistently." VA has not submitted information required by the law to Congress and employees have reported the department is unfairly interpreting its new authorities, according to the four Democratic members of the Senate Veterans Affairs Committee who sent the letter to the agency's inspector general. When presented with those accusations, the lawmakers said, the department failed to provide any information to "alleviate our concerns or demonstrate in any way that application of these authorities has been consistent, fair or appropriate." The Senators calling for the investigation are Jon Tester, D-Mont.; Richard Blumenthal, D-Conn.; Tammy Baldwin, D-Wis.; and Sherrod Brown, D-Ohio.

**(Emphasis added).** *See* Erik Katz, "Lawmakers Call for an Investigation Into Discipline at VA," Gov't Executive, June 19, 2018, at: https://www.govexec.com/oversight/2018/06/lawmakers-call-investigation-discipline-va/149135/. Certain reports indicate that VA is firing lower-level employees in each instance of discipline, in an effort to *"undue . . . [the] apolitical civil service system and dismantle unions across the country." See* "One Year Later, VA Accountability Act Is a Massive Failure," AFGE, June 18, 2018, at: https://www.afge.org/article/one-year-later-va-accountability-act-is-a-massive-failure/. *See also* Sherkiya Wedgeworth, "Arbitrator: VA wrongfully fired workers," Federal Soup, Sept. 4, 2018, at: https://federalsoup.com/articles/2018/09/04/va-improperly-enforced-accountability-act.aspx. *See*

*also* "AFGE Members at VA Win Major Arbitration in Another Blow to Union-Busting Administration," AFGE, Sept. 4, 2018, at:  https://www.afge.org/article/afge-members-at-va-win-major-arbitration-in-another-blow-to-union-busting-administration/.  *See also* Eric Katz, "VA Is Overstepping Congressional Intent With 'Unacceptable' Firings, Senators Say," Gov. Exec., Mar. 13, 2018, at:   https://www.govexec.com/management/2018/03/va-overstepping-congressional-intent-unacceptable-firings-senators-say/146640/.  *See also* Eric Katz, "VA Appeals Ruling That Could Force It to Rehire Fired Workers," Gov. Exec., Oct. 1, 2018, at:  https://www.govexec.com/management/2018/10/va-appeals-ruling-could-force-it-rehire-fired-workers/151704/.

128.    On Nov. 29, 2018, a VA hearing occurred before the House Veterans Affairs Committee's Subcomm. On Disability Assistance and Memorial Affairs.  *See* House Comm. on Veterans Affairs, "VA's Development & Implementation of Policy Initiatives," Nov. 29, 2018, at: https://veterans.house.gov/calendar/eventsingle.aspx?EventID=2270.   At approx. the one hour, forty-four minute mark of the hearing, Congressman Coffman asked Dr. Lawrence how many senior executives he has working under him within VA's Veterans Benefits Administration, and how many of those officials has Dr. Lawrence "let go" (i.e., fired for misconduct or deficient performance).  Id.  Dr. Lawrence paused and thought intently for about ten seconds, then replied by saying "I think the answer is zero."  Congressman Coffman then said the following:

> Really, because I had a conversation with the prior . . . with our new [VA] Secretary [Robert Wilkie] . . . and followed up . . . in writing to him, and there are about 400 positions in the senior executive service level in the Dept. of Veterans Affairs . . . after . . . the scandal with the employment [Veteran] wait times, the . . . on a bipartisan basis, the Congress of the United States passed, and President Obama signed, the ability for you and for the senior leadership of this Dept. – the Dept. of Veterans Affairs, to expeditiously let go . . . senior executive service personnel that were not competent.  In my discussions with the Secretary [Robert Wilkie], he is unwilling to make that commitment to do that . . . to look through these 400 positions, [and] where there is objective failure and the inability to correct that

failure, by . . . [VA] Inspector General reports, by GAO [General Accountability Office] reports, and yet . . . you will never change the culture of bureaucratic incompetence in the VA, unless you're willing to look through those 400 positions, and . . . where there's . . . a lack of competence, where problems are unresolved . . . where you're unwilling to make those hard decisions . . . which you're which our Secretary [Wilkie] is not willing to do, and which you've obviously haven't done . . . then nothing will change.  This President [Donald J. Trump] will fail the Country, in terms of the commitments that he made to change the VA . . . he changed the [VA] Secretary [i.e., former VA Secretary David Shulkin], but that was on the basis of . . . his [former VA Secretary David Shulkin's] record in terms of personal spending . . . taxpayer dollars on [an improper] European vacation.  It was not on his [David Shulkin's] competence on running the VA.  This is the same VA of the prior [President Obama] administration . . . just papered over with [VA] saying how great things are, when they're not great.  I yield back [my time].

Id.

## Part X. Conclusion[69]

129.    In order for VA to implement the Accountability Act correctly as Congress intended, the agency must empower, allow, and require OAWP to meet its statutory obligations; coordinate and synergize lawfully with the OIG and DOJ as appropriate; and make proper recommendations to the Sec'y of VA as mandated, without undue conflicts, influence, or involvement from other VA offices, including OGC.[70]  It remains to be seen and time will tell, whether OAWP will be allowed and capable of functioning as intended, while being physically located in VA headquarters.

130.    Additionally, the Sec'y of VA must possess and exhibit the credibility, integrity, and wisdom necessary to carefully consider OAWP's disciplinary recommendations with utmost

[69] The Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint by reference, as though fully set forth herein (with the exception of those sections where it is indicated Defendants need not respond).

[70] See Nikki Wentling, "VA inspector general accuses acting VA secretary of concealing information," Stars & Stripes, June 20, 2018, at:  https://www.stripes.com/news/va-inspector-general-accuses-acting-va-secretary-of-concealing-information-1.533822.  See also Eric Katz, "Senate Intervenes on Behalf of [the OIG] After VA Questions the Watchdog's Authority," June 22, 2018, at:  https://www.govexec.com/management/2018/06/senate-intervenes-behalf-ig-after-va-questions-its-authority/149222/.

integrity, and consistently and evenly hold all VA employees accountable, including senior VA officials.  VA must also unwaveringly support and protect the agency's whistleblowers, and relentlessly deter, confront, and punish those employees that seek to threaten, intimidate, and silence them.  Failure to correct these deficiencies will cause further harm to employee morale; hamper the agency's recruitment and retention efforts; engender further cynicism and mistrust about VA; and thwart the agency's sacred obligation -- *"to care for those who shall have born the battle, and for their families, caregivers, and survivors."*[71]

### **Part XI. Relief Sought**[72]

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor, and grant the following relief:

A.      Monetary damages in the amount of $25,000,000.00, payable by a date certain, and in accordance with applicable law (e.g., 28 U.S.C. § 2679 & 31 U.S.C. § 1304).

B.      Declare that Gore was constructively terminated from VA, and require VA by a date certain, to award the Plaintiffs his back pay with interest, work time credited, and benefits accrued, from his last day of employment at VA (i.e., May 4, 2019) to the date of this Court's ruling.

C.      Declare that:  (i) the interim and final warning letters that Byrne issued to Fleck, as well as the corresponding requirement that Fleck take additional training violated the APA; were *ultra vires*; are invalid; contravened the Accountability Act, including the role of OAWP in the disciplinary process for senior VA officials; caused undue harm to the Plaintiffs; and are therefore void; and (ii) VA leadership knew or should have known that Byrne was behaving in an improper and illegal manner that would violate the Accountability Act, and failed to prevent such conduct.

---

[71]  *See* Nikki Wentling, "Two House lawmakers launch new effort to make VA motto gender inclusive," Stars & Stripes, Nov. 19, 2019, at:   https://www.stripes.com/news/two-house-lawmakers-launch-new-effort-to-make-va-motto-gender-inclusive-1.556957.
*See also* Veterans Legal Services Clinic, "Petition For Rulemaking To Promulgate Regulations Changing the Official Motto of the [U.S.] Dep't of Veterans Affairs, Yale Law School," Oct. 12, 2018, at:   http://iava.org/wp-content/uploads/2018/10/10.12.18-Petition-For-Rulemaking-final.pdf.
[72]  The Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint by reference, as though fully set forth herein. (with the exception of those sections where it is indicated Defendants need not respond).

D.      Along with the preceding Clause C above, declare that OAWP should:  (i) promptly confer with the OIG and DOJ regarding whether Byrne's acts to disregard the OIG's recommendation that Fleck be fired, as well as Hipolit's recommendation that Fleck be demoted to a non-supervisory position, and instead issue an interim and then final warning letter to Fleck, with a requirement that Fleck take additional training – constituted a violation of:  (a) 18 U.S.C. § 208, titled *"Acts affecting a personal financial interest;"* and (b) 18 U.S.C. § 1505, titled *"Obstruction of proceedings before departments, agencies, and committees;"* and (ii) take appropriate actions under the Accountability Act to document such findings; (iii) issue any disciplinary recommendations deemed appropriate for Byrne, to the Sec'y of VA; and (iv) take any additional actions as deemed appropriate.

E.      Declare that after Gore was no longer employed at VA as of May 4, 2018, VA failed to adequately and properly supervise and prevent Fleck (and by proxy Wiercinski) from continuing and perpetuating lies about Gore in the <u>Fleck v. Dep't of Veterans Affairs</u> case, given:  (i) the findings and recommendations of the OIG Report; (ii) the then VA Deputy Secretary's documented review and concurrence with the OIG Report; and (iii) Byrne's issuance of an interim and then final warning letter to Fleck, and requirement that Fleck take additional training (even if such actions of Byrne were *ultra vires* per the preceding Clause B).

F.      Declare that DOJ failed in its duty under Rule 3.3(d) of the D.C. Rules of Prof'l Conduct and Rule 3.3(b) of the ABA Model Rules of Prof'l Conduct, to clearly, consistently and unequivocally articulate in its briefs filed with this Court – that contrary to the repeated false allegations about Gore contained in the Plaintiff's briefs filed in <u>Fleck v. Dep't of Veterans Affairs</u> case, specifically at:  (i) ¶ 36 of the Fleck Complaint; (ii) ¶ 36 of the Amended Fleck Complaint; and (iii) pp. 3, 18 & 22-23 of the Fleck Opposition Motion – Gore did not telephone Wiercinski <u>in mid-Sept. 2016</u>, and offer her the e-discovery attorney position.

G.      Declare that OAWP should promptly confer with the OIG and DOJ regarding:  (i) Fleck's (and by proxy Wiercinski's) violation of:  (a) Rule 4.1, 8.4, and 3.3(a) of the D.C. Rules of Prof'l Conduct; (b) Rule 4.1, 8.4, and 3.3(a) of the ABA Model Rules of Prof'l Conduct; and (c) Rule 11(b)(3) of the Fed. R. Civ. P.; (f) Rule 3.3(a) of the D.C. Rules of Prof'l Conduct, by submitting multiple briefs to this Court in the <u>Fleck v. Dep't of Veterans Affairs</u> case, which constituted further fraudulent and reckless attempts to frame Gore – despite (iii) the contrary findings and recommendations of the OIG Report; (iv) the VA Deputy Secretary's documented review and concurrence with the OIG Report; and (v) Byrne's issuance of an interim final warning letters and an additional training requirement to Fleck (even if such actions were *ultra vires* per the preceding Clause B) – and then (vi) determine and issue per the Accountability Act – appropriately revised disciplinary recommendations regarding Fleck & Wiercinski, to the Sec'y of VA.

H.      Along with the preceding Clause G above, declare that OAWP should promptly confer with the OIG and DOJ regarding whether:  (i) Fleck & Wiercinski's conduct violated:  (a) 18 U.S.C. § 371, titled *"Conspiracy to commit offense or to defraud United States;"* (b) 18 U.S.C. § 1001, titled *"Statement or entries generally;"* (c) 18 U.S.C. § 1505, titled *"Obstruction of proceedings before departments, agencies, and committees;"* (d) 18 U.S.C. § 1621, titled *"Perjury generally;"* and (e) 18 U.S.C. § 1622, titled *"Subordination of Perjury;"* and (ii) OAWP should

take appropriate actions under the Accountability Act to document such findings; (iii) issue any disciplinary recommendations deemed appropriate for Fleck & Wiercinski, to the Sec'y of VA; and (iv) take any additional actions as deemed appropriate..

I.      Declare that the Sec'y of VA should as applicable, take the steps necessary following the events described in the preceding Clauses C, D, G, and H, to levy appropriate discipline regarding Byrne, Fleck & Wiercinski, under the Accountability Act.

J.      Declare that OAWP in coordination with the OIG and DOJ, should either as applicable by a date certain:  (i) report Fleck & Wiercinski to their underlying state bar associations, for their egregious misconduct as documented in the OIG Report; or (ii) provide documentary evidence to this Court that:  (a) evinces that such reporting has already occurred; and indicates (b) what results have transpired; and (c) what decisions are pending from each such jurisdiction.

K.      Along with any disciplinary actions that the Sec'y of VA determines should be taken in accordance with the preceding Clause I, declare that OAWP in coordination with the OIG and DOJ, should either as applicable:  (i) report Byrne to his underlying state bar association(s) for any misconduct that is confirmed under the preceding Clause D; (ii) report Fleck & Wiercinski to their underlying state bar associations, for any misconduct that is confirmed under the preceding Clauses G & H; or (ii) provide documentary evidence to this Court by a date certain that:  (a) evinces that such reporting has already occurred; and  indicates (b) what results have transpired; and (c) what decisions are pending from each such jurisdiction.

L.      Permanently enjoin the Defendants from making any further false statements or allegations that Gore telephoned and hired Wiercinski in Sept. 2016, where violations of the same shall be bases for the Plaintiffs to seek additional recourse and remedies against the Defendants.

M.      Compel the Defendants through DOJ, to provide this Court and Plaintiffs' counsel with recurring written status reports for the actions required in the preceding Clauses D, G, H, I, J, and K, every thirty days or at another interval as this Court may require, until the Defendants' required actions have been completed.

N.      Attorney's fees to Plaintiffs' counsel, as permitted under applicable law (e.g., 28 U.S.C. § 2678).

O.      Such other relief as this Court deems just and proper.

Respectfully Submitted,

**CAMERON GORE, ESQ.**
**HEATHER WOODS**

By Counsel,

**THE BROWN FIRM PLLC**

/s/ *Christopher Brown*
Christopher E. Brown, Esq.
D.C. Bar No. 458897
526 King Street, Suite 213
Alexandria, VA 22314
T: 703-924-0223
F: 703-997-2362
Email: cbrown@brownfirmpllc.com